## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN BAR ASSOCIATION<br>  321 North Clark Street<br>  Chicago, IL 60654<br><br>GEOFFREY T. BURKHART<br>  1912 W. Estes #2<br>  Chicago, IL 60626<br><br>MICHELLE D. QUINTERO-MILLAN<br>  306 12th St., NE<br>  Washington, D.C. 20002<br><br>JAMIE B. RUDERT<br>  16 17th St., NE, Unit 113<br>  Washington, D.C. 20002<br><br>and<br><br>KATE A. VOIGT<br>  2480 16th St., NW, Apartment 412<br>  Washington, D.C. 20009<br><br>    Plaintiffs,<br><br>      v.<br><br>UNITED STATES DEPARTMENT OF<br>EDUCATION<br>  400 Maryland Avenue, S.W.<br>  Washington, D.C. 20202<br><br>  and<br><br>JOHN B. KING, JR., *in his official capacity as*<br>*Secretary of Education*,<br>  400 Maryland Avenue, S.W.<br>  Washington, D.C. 20202<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Civil Action No. |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs – the American Bar Association ("ABA"), and Geoffrey Burkhart, Michelle

Quintero-Millan, Jamie Rudert, and Kate Voigt (the "Individual Plaintiffs") – complain and

allege as follows against Defendant United States Department of Education (the "Department" or "ED"), and Defendant John B. King, Jr., in his official capacity as Secretary of Education:

## SUMMARY OF THE ACTION

1.     This lawsuit seeks to hold the Department of Education accountable for promises it made to individuals who have dedicated their lives to public service.  Having entered their professions with six figures of educational debt, these individuals chose not to pursue high-paying jobs and to instead serve the public, relying on the Department's promise: Make payments on your federal loans while working in your public service jobs and, after ten years, the Public Service Loan Forgiveness ("PSLF") program will forgive your remaining debt.  The Department led these individuals and their employers to believe that they were working in qualifying jobs, on track for loan forgiveness.

2.     With no warning and no coherent explanation, the Department then changed its mind.  As a result, these individuals were told that their years of public service counted for naught, their debt loads continued to mount, and their hopes of future financial security were suddenly dashed.  Many nonprofit organizations, the ABA among them, will now struggle to attract and retain the talented, committed professionals that the organizations need to address critical unmet public needs.  The Department's actions violate law and are contrary to basic principles of fairness and deeply damaging to the critical public service missions of these plaintiffs and the ABA.

3.     Congress enacted the PSLF program in 2007.  The next year, the Department adopted a regulation implementing the program, which is administered by the Secretary of Education.  The program provides incentives for graduates to pursue full-time public service careers by providing that a borrower-graduate's student loan debt balance will be forgiven if the

borrower complies with rigorous requirements.  Specifically, a borrower's loans will be forgiven only after she makes timely loan payments for ten years while working full-time in a public service job.

4.     The PSLF program broadly offers loan forgiveness to many public service employees, including those providing "public interest law services," "public education," "public service for individuals with disabilities," and "public service for the elderly," among a variety of other categories.

5.     Given that some borrowers began making PSLF-eligible payments in October 2007 – the earliest date permitted under the Act – and continued making eligible monthly payments, the first group of student loans will be eligible for forgiveness in October 2017.

6.     For many years, the Department informed public service employees – including those employed by the ABA and other nonprofit organizations – that they qualified for loan forgiveness under the PSLF program.  It appears that the Department began issuing denials of eligibility a few years ago – in advance of the date that the first set of loans would be forgiven – reversing prior eligibility determinations without any prior notice.

7.     On information and belief, Plaintiff ABA is only one of many nonprofit organizations impacted by the Department's reversal of prior eligibility determinations.  The ABA devotes substantial resources to its public service mission and champions public education and the provision of public interest law services.

8.     Each of the Individual Plaintiffs in this lawsuit graduated from law school with six figures in student loan debt.  All of the Individual Plaintiffs then decided to pursue careers serving the public.  Jamie Rudert served disabled and aging Vietnam-era veterans and their families.  Michelle Quintero-Millan provided legal services to unaccompanied immigrant minors

on the U.S.-Mexico border.  Geoffrey Burkhart works to improve public defender systems in the United States.  Kate Voigt educates the public about crucial issues facing immigrants in this country.  The annual salaries for these jobs are low – just a fraction of the Individual Plaintiffs' outstanding student debt at the time they began their public service.

9.      Despite their financial sacrifices, the promise of loan forgiveness under the PSLF program allowed the Individual Plaintiffs to plan for a career in public service with some promise of future financial stability.  All of the Individual Plaintiffs asked whether working for their respective organizations rendered them eligible for the PSLF program.  They made their decisions to accept their positions, and/or stay in their positions, based largely on the understanding that their employment would qualify for the program.

10.     The Department confirmed with three of the Individual Plaintiffs that their employment would allow them to qualify for loan forgiveness if they continued to make loan payments while in those positions.  These Plaintiffs were provided confirmation that they had already made several months – or, in one case, several years – of past qualifying loan payments under the program.  The remaining Individual Plaintiff believed she would qualify for loan forgiveness because of the public service nature of her work and the fact that her employer was a nonprofit organization whose eligibility as a qualifying employer had already been certified by the Department.

11.     Safe in the knowledge that they were on track for loan forgiveness, the Individual Plaintiffs continued in their public service jobs.  Given their low annual salaries, the Individual Plaintiffs took steps to ensure they could make their loan payments for ten years while also covering their living expenses.  The Individual Plaintiffs entered into income-driven repayment plans.  This approach allowed them to meet their month-to-month expenses, but it meant that

their payments struggled to cover even just the interest on the loans, leaving the bulk of the principal intact. In some cases, the Individual Plaintiffs' loan balances continued to grow dramatically while they worked in their public service jobs.

12. Years after some of the Individual Plaintiffs had committed to public service jobs, the Department changed its interpretation of the PSLF provisions – without notice or explanation. As a result, the Individual Plaintiffs were told that their employment no longer qualified for loan forgiveness.

13. Those Individual Plaintiffs who had previously received confirmation of their eligibility were also informed that the change of interpretation would apply retroactively. These Plaintiffs were informed that their prior public service would no longer be considered eligible and their prior payments would no longer count toward loan forgiveness under the PSLF program.

14. This new interpretation seriously harms borrowers who have made career, financial, and life choices – many of them irrevocable – in reliance on the availability of loan forgiveness and the Department's prior certifications of eligibility.

15. The new interpretation also inhibits the public service mission of the ABA with respect to its ability to attract and retain high-caliber employees. At least one employee has already left the ABA upon hearing of the Department's recent decisions disqualifying ABA employment from PSLF eligibility. Other employees have indicated that they will struggle to continue working for the ABA if their work for the ABA does not make them eligible for the program. Thus, the ABA faces the prospect of losing more employees as a result of the Department's actions. In recruiting, the ABA has found eligibility for the PSLF program to be a determinative factor in prospective employees' decisions on where to work.

16.     The Department's change of interpretation violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, for at least three reasons.

17.     First, the Department's interpretation of the PSLF eligibility criteria is incompatible with the enabling statute and the relevant regulation.  No reasonable reading of the Act and regulation could exclude the work performed by the Individual Plaintiffs, and work performed for the ABA, from the scope of the "public service jobs" that qualify for loan forgiveness.

18.     Second, even if the Department *could* permissibly have adopted such an interpretation, the Department did not follow an adequate or appropriate process for changing its interpretation.  The Department failed to provide any explanation for its complete turnaround, let alone give reasons that would justify sweeping aside the Individual Plaintiffs' settled reliance interests.  Nor did the Department provide any prior notice that it had changed its interpretation.

19.     Third, the Department lacked statutory authorization to apply its new interpretation retroactively.  Even a legitimate new interpretation achieved through an adequate process would not have allowed the Department to simply ignore its prior eligibility certifications and purge borrowers' past years of qualifying public service.

20.     The Department's actions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  This Court should declare that they violate the APA and constitute a violation of due process, and it should order the Department to strictly comply with the Act and remedy the harm to graduates in public service, their employers, and the communities they serve.

**THE PARTIES**

21.     The ABA is a voluntary organization for legal professionals in the United States and around the world, headquartered in Chicago, Illinois.   The ABA supports the legal profession and the broader public by improving the administration of justice, providing direct public interest law services, educating the public about important legal issues, administering charitable initiatives, accrediting law schools, and establishing model ethics codes.

22.     Jamie Rudert is a former employee of Vietnam Veterans of America.   He currently works for Paralyzed Veterans of America as Associate General Counsel for Appeals. He works and resides in Washington, D.C.

23.     Kate Voigt is an employee of the American Immigration Lawyers Association. She has worked there since 2012 and currently serves as Associate Director of Liaison.   She works and resides in Washington, D.C.

24.     Geoffrey Burkhart is an employee of the ABA, where he was worked since June 2014.   He currently serves as Attorney and Project Director for the ABA's Division of Public Services.   Mr. Burkhart works and resides in Chicago, Illinois.

25.     Michelle Quintero-Millan is a former employee of the ABA, where she worked from June 2012 to May 2015.   She currently works as a refugee officer for United States Citizenship and Immigration Services.   She resides in Washington, D.C.

26.     The United States Department of Education is a federal agency headquartered in the District of Columbia with its principal office located at 400 Maryland Avenue, SW, Washington, D.C. 20202.

27.     John B. King, Jr., is sued solely in his official capacity as Secretary of Education, in which capacity he has the ultimate responsibility for the activities of the Department,

including the actions complained of herein.  Secretary King maintains an office at 400 Maryland Avenue, SW, Washington, D.C. 20202.

## JURISDICTION AND VENUE

28.    This Court has subject matter jurisdiction over this action because it is a case arising under federal law, *see* 28 U.S.C. § 1331, and because it is a case to compel federal agencies and officers to perform their duty, *see* 28 U.S.C. § 1361.

29.    The relief requested herein is authorized by the APA, 5 U.S.C. §§ 702-706, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and the All Writs Act, 28 U.S.C. § 1651.

30.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 because this is a civil action in which one of the defendants is an officer of the United States who resides in this judicial district or an agency of the United States that resides in this judicial district.

31.    Defendants have waived sovereign immunity as to the relief requested in this matter pursuant to 5 U.S.C. § 702.  *See Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006).

32.    The Department's decision not to certify the Individual Plaintiffs' applications for PSLF eligibility, its recent decision to reverse the eligibility of the ABA as a qualifying employer, and its decision to apply these determinations retroactively constitute final agency actions.  *See* 34 C.F.R. § 685.219(e)(3).

33.    No further exhaustion of remedies for the issues raised by this lawsuit is necessary and, in all events, further exhaustion would be futile.  As further alleged below, *see infra* ¶¶ 93-106, the ABA has raised the issue with the Department and has presented the material facts and arguments supporting eligibility, but the Department has not been willing to reconsider its interpretation of the Act or its denial of the Individual Plaintiffs' applications for certification.

34.     Defendants' actions give rise to an actual controversy for purposes of the Declaratory Judgment Act and Article III of the U.S. Constitution.

35.     Plaintiffs have no adequate alternative legal remedy.

## GENERAL ALLEGATIONS

I.      **Congress Created the Public Service Loan Forgiveness Program to Provide Financial Support for Borrowers Pursuing a Broad Range of Public Interest Careers.**

36.     Congress created the PSLF program when it passed the College Cost Reduction and Access Act of 2007 ("CCRAA" or the "Act"), signed into law by President George W. Bush on September 27, 2007.  The provisions relevant to the PSLF program are codified at 20 U.S.C. § 1087e(m).

37.     Those provisions state that the Secretary of Education shall cancel the remaining principal and interest due on any Federal Direct Loan (including Direct Subsidized Loans, Direct Unsubsidized Loans, Direct PLUS Loans, and Direct Consolidated Loans) where:

a. The loan is not in default;

b. The borrower has made 120 monthly payments since October 1, 2007 on an eligible Federal Direct Loan;

c. The borrower has been employed in a "public service job" at the time she made each of the 120 monthly payments; and

d. The borrower is employed full-time in a "public service job" at the time of the forgiveness.

38.      The Act's definition of public service jobs is broad.  The Act defines "public service job" to include a full-time job in a number of different areas, including:

    a. "public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a non-profit organization)";

    b. "public education";

    c. "public service for individuals with disabilities"; and

    d. "public service for the elderly."

39.    The Act does not further define the terms "public interest law services," "public education," "public service for individuals with disabilities," or "public service for the elderly." The Act does not require that the provision of any of these services be the "primary purpose" of an organization as a condition for eligibility. Indeed, the Act contains no other conditions that narrow the definitions of these bases for eligibility. It does not require, for example, that "public education" occur in a school or school-like setting.

40.    The purpose of the PSLF program is to encourage individuals to enter and continue working in public service.

41.    Senator Jay Rockefeller lauded the PSLF program as "a strong, long-term investment in our communities and families." Senator Edward Kennedy testified: "Our society needs more . . . public interest lawyers . . . . Under our bill, we will produce more of them, because they – and all the groups I have just mentioned – will be eligible for loan forgiveness."

42.    In establishing the PSLF program, Congress ensured that those pursuing many public service careers would not need to worry that their salaries would be insufficient to cover their loan repayments along with their living expenses. It was intended to encourage individuals to enter and continue in full-time public service employment.

43.    The PSLF program provides public service employers an important tool for recruiting. Many of these employers, as governmental entities and nonprofit organizations,

cannot otherwise attract law school graduates with high debt loads because these organizations are in a position to offer only relatively modest salaries.

## II.     Consistent with Congressional Intent, the Department's Implementing Regulation Established Broad Categories of Eligibility.

44.     In October 2008, the Department promulgated a regulation to implement the PSLF program, codified at 34 C.F.R. § 685.219.  It followed the mandate from Congress to offer loan forgiveness to individuals in a broad range of public interest jobs.

45.     The Department decided not to determine borrowers' eligibility by enumerating in the regulation the specific categories of legal jobs that would satisfy the term "public service job."  The Department took account of the view that an enumerated list of jobs would limit the definition of "public service organization" in a manner inconsistent with the intent of Congress.

46.     Instead, the regulation defines the term "public interest law" by reference to the employer.  "***Public interest law***" refers to "legal services provided by a ***public service organization***" when those activities "are funded in whole or in part by a local, State, Federal, or Tribal government."

47.     In turn, a "***public service organization***" is defined in the regulation as:

> (1) A Federal, State, local, or Tribal government organization, agency, or entity;
> (2) A public child or family service agency;
> (3) A non-profit organization under section 501(c)(3) of the Internal Revenue Code that [meets certain requirements];
> (4) A Tribal college or university; or
> (5) A private organization that—
>> (i) Provides . . . public services [including] ***public interest law services*** [or] ***public service for individuals with disabilities and the elderly***, [or] ***public education*** . . .; and
>> (ii) Is not a business organized for profit, a labor union, a partisan political organization, or an organization engaged in religious activities, unless the qualifying activities are unrelated to religious instruction, worship services, or any form of proselytizing.

48. The regulation does not require that the provision of any of these public services be the "primary purpose" of an organization as a condition for eligibility.

49. The regulation also does not include any other definitions or requirements that further narrow the definitions of "public interest law services," "public service for individuals with disabilities and the elderly," or "public education."

III. **The Department Implemented an Eligibility and Employment Certification Process to Allow Borrowers to Confirm Their Valid Participation in the Program.**

50. Following graduation, a borrower could choose to participate in the PSLF program by starting to make loan payments.

51. Any monthly payment made after October 1, 2007 counts toward a borrower's 120 PSLF-eligible payments if the payment meets the requirements of the PSLF program.

52. The required 120 monthly payments must be made under one or more Direct Loan Program repayment plans: Revised Pay As You Earn Repayment Plan ("REPAYE Plan"), Pay As You Earn Repayment Plan ("PAYE Plan"), Income-Based Repayment Plan ("IBR Plan"), Income-Contingent Repayment Plan ("ICR Plan"), 10-year Standard Repayment Plan, or any other Direct Loan Program repayment plan where the payments are at least equal to the monthly payment amount that would have been required under the 10-year Standard Repayment Plan.

53. To be eligible for PSLF, a borrower must be employed full-time at a public service organization as "full-time" is defined by the employer, provided that this definition equates to at least an annual average of 30 hours per week. Employment in more than one qualifying part-time job that amounts to a combined average of at least 30 hours per week also satisfies the "full-time" requirement.

54.     Eligible PSLF program borrowers need not make the required 120 monthly payments in consecutive payments, but they must be employed by a qualifying employer at the time each payment is made.  Thus, a borrower could receive PSLF credit for regular payments made while employed by a qualifying employer, then decide to work in a non-qualifying position for some time (during which time payments would not be credited toward PSLF), and subsequently re-enter qualifying employment, at which time she would resume receiving credit toward the 120 required payments for PSLF.

55.     PSLF program borrowers may not make qualifying payments before the grace period on their Federal Direct Loans has expired unless they consolidate their loans into a Direct Consolidation Loan during the grace period and immediately begin repayment.

56.     After a borrower has made the required 120 qualifying payments, she must submit an application for loan forgiveness.  The borrower must be employed by a qualifying employer at the time of the application and at the time forgiveness is granted.  Any remaining balance that is forgiven is not subject to taxation as income by the Internal Revenue Service.

57.     Following the inception of the PSLF program, the Department created an Employment Certification Form ("ECF") to allow borrowers to seek confirmation that they are on track for loan forgiveness.

58.     Borrowers are encouraged to file an ECF each year.  This is a way for an employee to verify that her employment qualifies for PSLF and that all of the payments made over the course of the last year of employment count toward PSLF eligibility.

59.     Each time an ECF is approved, the number of qualifying payments that the borrower has made is updated to include payments made during the period of employment that has been certified.  An application for forgiveness is likely to be processed more quickly if the

borrower has regularly submitted the ECF than it would be if the borrower had not regularly submitted this form.

60.    The Department uses the Pennsylvania Higher Education Assistance Authority (referred to here as "FedLoan Servicing," the name under which it does business) as its PSLF servicer.  FedLoan Servicing processes the ECFs to ensure that borrowers are in "qualifying employment" and making "qualifying payments" that will count toward the 120 payments required for loan forgiveness.

61.    On its website, FedLoan Servicing suggests to employers: "After you know that your organization qualifies for PSLF, use it as a recruiting opportunity!"

62.    On its website, the Department provides the following instructions to borrowers:

- We will review your Employment Certification form . . . to determine whether your employment is qualifying employment for the PSLF program. . . .

- We may ask you to provide additional information or documentation to help us determine whether you were employed by a qualifying public service organization. . . .

- If we determine that your employment qualifies, and if some or all of your federal student loans that are owned by the U.S. Department of Education are not already serviced by FedLoan Servicing (PHEAA), those loans will be transferred to FedLoan Servicing (PHEAA). . . .

- If we determine that your employment qualifies, we will then review your payment history . . . to determine how many payments made during the period of employment certified on the Employment Certification form are qualifying monthly payments for PSLF.  We will then inform you that your employment qualifies and notify you of the total number of qualifying payments you have made, and how many payments you must still make before you can qualify for PSLF.

63.     When a borrower's employment is certified as eligible for the PSLF program and FedLoan Servicing becomes the loan servicer, the borrower may create an online account through FedLoan Servicing.

64.     Surprisingly, there is no appeals process through FedLoan Servicing or the Department for any borrower receiving an adverse decision as to eligibility for the PSLF program.

65.     There is also no appeals process for any employer, such as the ABA, whose employees are denied eligibility for the program.

66.     Although FedLoan Servicing functions as the loan servicer, the Department retains final reviewing authority under the PSLF program.

67.     On information and belief, the Department has never delegated final decision-making authority under the PSLF program to FedLoan Servicing or any other entity.

**IV.    The Department Previously and Appropriately Determined the ABA to Be a Qualifying Employer Under the PSLF Program.**

68.     The ABA was founded in Washington, D.C. in 1878.  It serves as a leading voluntary professional association for legal professionals in the United States and around the world, with total membership in excess of 400,000 as of 2016.

69.     The ABA is not a business organized for profit, a labor union, a partisan political organization, or an organization engaged in religious activities.

70.     Among the ABA's stated goals are to "promote the highest quality legal education," "promote pro bono and public service by the legal profession," "increase public understanding of and respect for the rule of law, the legal process, and the role of the legal profession at home and throughout the world," and "assure meaningful access to justice for all persons."

71.     To achieve its public education objectives, the ABA operates several sections and divisions in furtherance of the enhancement of legal education at the law school level, for K-12 educational curriculum, and for experienced professionals.

72.     For example, the ABA's Section of Legal Education and Admissions to the Bar, formed in 1893, seeks to promote uniformity and quality in professional legal education.  The Section issues standards for schools in the administration of legal education, and, since 1953, its Council and Accreditation Committee have been recognized by the federal government as the national accrediting agency for J.D. programs.  Indeed, the Department is responsible for receiving and approving the ABA's periodic applications for renewed recognition as the accrediting agency.

73.     With respect to primary education, the ABA's Division for Public Education produces programs and resources for the public and for schools, including, for example, lesson plans for K-12 students and teachers relating to civics and the law.

74.     Apart from providing programming and materials for students, several ABA divisions provide regular trainings and CLE programs for practicing attorneys, author educational publications that are available to the public on the ABA's website, and contribute articles to various newsletters.

75.     The ABA also provides public interest law services.  These services are direct legal services funded in large part by the government.

76.     For example, the ABA's South Texas Pro Bono Asylum Representative Project ("ProBAR") serves as the nation's largest provider of legal services and legal rights education for detained unaccompanied immigrant children, with nearly 100 percent of its operations funded by the federal government.

77.     Still other ABA initiatives and projects support direct representation on matters involving children, the elderly, victims of domestic and sexual violence, families recovering from natural disasters, and similar constituencies.

78.     For example, among many other examples, the ABA's Commission on Homelessness and Poverty provides legal services aimed at removing administrative, civil, and criminal legal barriers for the homeless and those living in poverty to receive benefits, education, employment, and housing.

79.     The ABA's Commission on Disability Rights advocates for the rights of persons with disabilities to achieve full and equal enjoyment of human rights and participation in all aspects of society, including education, employment, health care, and housing.

80.     The ABA's Commission on Law and Aging works to strengthen and secure the legal rights, dignity, autonomy, quality of life, and quality of care of aging persons.

81.     The ABA's Rule of Law Initiative has worked to strengthen legal institutions, to support legal professionals, to foster respect for human rights and to advance public understanding of the law and of citizen rights in over 100 countries in the last 25 years.

82.     The ABA's Center on Children and the Law seeks to improve children's lives by helping to protect their rights, providing direct assistance to children, educating the public about important issues related to child welfare, and training and informing attorneys to improve the representation of children in the legal system.

83.     The ABA's charitable fund, the Fund for Justice and Education ("Fund") (a 501(c)(3) organization), supports the ABA's public service and educational programs.  Over 200 such programs are supported through the Fund each year.

84.     For the last fiscal year, these programs were funded by the ABA's own general revenue and by approximately $50 million in federal and private grants and contracts, charitable gifts, and donations, with total expenses exceeding $64 million.

85.     Following the establishment of the PSLF program, the ABA informed its employees of the availability of the program and several employees filed ECFs in order to obtain confirmation that they were employed in qualifying public service jobs.   Numerous ABA employees subsequently received confirmation that their employment with the ABA qualified them for participation in the PSLF program.

86.     The Department held a long-standing position that the ABA was a qualifying employer, consistent with its interpretation of the Act and its regulation.

87.     The ABA used the knowledge that its jobs qualified under the PSLF program when recruiting new staff.   Prospective employees have regularly asked the ABA whether it qualifies as an employer for PSLF purposes.   Previously, while its employees were routinely receiving approvals for PSLF eligibility, the ABA answered in the affirmative.

## V.     The Department's Reversal of its Prior Position and Corresponding Denial of Employee Certification Requests Have Adversely Impacted the ABA and Its Public Service Mission.

88.     Recently, the ABA has had to explain to prospective employees that its employees have started to receive denials of eligibility when submitting ECFs.   Negotiations during the final stages of potential employment broke down with candidates, who elected to go elsewhere due to the uncertainty surrounding the ABA's PSLF eligibility.

89.     The denials of eligibility have also had a significant impact on the ABA's ability to retain existing employees.   The ABA has lost employees to other organizations as a result of the Department's unexplained changed position on ABA employee eligibility.   Recently, for

example, a former employee and a member of the ProBAR initiative left the ABA to work for a qualifying employer and specifically cited the ABA's ineligibility for the PSLF program as a major reason for her departure.

90.     A number of other ABA employees also have indicated that they will seek alternative employment if the Department continues to deny applications from ABA employees.

91.     Managers at the ABA are understandably concerned about the organization's ability to continue to be competitive in hiring and retention.  Recruiting is already difficult given the relatively low salaries.  An attorney working for the ABA's ProBAR initiative makes an average of $52,500, for example; prior to September 2016, the average ProBAR attorney salary was just $47,500.  When employees receive salaries that are already low, the impact of loan forgiveness availability is significant and becomes a determining factor in whether an employee remains in a particular public service position.

92.     It is also difficult to attract employees to work in some of the more remote locations where the ABA provides its public services.  To work for the ABA's ProBAR initiative, for example, an attorney must relocate to Harlingen, Texas, a small town in the southern tip of the state.  The lack of eligibility for the PSLF program further exacerbates the problem.

## VI.    Despite the ABA's Requests, the Department Has Refused to Explain or Rescind Its Arbitrary Actions.

93.     The ABA's efforts to have the Department reaffirm its original position as to the eligibility of the ABA as a qualified PSLF employer have been unavailing.

94.     The ABA has written to, and met with, Department officials on several occasions this year.  The Department, however, refuses to rectify the problems caused by its denial of eligibility certifications submitted by ABA employees.

95.    For example, on April 7, 2016, Jack L. Rives, Executive Director and Chief Operating Officer of the ABA, wrote a letter requesting a meeting with Lynn Mahaffie, Acting Assistant Secretary of Education for the Office of Postsecondary Education, "to discuss recent decisions by your office indicating the Department of Education no longer considers any position at the American Bar Association eligible for [PSLF]" and to "address . . . the additional decision by your office to rescind prior years' approvals."

96.    In the April 7, 2016 letter, Mr. Rives further explained that the "[r]etroactive application" of this decision was "fundamentally unfair to those caught unaware," that it "materially harms [ABA] employees who have relied on the Department's historical approval in deciding to assume and remain in [ABA's] public service positions," and that "retroactive application renders meaningless a certification program intended to ensure public confidence and certainty in the PSLF program."  Mr. Rives stated that many of the affected positions are "100% funded by grants from 501(c)(3) organizations and the federal government," and that "[a]ny exclusion based solely on our 501(c)(6) status is an exclusion created by the Department, inconsistent with the language and spirit of the Congressional enactment."

97.    On April 18, 2016, Ms. Mahaffie met with Mr. Rives and his staff to discuss the concerns raised in his April 7, 2016 letter.

98.    On May 20, 2016, Mr. Rives wrote a letter to Ms. Mahaffie thanking her for meeting with ABA staff on April 18, 2016.  In the letter, he expressed the ABA's "strong[] disagree[ment]" with the Department's actions to reject the ABA as an eligible employer under the PSLF program, and noted that the ABA had "detailed for [the Department] the substantial qualifying public services the ABA provides – services that are a very explicit part of our mission and goals, and not merely incidental to the work of some."

99.     In his May 20, 2016 letter, Mr. Rives further noted that, with respect to the Department's change in policy, "no prior notice or discussion was communicated directly to those affected by the new method of evaluating PSLF-eligible employment," and that "the decision to rescind prior years' certification approvals is unconscionable."  Mr. Rives stated that the ABA had requested from the Department any guidance "regarding the rationale for the new interpretation, or any newly issued Department guidance that might have affected [FedLoan Servicing's] decisions," but that "[n]one has been forthcoming."   Mr. Rives concluded by reiterating the ABA's request for "(1) the immediate reversal of any rejection of an application for employment certification based solely on employment with the ABA, and (2) a retraction of the retroactive application of the new and still-secret standards."

100.     On May 26, 2016, Mr. Rives wrote a letter to Ted Mitchell, Under Secretary of Education, to request assistance with the "difficult problem" confronting the ABA as a result of ED's policy change to the PSLF program.   In the letter, Mr. Rives requested Under Secretary Mitchell's "immediate intervention to (1) suspend any further use of what appears to be a novel, secret evaluation of employer eligibility under PSLF; (2) take action to reverse any denial of employment certification decided solely on the basis of ABA employment; and (3) retract the rescission of prior years' approvals."

101.     In his May 26, 2016 letter, Mr. Rives also requested a meeting with Under Secretary Mitchell to discuss the matter.  Mr. Rives explained that he had met with Ms. Mahaffie in the preceding month, but that the "only relevant information [Mr. Rives] learned in the meeting was that the policy change that resulted in the use of new eligibility criteria did not originate in [Ms. Mahaffie's] office."  He stated that he "was given no additional information about why the policy was changed, how the decisions to make the changes were reached, and

why the changes were adopted without any public discussion or notice or other public process."

Mr. Rives continued by explaining the requirements for PSLF eligibility under the Department's

regulation, 34 C.F.R. § 685.219, and the reasons for which the ABA satisfies those requirements.

Specifically, he cited the ABA's mission statement and provided examples of the ABA's public

education and legal services.  *See* ¶¶ 70-76, *supra*.

102.    On June 21, 2016, Ms. Mahaffie wrote a letter to Mr. Rives explaining that, as

discussed during their meeting on April 18, 2016, "the Department has determined that the ABA

does not qualify as a public service organization for of [*sic*] PSLF purposes."   Although Ms.

Mahaffie acknowledged that "private organizations that provide public interest law services may

qualify as eligible employers for PSLF," she concluded that "no documentation from the ABA or

from a PSLF applicant demonstrates that the primary purpose of the ABA is to provide 'public

interest law services' [as] the term is defined in the PSLF regulations."

103.    On September 19, 2016, Under Secretary Mitchell met with Mr. Rives, ABA

President Linda Klein, ABA President-elect Hillarie Bass, and ABA staff to discuss their

concerns with the Department's administration of the PSLF program.   At the meeting, Under

Secretary Mitchell indicated that he would follow up with Mr. Rives within 30 days regarding

steps the Department may take to address these concerns.

104.    On December 1, 2016, Under Secretary Mitchell wrote a letter to Mr. Rives

following their September 19, 2016 meeting.   In the letter, Under Secretary Mitchell conceded

that, upon review of the Department's "processes for evaluating PSLF employment certification

requests, the information currently available on the studentaid.ed.gov website regarding PSLF,

and the notifications that we send to PSLF applicants[,] [w]e agree that more detailed

information on the PSLF webpage would be helpful to borrowers.   We also agree that

notifications to borrowers should provide more detailed explanations for the decisions."  Under Secretary Mitchell explained that, as a result of its discussions with Mr. Rives and ABA staff, the Department planned to "provide more information on the PSLF webpage" regarding employer eligibility and other items, and to "enhance communications with borrowers by revising the borrower notifications" to provide "more detailed" and "clear[]" explanations when the Department has determined that a borrower's employer is not eligible or that the employer does not perform a qualifying service.  Letter to Jack Rives, Dec. 1, 2016, attached as Exhibit A.

105.    Under Secretary Mitchell proceeded in his December 1, 2016 letter to inform Mr. Rives that the Department had "re-reviewed" his request to reconsider ABA employees' eligibility for PSLF, but that the Department had reached the same conclusion that ABA employees were not eligible for the reasons explained in Ms. Mahaffie's June 21, 2016 letter. Specifically, Under Secretary Mitchell stated that the Department had "not received documentation to date that shows ABA's primary purpose is to provide 'public interest law services' as defined in the PSLF regulations; thus we cannot determine that ABA qualifies as a public service organization for PSLF purposes."  Exhibit A.

106.    To date, the Department has not provided any adequate explanation as to why it reversed its previous position that the ABA was a qualified employer, nor the basis for the apparent adoption of a "primary purpose" test.  Neither has the Department explained its decision to retroactively – without any notice or ability to comment – deny eligibility to ABA employees and others whose eligibility the Department previously confirmed.

**VII.    The Experiences of the Individual Plaintiffs Underscore the Unfairness of the Department's Actions and Its Denials of Their Eligibility for Loan Forgiveness Under the PSLF Program.**

**A.    Jamie Rudert**

107.    Jamie Rudert obtained his law degree from American University Washington College of Law in May 2010.  He was admitted to the Maryland Bar in June 2011 and to the District of Columbia Bar in June 2012.

108.    Mr. Rudert took out federal student loans to fund his law school tuition.  Upon graduation, his loan balance was $134,808.16, with an interest rate of 7.625%.

109.    Having worked for the Legal Aid Society before law school and participated in a disability rights clinic while in law school, Mr. Rudert knew he wanted to use his law degree to serve the public.

110.    Mr. Rudert knew of the PSLF program while in law school.  He saw the program as an opportunity to serve the public while maintaining financial stability.

111.    After searching for full-time public interest work for around two years after graduating, Mr. Rudert began working for Vietnam Veterans of America ("VVA") in April 2012.  During the application process, he asked whether employees at the organization qualified for the PSLF program.

112.    VVA is a 501(c)(19) organization, founded in 1978, that works to make sure that veterans who have served our country receive the care and respect they have earned.  The organization educates the public to change the perception of Vietnam veterans, advocates on their behalf, and provides a wide range of support services to those veterans.  Those services include representing aging and elderly veterans in their claims for benefits from the Veterans Administration for their service-connected disabilities.

113.    Mr. Rudert worked as an Appellate Attorney at VVA until May 2013, when he was promoted to Deputy Director.  As an Appellate Attorney, Mr. Rudert represented Vietnam veterans appealing to the Board of Veterans' Appeals the denial of benefits for their service-connected disabilities.  As Deputy Director, Mr. Rudert continued to represent veterans in their appeals, while also supervising other attorneys providing similar services at VVA.

114.    Soon after starting work at VVA, Mr. Rudert submitted an ECF, following the recommendation FedLoan Servicing provides on its website:

> We recommend that you submit your first ECF after you are confident that you have qualifying loans and have made some qualifying payments. If you do so, you get early confirmation that you are on the right track.

115.    In a notice dated July 7, 2012, Mr. Rudert was informed that his employment and loan payments from April 1, 2012 through June 18, 2012 qualified under the PSLF program.  FedLoan Servicing Letter to Jamie Rudert, July 7, 2012, attached as Exhibit B.

116.    If Mr. Rudert had instead been informed that his employment with VVA did not qualify, he would have left and found a job that did qualify.  Despite his commitment to the role, he believed the PSLF program was his only path to financial stability.

117.    Because Mr. Rudert had made qualifying payments, FedLoan Servicing became the loan servicer for all of his federal student loans.

118.    Mr. Rudert later filed another ECF.  He received a notice on October 30, 2014, confirming that his employment and payments from June 19, 2012 through October 21, 2014 qualified under the PSLF program.  *See* FedLoan Servicing Letter to Jamie Rudert, Oct. 30, 2014, attached as Exhibit C.

119.    By FedLoan Servicing's count, as of January 2015, Mr. Rudert had made 30 qualifying payments.

120.    Mr. Rudert left VVA in September 2015.   By the time of his departure, Mr. Rudert believed he had made 37 qualifying payments.

121.    In early 2016, Mr. Rudert submitted an ECF to account for his payments between his last certification in October 2014 and his departure from VVA in September 2015.   This time, his certification was denied.   He received a letter from FedLoan Servicing, dated April 19, 2016, informing him that VVA "does not qualify" under the PSLF program.   Mr. Rudert's loan payments from October 22, 2014 to September 11, 2015 would not count toward his 120 qualifying payments for the PSLF program.   *See* FedLoan Servicing Letter to Jamie Rudert, Apr. 19, 2016, attached as Exhibit D.

122.    FedLoan Servicing also indicated that Mr. Rudert's denial would be applied retroactively.   Thus, none of Mr. Rudert's payments over the course of more than three years at the VVA would count toward his qualifying PSLF payments, despite FedLoan Servicing's two previous certifications recognizing that Mr. Rudert had been in qualifying employment from April 2012 to October 2014.

123.    There was no material change in Mr. Rudert's employment between the time his service was certified as qualifying for the PSLF program and the time his later application for certification was denied.

124.    Mr. Rudert called FedLoan Servicing on three occasions in April 2016 to request an explanation for the denial.   On April 18 and April 28, a FedLoan Servicing representative told Mr. Rudert that his employment with VVA did not qualify because VVA was not a 501(c)(3) and that it did not provide a qualifying public service.   On the latter of those two calls, Mr. Rudert was told that "public service for individuals with disabilities" is undefined.   On another call, however, on April 25, a FedLoan Servicing representative told Mr. Rudert that there was no

apparent reason for the denial and that it could have been because of FedLoan Servicing's belief that VVA provided partisan legal assistance.

125.    Mr. Rudert submitted a complaint to the Consumer Financial Protection Bureau ("CFPB") in April 2016.  The CFPB then contacted FedLoan Servicing, which responded via the CFPB, attaching a letter dated July 18, 2016.  The letter explained that the employment "had initially been approved in error" but that "it was determined that the Vietnam Veterans of America was not considered as qualifying public service [*sic*] for the purposes of the PSLF program."  After receiving the complaint through the CFPB, FedLoan Servicing reviewed the situation "in conjunction with the Department" and "the same conclusion was reached."  The letter failed to provide any explanation for the decision that VVA did not provide "public service for individuals with disabilities and the elderly."

126.    Mr. Rudert also contacted the constituent service office of his U.S. Representative, Eleanor Holmes Norton.  Rep. Norton's office contacted the Department.  On August 8, 2016, the Department responded, claiming: "This employment does not qualify due to their funding source and while they facilitate the provision of disability-related services to Vietnam Veterans, they do not provide the services outright."

127.    From September 2015 to the present, Mr. Rudert has been employed by Paralyzed Veterans of America ("PVA"), a 501(c)(3) organization, as Associate General Counsel of Appeals.  His work at PVA is almost identical to his former work at VVA.  He continues to represent veterans in their appeals to the Board of Veterans' Appeals of the denials of their applications for service-connected disability benefits.

128.    In the spring of 2016, Mr. Rudert submitted an ECF for his work at PVA.  He received notice on April 16, 2016, that his employment at PVA qualifies for the PSLF program. *See* FedLoan Servicing Letter to Jamie Rudert, Apr. 16, 2016, attached as Exhibit E.

129.    If Mr. Rudert's prior work with the VVA was still considered qualifying employment, he would instead be deemed to have made 45 qualifying payments under the program as of April 16, 2016.  Instead, as of that date, Mr. Rudert has been deemed to have made just six qualifying payments.

### B.    Kate Voigt

130.    Kate Voigt attended Boston College Law School, graduating in 2011.  She was admitted to the New York State Bar in January 2012.

131.    She knew, upon entering law school, that she wanted to perform public service on behalf of immigrants.  She had gained volunteer experience in this area while in college, had worked at the American Immigration Council – a 501(c)(3) organization – before attending law school, and had completed an internship at an immigrant rights organization during her legal studies.

132.    Upon graduation, Ms. Voigt returned to the American Immigration Council to work in a temporary position, funded by her law school.  While working there, she looked for permanent jobs.

133.    In December 2011, Ms. Voigt accepted a position with the American Immigration Lawyers Association ("AILA") in the Liaison Department.  She currently serves as Associate Director of Liaison.

134.    Ms. Voigt's organization performs a number of functions to serve immigrants, including providing education to the public about issues affecting immigrants.  For example, it

publishes on its website a broad range of news and information on immigration issues. It summarizes and comments on proposed and enacted immigration-related legislation and regulations. It provides updates on communications with members of Congress and government officials, and on briefs filed and decisions rendered in immigration cases. The organization also regularly makes requests for immigration-related information from the government via the Freedom of Information Act ("FOIA") and publishes the information it receives on its website to allow for public access. For its part, Ms. Voigt's department produces several documents that are made available to the public, including AILA's comments submitted in response to proposed regulations, amicus briefs and alerts, and correspondence with the government.

135. Shortly after beginning work at AILA, Ms. Voigt contacted the Department to ask whether her position at AILA would be qualifying employment for the purposes of the PSLF program. Department staff informed her in an email that her employment at AILA would indeed qualify for the program. *See* Email from Department of Education to Kate Voigt, June 20, 2012, attached as Exhibit F.

136. Largely as a result of this confirmation from the Department, Ms. Voigt decided to continue working at AILA. Had she learned that her employment at AILA did not constitute qualifying employment, she would have considered other job opportunities at organizations that qualified.

137. Ms. Voigt also selected her repayment plan based on the confirmation that her employment with AILA qualified under the PSLF program. She decided to use the IBR Plan, which capped her payments at 15% of her discretionary income (where her discretionary income is defined as the difference between her income and 150% of the federal poverty line). As a result, her student loan balance grew over time.

138.    After working for AILA for over two years, Ms. Voigt learned in a letter dated December 10, 2014 that the Department no longer considered AILA a qualifying employer under the PSLF program.   The letter acknowledged that the Department had informed Ms. Voigt in 2012 that AILA qualified, but claimed that it had changed course.   *See* Department of Education Letter to Kate Voigt, Dec. 10, 2014, attached as Exhibit G.

139.    The letter explained:

> For PSLF purposes, the Department considers "public education services" to be services that provide educational enrichment or support directly to students or their families in a school or school-like setting.  Because AILA's educational activities are directed primarily to its members and to the public in general, not to students or families, and are not provided in a school or school-like setting, AILA does not provide public education for the purposes of the PSLF program.

> Exhibit G.

140.    The letter explained that a manager at the Department had conducted an additional review of AILA's eligibility for the PSLF program before a final decision had been made.  Exhibit G.

141.    Again, the decision applied retroactively, despite the Department's prior communication to Ms. Voigt that AILA was a qualifying employer.

142.    Ms. Voigt contacted the Department on December 30, 2014 to contest its interpretation of her eligibility.  She has yet to hear back from the Department.

143.    Also on December 30, 2014, Ms. Voigt requested information from the Department under FOIA.  She asked for:

> i. A list of organizations that have qualified for the PSLF program despite not being 501(c)(3) organizations;

ii. A list of non-501(c)(3) organizations that had not qualified for the PSLF program;

iii. Documents relevant to the Department's determination of which organizations qualify for the PSLF program; and

iv. Documents regarding whether AILA qualified for the PSLF program.

144.    The Department informed Ms. Voigt that it would be unable to process her FOIA request within the 20 working-day limit "due to exceptional circumstances."

145.    On March 11, 2015, the Department sought clarification of part of Ms. Voigt's FOIA request.  Ms. Voigt responded on March 18, 2015.

146.    The Department provided an interim response on May 5, 2015, explaining that it had identified 200 pages of responsive documents – addressing parts (iii) and (iv) of her request – but that 198 of those pages were withheld.  The Department claimed that the records were exempt from the disclosure under 5 U.S.C. § 552(b)(5)-(7) because they were covered by the deliberative process, their disclosure would constitute a clearly warranted invasion of personal privacy, and/or the records were compiled for law-enforcement purposes.  The Department did not identify which documents fell within each purported exemption.

147.    On July 1, 2015, the Department told Ms. Voigt that it was unable to find any records responsive to parts (i) and (ii) of her request because the records were housed on FedLoan Servicing's systems and were not federal records.

148.    Ms. Voigt submitted a letter on August 4, 2015, appealing – on a number of grounds – the failure to provide the information requested under FOIA.

149.   On June 13, 2016, a FOIA Analyst at the Department emailed Ms. Voigt to apologize for the delay and to ask if she was still interested in pursuing her appeal.  Ms. Voigt responded within minutes, confirming that she remained interested in pursuing the appeal.

150.   Ms. Voigt has heard nothing further from the Department regarding her appeal.

151.   Ms. Voigt also complained to the CFPB.  FedLoan Servicing wrote Ms. Voigt a letter in November 2016, confirming that the Department had determined that AILA no longer qualified.  FedLoan Servicing further stated that the Department's determinations are final and that further questions should be directed to the Department.

152.   At the time she received the denial letter in December 2014, Ms. Voigt believed, based on this Department's prior confirmation of AILA's eligibility, that she had made 30 qualifying payments under the program.  Regardless, the Department now deems that Ms. Voigt has not made any qualifying payments.

153.   Ms. Voigt's student loan balance was approximately $210,000 when she started working for AILA.  By the time the Department reversed course in December 2014, the balance had increased to approximately $230,000.  As of December 2016, the balance is over $244,000.

### C.   Geoffrey Burkhart

154.   Geoffrey Burkhart graduated from DePaul University College of Law in 2008.

155.   Mr. Burkhart took out federal student loans to assist with his law school expenses. Upon graduation, his student loan balance totaled over $150,000.

156.   After working for one year at a law firm following his graduation, he decided to pursue a career in public service.  Mr. Burkhart spent four years as a public defender in Chicago before embarking on a one-year judicial clerkship.  From there, Mr. Burkhart moved to the ABA to work in the position of Attorney and Project Director for the Division of Legal Services,

focusing on indigent defense.  In that role, he works with the ABA Standing Committee on Legal Aid and Indigent Defendants ("SCLAID"), the ABA's oldest standing committee.

157.    As of December 21, 2016, Mr. Burkhart will assume a new position within the ABA as Deputy Director of the Center for Innovation, where he will focus on improving civil legal services and criminal justice for the poor.

158.    In his current role, Mr. Burkhart seeks to improve public defense throughout the United States, focusing on issues related to the delivery of criminal defense services to indigent persons accused of crimes.  His division seeks to accomplish this objective by providing testimony, filing amicus briefs, and engaging in general advocacy on these issues.

159.    Mr. Burkhart's division also educates the wider legal community on issues related to public defense by providing presentations and trainings to develop standards across the public defender community nationwide, issuing publications available to defense attorneys, researchers, academics, and the general public on its website, and submitting articles to public defense newsletters.  In addition, the division hosts an annual summit on public defense, featuring topics related to the provision of public defense services and the structure of and innovation in public defense systems.

160.    Mr. Burkhart's division receives approximately 40 percent of its funding from government entities, including the United States Department of Justice, the Louisiana Public Defender Board, and Texas A&M University.

161.    In deciding to accept a position at the ABA, Mr. Burkhart placed great reliance on the promise of loan forgiveness provided by the PSLF program, choosing to give up more lucrative employment opportunities that were available to him.  He would not have accepted the

position at the ABA had he known that he would not be eligible for loan forgiveness under the PSLF program.

162.     Indeed, prior to joining the ABA, Mr. Burkhart, who was aware that the ABA had 501(c)(6) rather than 501(c)(3) status, contacted both the ABA and FedLoan Servicing to inquire as to whether his job would qualify for the PSLF program.  Both organizations assured him that it would.

163.     After commencing his employment at the ABA, Mr. Burkhart submitted an ECF to FedLoan Servicing on July 7, 2014, which was approved.  *See* FedLoan Servicing Email to Geoff Burkhart, June 28, 2016, attached as Exhibit H.

164.     On October 12, 2016, more than two years after his ECF was approved, Mr. Burkhart received a letter from FedLoan Servicing informing him that, following "further research and after consulting with the Department," it had reversed his previously approved employment period because his employer "do[es] not provide a qualifying service."  *See* FedLoan Servicing Letter to Geoff Burkhart, Oct. 12, 2016, attached as Exhibit I.

165.     The diligence Mr. Burkhart exhibited in certifying – almost immediately after assuming his role – that his ABA employment qualified was exercised in vain.  As a result of the Department's reversal, all of Mr. Burkhart's loan payments made since July 7, 2014 no longer qualified toward the 120 total needed to obtain loan forgiveness under the PSLF program.  In total, therefore, Mr. Burkhart made nearly two-and-a-half years' worth of payments with the belief, based on his prior certification, that he was accruing credit toward the 120-payment threshold.  As a result, Mr. Burkhart's credited payments remain the same as when he started working at the ABA more than two-and-a-half years ago.

### D.      Michelle Quintero-Millan

166.      Michelle Quintero-Millan graduated from the Sturm College of Law at the University of Denver in 2012.  She was admitted to the State Bar of Texas in 2013.

167.      Prior to entering law school, Ms. Quintero-Millan sought out the advice of a financial aid officer due to concerns about her already large student debt load, which she had incurred while obtaining a master's degree.  The financial aid advisor informed her of the PSLF program, which eased her fears about taking out more student loans in pursuit of a J.D.

168.      Shortly after graduating from law school, Ms. Quintero-Millan was hired by the ProBAR Children's Project as a staff attorney.

169.      Due to the significant travel involved in her job, which required her to visit detention centers across south Texas, Ms. Quintero-Millan had to purchase a car upon starting her employment with ProBAR.

170.      In her time at ProBAR, Ms. Quintero-Millan provided direct pro bono legal services for unaccompanied undocumented immigrant children, including by making frequent appearances in immigration and state court, representing such children in removal proceedings, assisting them in filing for visas, filing complaints against Border Patrol officers for verbal and physical abuse, and counseling children who expressed a desire to return to their home countries. After two years, she was promoted to the position of supervising attorney.  In that role, Ms. Quintero-Millan continued to provide direct legal services, while also hiring and overseeing staff attorneys for the organization.

171.      In May 2015, Ms. Quintero-Millan left ProBAR in order to relocate to Washington, D.C. and be closer to her spouse.  She accepted a position at Catholic Charities, a 501(c)(3) organization, where she remained for four months.

172.    In August 2015, Ms. Quintero-Millan entered her current position as a refugee officer with United States Citizenship and Immigration Services ("USCIS"), a component of the United States Department of Homeland Security.

173.    In late 2015, having previously heard about the PSLF certification process while dialed in to a session at a public interest conference attended by her former ProBAR colleagues, Ms. Quintero-Millan decided to complete and submit three separate ECFs – one for each of her post-law school employers – to certify the eligibility of her past payments for the PSLF program. While she promptly obtained notices confirming the eligibility of payments made while she was employed at Catholic Charities and USCIS, she did not receive any confirmation regarding her payments while employed at ProBAR for several months.

174.    In early 2016, Ms. Quintero-Millan received notice from FedLoan Servicing that the Employer Identification Number ("EIN") on her ECF for her time at ProBar was incorrect. Ms. Quintero-Millan had the form corrected and resubmitted it to FedLoan Servicing.

175.    On November 19, 2016, Ms. Quintero-Millan received a notice from FedLoan Servicing informing her that her employment at ProBAR did not qualify under the PSLF program, with the result being that the two-and-a-half years' worth of payments made during her nearly three years at ProBAR were ineligible for PSLF.  *See* FedLoan Servicing Letter to Michelle Quintero-Millan, Nov. 19, 2016, attached as Exhibit J.

176.    As a result of the ineligibility of Ms. Quintero-Millan's employment at ProBAR for the PSLF program, she is deemed to have made only approximately one-and-a-half years' worth of payments toward loan forgiveness, as opposed to being nearly one-half of the way toward making the necessary ten years' worth of payments.

177.    Ms. Quintero-Millan's student loan balance, which was approximately $340,000 when she first started making payments after law school, now stands at approximately $420,000.

## VIII.   The Department Did Not Provide Any Notice or Follow Any Procedures Before Reversing Prior Determinations and Denying Eligibility to the ABA and Individual Plaintiffs.

178.    The Department did not engage in any notice-and-comment rulemaking at any time after October 2008 that affected the interpretation of the terms "public interest law," "legal services provided by a public service organization," "public education," "public service for individuals with disabilities," or "public service for the elderly," as those terms are used in the PSLF program under 20 U.S.C. § 1087e(m) and 34 C.F.R. § 685.219.

179.    During the same time period, the Department did not issue any public letters, memoranda, or any other statements of policy or guidance documents that affected the interpretation of any of those terms as used in the PSLF program under 20 U.S.C. § 1087e(m) and 34 C.F.R. § 685.219.

180.    During the same time period, the Department did not notify borrowers that it had changed its interpretation of any of those terms as used in the PSLF program under 20 U.S.C. § 1087e(m) and 34 C.F.R. § 685.219.

181.    To date, the Department has not issued any adequate explanation or rationale for its decisions to deny employees of the ABA, including some of the Individual Plaintiffs, eligibility under the PSLF program.

182.    With respect to Plaintiffs Burkhart, Rudert, and Voigt, the Department has not provided any adequate explanation for the denial of their eligibility determinations and the corresponding retroactive purge of their previously established years of eligibility under the PSLF program.

**COUNT I – 5 U.S.C. § 706(2)**
**(Arbitrary and Capricious Agency Action)**
**(All Plaintiffs Against All Defendants)**

183.    Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 182 (and all subparts thereto) as if set forth fully herein.

184.    The APA provides a cause of action in federal district court for any person aggrieved by final agency action.  *See* 5 U.S.C. §§ 702-704.

185.    The APA provides that the reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or not in accordance with law.  *Id.* § 706(2)(A).

186.    When an agency changes its position on its interpretation of a rule, it must – at a minimum – acknowledge that it is changing its position and provide an explanation for the new policy.  The explanation must show that there are good reasons for the new position, including reasons sufficient to justify disregarding the facts and circumstances that gave rise to – or were created by – the prior policy.

187.    The explanation must also demonstrate that the agency is taking into account any serious reliance interests that the preexisting interpretation may have engendered.

188.    A change in interpretation that does not meet these standards is arbitrary and capricious and must be set aside.

189.    The Department changed its interpretation of the PSLF eligibility requirements without explanation.

190.    In the absence of any explanation, the Department did not demonstrate that it took into account the Plaintiffs' serious reliance interests regarding retention and recruitment and the

ability to obtain loan forgiveness that resulted from the prior interpretation and the certifications of PSLF eligibility.

191.    The agency therefore acted arbitrarily and capriciously.  Its new interpretation should be set aside.

192.    To the extent the Department's new interpretation is in fact the subject of a new rule, the new rule must be set aside for the Department's failure to comply with the required notice-and-comment rule making procedures.  *See* 5 U.S.C. § 553.

### COUNT II – 5 U.S.C. § 552
### (Failure to Make Required Information Available to the Public)
### (All Plaintiffs Against All Defendants)

193.    Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 192 (and all subparts thereto) as if set forth fully herein.

194.    The APA requires every agency to "state and currently publish in the Federal Register . . . substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency," along with "each amendment, revision, or repeal of the foregoing.  *See* 5 U.S.C. § 552(a)(1)(D).

195.    No person may be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published, unless that person has actual and timely notice of that matter.  *See* 5 U.S.C. § 552(a)(1).

196.    In changing its interpretations of "public interest law services," "public education," "public service for individuals with disabilities," and "public service for the elderly," the Department made interpretations of the bases of eligibility for the PSLF program under 34 C.F.R. § 685.219.

197.     In the alternative, it amended or revised the interpretations that previously existed as to those bases of eligibility.

198.     The Department did not state and publish in the Federal Register any of its new or revised interpretations of the bases of eligibility.

199.     No Plaintiff had actual and timely notice of any of the new or revised interpretations of the bases of eligibility.

200.     The Plaintiffs may not therefore be subject to the new or revised interpretations to the extent that those interpretations led to the determination that the ABA was not a qualifying employer under the PSLF program and the determinations that periods of the Individual Plaintiffs' employment did not qualify under the PSLF program.

### COUNT III – 5 U.S.C. § 706(2)
### (Retroactive Agency Action That Is Arbitrary, Capricious, and
### Not In Accordance with Law)
### (The ABA and Plaintiffs Burkhart, Rudert, and Voigt Against All Defendants)

201.     Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 200 (and all subparts thereto) as if set forth fully herein.

202.     The APA provides a cause of action in federal district court for any person aggrieved by final agency action.  *See* 5 U.S.C. §§ 702-704.

203.     The APA provides that the reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *Id.* § 706(2)(A).  The court must also set aside agency actions, findings, and conclusions found to be in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.  *Id.* § 706(2)(C).

204.     An agency may act retroactively only if Congress expressly authorizes retroactive action.  Here, 20 U.S.C. § 1087e(m) does not authorize retroactive action.  Any retroactive effect is therefore inconsistent with the Act and must be set aside.

205.     The Individual Plaintiffs each received one or more certifications confirming that their public service work and loan payments qualified under the PSLF program and counted toward the 120 eligible payments required for loan forgiveness.  The Individual Plaintiffs relied on those certifications in making decisions regarding their ongoing employment and loan repayment plan.

206.     In accordance with FedLoan Servicing's processes, following each approved certification, the count of qualifying payments each Individual Plaintiff made was updated to include payments made during the period of employment that had been certified.

207.     Each Individual Plaintiff was later informed that his or her previously certified loan payments would no longer count toward his or her 120 eligible payments because the Department had decided that each Individual Plaintiff's employer no longer qualified as a "public service job."

208.     Applying this reversal of interpretation to apply to borrowers who had already worked in public service jobs and had previously obtained certifications confirming their status, and to strip the ABA of its status as an eligible employer, is impermissibly retroactive and must be set aside.

## COUNT IV – 5 U.S.C. § 706(2)
### (Agency Action Not In Accordance With Law)
### (All Plaintiffs Against All Defendants)

209.     Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 208 (and all subparts thereto) as if set forth fully herein.

210.    The APA provides a cause of action in federal district court for any person aggrieved by final agency action.  *See* 5 U.S.C. §§ 702-704.

211.    The APA provides that the reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *Id.* § 706(2)(A).

212.    The definition of the term "public service job" in 20 U.S.C. § 1087e(m) cannot fairly be interpreted to exclude the ABA as a qualified employer or deny the Individual Plaintiffs PSLF certification.

213.    The Individual Plaintiffs met all of the other requirements under 20 U.S.C. § 1087e(m) such that their monthly student loan payments should have all been applied toward the 120 monthly payments necessary for forgiveness under the PSLF program.

214.    If a borrower meets the statutory requirements, the Act does not allow the Secretary discretion to deny the borrower credit toward the 120 payments required for forgiveness.

215.    The Department's determination that the Individual Plaintiffs' payments did not qualify were therefore inconsistent with 20 U.S.C. § 1087e(m), and thus not in accordance with law for the purposes of the APA.  The Department's interpretation should be set aside.

216.    In the alternative, the Department's interpretation is not in accordance with law because it is inconsistent with its own regulation, 34 C.F.R. § 685.219, by denying eligibility to the ABA and other employers of the Individual Plaintiffs.  The interpretation should therefore be set aside.

**COUNT V – Fifth Amendment to the U.S. Constitution**
**(Violation of Due Process)**
**(All Plaintiffs Against All Defendants)**

217.    Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 216 (and all subparts thereto) as if set forth fully herein.

218.    The Fifth Amendment provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law."  Due process requires that, at a minimum, individuals receive notice and an opportunity to be heard before they are deprived of property.

219.    The ABA was deprived of a property interest when the Department retroactively revoked its status as a PSLF-eligible employer, thus compromising its ability to attract and retain employees.

220.    The Individual Plaintiffs were each deprived of a property interest when the Department retroactively purged their prior years of certified PSLF-eligible work and loan payments without notice.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court enter a Judgment:

(1)    Ordering the Defendants, within 30 days of the entry of the judgment, to adopt an interpretation that recognizes that the ABA is a "public service organization" that employs individuals in "public service jobs" for the purposes of the PSLF program, and is therefore a qualifying employer;

(2)    Ordering the Defendants, within 30 days of the entry of the judgment, to adopt an interpretation that recognizes that the Individual Plaintiffs have qualified for the PSLF program through at least the following bases of eligibility:

     (a)      In the case of Ms. Quintero-Millan and Mr. Burkhart, public interest law services while working for the ABA;

     (b)      In the case of Mr. Burkhart, public education while working for the ABA;

     (c)      In the case of Ms. Voigt, public education while working for AILA; and

     (d)      In the case of Mr. Rudert, "public service for individuals with disabilities" and "public service for the elderly" while working for VVA;

(3)     Declaring that Defendants have violated the APA – by acting arbitrarily, capriciously, in abuse of discretion, or in a manner otherwise not in accordance with law – in changing the interpretation of the Plaintiffs' eligibility without notice or adequate explanation, in a manner that exceeds the authority conferred under the Act, and by applying the new interpretation retroactively without statutory authorization;

(4)     Vacating and holding unlawful the retroactive application of the Department's new interpretation of the Plaintiffs' eligibility;

(5)     Ordering the Defendants, within 30 days of the entry of the judgment, to remedy the retroactive effect of the new interpretation by reinstating eligibility certifications previously issued;

(6)     Ordering the Defendants to cease any retroactive denials of eligibility under the PSLF program;

(7)     Ordering the Defendants to implement an appeals process relating to any prospective determinations of ineligibility under the PSLF program;

(8)     Ordering the Defendants to provide public notice of its interpretations of "public interest law services," "public education," and "public services for individuals with disabilities and the elderly";

(9)     Awarding any and all injunctive relief necessary to prevent the application of the Department's arbitrary and capricious interpretation;

(10)    Retaining jurisdiction in this Action to ensure Defendants' compliance with the Court's Judgment;

(11)    Awarding Plaintiffs their attorney's fees, expert witness fees, and all other reasonable expenses incurred in pursuit of this Action under 28 U.S.C. § 2412; and

(12)    Awarding such other relief as the Court deems just and proper.


Dated: December 20, 2016

                                        Respectfully submitted,

                                        ___/s/ Chong S. Park_____

                                        Chong S. Park (D.C. Bar No. 46050)
                                        John T. Dey (D.C. Bar No. 1029475)
                                        Edward F. Roche (D.C. Bar No. 1029012)
                                        ROPES & GRAY LLP
                                        2099 Pennsylvania Avenue, N.W.
                                        Washington, DC 20006
                                        (202) 508-4631