# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN BAR ASSOCIATION<br>   321 North Clark Street<br>   Chicago, IL 60654 | ) ) ) | |
| GEOFFREY T. BURKHART<br>   1912 W. Estes #2<br>   Chicago, IL 60626 | ) ) ) ) | |
| MICHELLE D. QUINTERO-MILLAN<br>   306 12th St., NE<br>   Washington, D.C. 20002 | ) ) ) | |
| JAMIE B. RUDERT<br>   16 17th St., NE, Unit 113<br>   Washington, D.C. 20002 | ) ) ) | |
| and | ) | |
| KATE A. VOIGT<br>   2480 16th St., NW, Apartment 412<br>   Washington, D.C. 20009 | ) ) ) ) | Civil Action No. 16-2476-RDM |
| Plaintiffs, | ) | |
| v. | ) | |
| UNITED STATES DEPARTMENT OF<br>EDUCATION<br>   400 Maryland Avenue, SW<br>   Washington, D.C. 20202 | ) ) ) ) | |
| and | ) | |
| BETSY DEVOS, *in her official capacity as*<br>*Secretary of Education,*<br>   400 Maryland Avenue, SW<br>   Washington, D.C. 20202 | ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7(h), Plaintiffs, the

American Bar Association ("ABA") and Geoffrey Burkhart, Michelle Quintero-Millan, Jamie

Rudert, and Kate Voigt (the "Individual Plaintiffs") move for summary judgment on their claims

against Defendants, the United States Department of Education and Secretary of Education Betsy DeVos[1], for violations of the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*, and of Plaintiffs' due process rights under the Fifth Amendment to the United States Constitution resulting from Defendants' administration of the Public Service Loan Forgiveness ("PSLF") program.

As fully set forth in the accompanying Memorandum of Points and Authorities, Defendants (1) failed to comport with the PSLF program's authorizing statute; (2) failed to follow statutorily required procedures in modifying the regulation, or their interpretation of the regulation, governing the program; and (3) applied regulatory changes in an impermissibly retroactive manner. These improper actions resulted in the Plaintiffs being retroactively denied years of eligibility for the PSLF program, causing the Plaintiffs serious economic harm. The Court should grant Plaintiffs' Motion and order Defendants to (i) restore Plaintiffs' eligibility for the PSLF program; (ii) adopt an interpretation that recognizes Plaintiffs' eligibility; (iii) cease issuing retroactive denials under the PSLF program; (iv) implement a formal intra-agency appeals process whereby borrowers may challenge determinations of ineligibility; and (v) provide public notice of their interpretation of the qualifying employment categories at issue in this case. Further, the Court should declare that Defendants have violated the APA by virtue of their arbitrary and capricious actions; vacate and declare unlawful Defendants' retroactive application of their new interpretation; retain jurisdiction in this Action to ensure Defendants' compliance with the Court's judgment; and award Plaintiffs reasonable attorneys' fees, costs and expenses and other relief the Court deems just and proper.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Betsy DeVos is substituted as a defendant in this action in her official capacity as Secretary of Education in place of former Secretary John B. King, Jr.

Dated:  May 24, 2017

Respectfully submitted,

Chong S. Park (D.C. Bar No. 46050)
John T. Dey (D.C. Bar No. 1029475)
Edward F. Roche (D.C. Bar No. 1029012)
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 508-4600
Chong.Park@ropesgray.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of May, 2017, I electronically filed the foregoing Motion for Summary Judgment with the Clerk of the Court using the Court's electronic filing system, which will send a notice of electronic filing to all Counsel of Record.

                                          */s/     Chong S. Park*

                                          Chong S. Park

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AMERICAN BAR ASSOCIATION<br>    321 North Clark Street<br>    Chicago, IL 60654 | ) ) ) | |
| GEOFFREY T. BURKHART<br>    1912 W. Estes #2<br>    Chicago, IL 60626 | ) ) ) ) | |
| MICHELLE D. QUINTERO-MILLAN<br>    306 12th St., NE<br>    Washington, D.C. 20002 | ) ) ) | |
| JAMIE B. RUDERT<br>    16 17th St., NE, Unit 113<br>    Washington, D.C. 20002 | ) ) ) ) | |
| and | ) | |
| KATE A. VOIGT<br>    2480 16th St., NW, Apartment 412<br>    Washington, D.C. 20009 | ) ) ) ) | Civil Action No. 16-2476-RDM |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| UNITED STATES DEPARTMENT OF<br>EDUCATION<br>    400 Maryland Avenue, SW<br>    Washington, D.C. 20202 | ) ) ) ) ) | |
| and | ) ) | |
| BETSY DEVOS, *in her official capacity as*<br>*Secretary of Education*,<br>    400 Maryland Avenue, SW<br>    Washington, D.C. 20202 | ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................ 2

I.   STATUTORY AND REGULATORY FRAMEWORK OF THE PSLF PROGRAM ........ 2

II.  ADMINISTRATION OF THE PSLF PROGRAM ........................................................... 3

III. THE AMERICAN BAR ASSOCIATION ........................................................................ 4

IV.  INDIVIDUAL PLAINTIFFS ........................................................................................... 7

    A.   Jamie Rudert ...........................................................................................................7

    B.   Kate Voigt................................................................................................................9

    C.   Geoffrey Burkhart..................................................................................................11

    D.   Michelle Quintero-Millan .....................................................................................12

LEGAL STANDARD......................................................................................................... 14

ARGUMENT ...................................................................................................................... 14

I.   THE DEPARTMENT'S EMPLOYMENT ELIGIBILITY DETERMINATIONS
     ARE PROPERLY SUBJECT TO JUDICIAL REVIEW.................................................. 14

    A.   The Department's Eligibility Denials Constitute Final Agency Actions ..................15

    B.   Exhaustion of Administrative Remedies Is Not Required.........................................19

II.  THE DEPARTMENT UNLAWFULLY DETERMINED THAT ABA
     EMPLOYEES AND THE INDIVIDUAL PLAINTIFFS WERE NOT ELIGIBLE
     TO PARTICIPATE IN THE PSLF PROGRAM .............................................................. 20

    A.   The Department's Changed Interpretation Is Contrary to the Statute .......................20

    B.   Even Were the Court To Uphold the Department's Statutory Interpretation, the
     Changed Interpretation Remains Inconsistent with the Department's Own
     Implementing Regulation .........................................................................................24

    C.   The Department's Changed Interpretations Are Not Entitled to Deference...............25

III. THE DEPARTMENT FAILED TO FOLLOW ADEQUATE PROCESS AND
     PROCEDURE IN CHANGING ITS INTERPRETATION OF THE
     REGULATION ............................................................................................................... 28

    A.   The Department Departed from Past Agency Practice Without Providing a
     Reasonable Explanation............................................................................................29

1.      Public Interest Law Services .......................................................................31

2.      Public Education .........................................................................................32

3.      Public Service for Individuals with Disabilities and the Elderly .....................32

B.   The Department Ignored Settled Reliance Interests when Changing its Interpretation of the Statute and Regulation ...............................................................33

IV.   THE DEPARTMENT HAS UNLAWFULLY IMPOSED RETROACTIVE CONSEQUENCES ON PLAINTIFFS ................................................................. 37

A.   Congress Did Not Authorize the Department To Act Retroactively ........................38

B.   The Department's Change of Policy Applies Retroactively to Impair Vested Rights and Deprives Plaintiffs of Reasonable Reliance on Past Agency Policy ........38

V.   THE DEPARTMENT DEPRIVED PLAINTIFFS OF CONSTITUTIONALLY PROTECTED PROPERTY INTERESTS ......................................................... 43

CONCLUSION .................................................................................................. 44

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arkema Inc. v. EPA*,
   618 F.3d 1 (D.C. Cir. 2010) ...........................................................................................41, 43

*Auer v. Robbins*,
   519 U.S. 452 (1997) ........................................................................................................28, 30

*Barnhart v. Walton*,
   535 U.S. 212 (2002) ...............................................................................................................27

*Board of Regents of State Colleges v. Roth*,
   408 U.S. 564 (1972) ........................................................................................................44, 45

*BellSouth Corp. v. FCC*,
   162 F.3d 1215 (D.C. Cir. 1999) ............................................................................................30

*Bennett v. Spear*,
   520 U.S. 154 (1997) ...............................................................................................................15

*Bowen v. Georgetown Univ. Hosp.*,
   488 U.S. 204 (1988) ........................................................................................................38, 39

*Bowers v. Federal Express Corp.*,
   96 F.3d 200 (6th Cir. 1996) ...................................................................................................22

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156 (1962) ...............................................................................................................33

*Chevron, U.S.A. Inc. v. NRDC*,
   467 U.S. 837 (1984) ........................................................................................26, 27, 28, 30

*Cleveland Bd. of Educ. v. Loudermill*,
   470 U.S. 532 (1985) ...............................................................................................................45

*Consol. Edison Co. v. Dep't of Energy*,
   870 F.2d 694 (D.C. Cir. 1989) ..............................................................................................22

*In re D.F.*,
   70 A.3d 240 (D.C. Cir. 2013) ...............................................................................................21

*Darby v. Cisneros*,
   509 U.S. 137 (1993) ...............................................................................................................20

*Eisai, Inc. v. FDA*,
   134 F. Supp. 3d 384 (D.D.C. 2015) ...................................................................29

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016) ....................................................................................31

*FCC v. Fox TV Stations, Inc.*,
   556 U.S. 502 (2012) ....................................................................................34, 37

*Fidelity Television, Inc. v. FCC*,
   502 F.2d 443 (D.C. Cir. 1974) ..........................................................................18

*Fogo de Chao (Holdings) Inc. v. Dep't of Homeland Sec.*,
   769 F.3d 1127 (D.C. Cir. 2014) ...................................................................26, 28

*Fox v. Clinton*,
   684 F.3d 67 (D.C. Cir. 2012) .......................................................................27, 28

*Friedman v. FAA*,
   841 F.3d 537 (D.C. Cir. 2016) ..............................................................16, 19, 20

*Landgraf v. USI Film Prods.*,
   511 U.S. 244 (1994) ..........................................................................................42

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
   463 U.S. 29 (1983) ............................................................................................30

*National Mining Ass'n v. Dep't of Interior*,
   177 F.3d 1 (D.C. Cir. 1999) ..............................................................................43

*National Mining Ass'n v. Dep't of Labor*,
   292 F.3d 849 (D.C. Cir. 2002) ..........................................................................40

*Nicholas v. Riley*,
   874 F. Supp. 10 (D.D.C. 1995) .........................................................................44

*NRDC v. Thomas*,
   845 F.2d 1088 (D.C. Cir. 1988) ........................................................................17

*Philip Morris USA Inc. v. FDA*,
   202 F. Supp. 3d 31 (D.D.C. 2016) ....................................................................18

*Ramaprakash v. FAA*,
   346 F.3d 1121 (D.C. Cir. 2003) ...................................................................30, 34

*Rempfer v. Sharfstein*,
   583 F.3d 860 (D.C. Cir. 2009) ..........................................................................14

iv

*Sackett v. EPA,*
    566 U.S. 120 (2012) ................................................................................................16

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944) ...........................................................................................27, 28

*Smiley v. Citibank (S. Dakota), N.A.,*
    517 U.S. 735 (1996) ...........................................................................................34, 38

*Student Loan Mktg. Ass'n v. Riley,*
    104 F.3d 397 (D.C. Cir. 1997) ................................................................................17

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
    136 S. Ct. 1807 (2016) ............................................................................................16

*United States v. Mead Corp.,*
    533 U.S. 218 (2001) ................................................................................................26

*United Student Aid Funds, Inc. v. King,*
    200 F. Supp. 3d 163 (D.D.C. 2016) ...............................................28, 30, 31, 34

*Water Quality Ins. Syndicate v. United States,*
    No. CV 15-789 (BAH), 2016 WL 7410549 (D.D.C. Dec. 22, 2016) ....................14

*Williams Natural Gas Co. v. FERC,*
    3 F.3d 1544 (D.C. Cir. 1993) ..................................................................................42

## Constitutional Provisions, Statutes and Rules

U.S. Const. amend. V ................................................................................1, 29, 44

5 U.S.C. § 553(b) ..............................................................................................31

5 U.S.C. § 553(c) ..............................................................................................31

5 U.S.C. §§ 701-706 ...................................................................................*passim*

5 U.S.C. § 704 ..............................................................................................15, 20

5 U.S.C. § 706 ..................................................................................................14

20 U.S.C. § 1087e(m) ..................................................................................2, 20, 39

20 U.S.C. § 1087e(m)(1) ......................................................................................7

20 U.S.C. § 1087e(m)(1)(A) ................................................................................2

20 U.S.C. § 1087e(m)(1)(B) ..............................................................................39

20 U.S.C. § 1087e(m)(3)(B) ................................................................................2, 21

20 U.S.C. § 1087e(m)(3)(B)(i) ...........................................................................22, 23

20 U.S.C. § 1087e(m)(3)(B)(ii) ...............................................................................26

26 U.S.C. § 501(c)(3)..................................................................................3, 24, 25

34 C.F.R. § 685.219 ............................................................................................2, 20

34 C.F.R. § 685.219(a)...............................................................................................3

34 C.F.R. § 685.219(b) ..........................................................................................3, 24

34 C.F.R. § 685.219(b)(5)..........................................................................................3

34 C.F.R. § 685.219(e)(3).........................................................................................20

Fed. R. Civ. P. 56(c) ................................................................................................14

## Other Authorities

153 Cong. Rec. S9574-02 (July 19, 2007).................................................................24

Completing the Employment Certification Form (ECF),
   https://myfedloan.org/borrowers/special-programs/pslf/pslf-completing-ecf
   (last accessed May 8, 2017) ..............................................................................40

*Employment Certification for Public Service Loan Forgiveness Form*, Federal
   Student Aid (Jan. 31, 2012), https://ifap.ed.gov/dpcletters/GEN1202.html ...........................4

Federal Student Aid, https://studentaid.ed.gov/sa/repay-loans/forgiveness-
   cancellation/public-service#track-eligibility (last visited May 8, 2017) ..................................4

FEMA, Fact Sheet: Direct Legal Services, https://www.fema.gov/media-library-
   data/1465336147412-
   c73997975bfa304bdc8ea28e4c35554e/FACT_SHEETDisasterLegalServices2
   016.pdf .............................................................................................................25

Other Eligibility Requirements for PSLF: Make 120 Qualifying Payments,
   FedLoan Servicing, https://myfedloan.org/borrowers/special-
   programs/pslf/pslf-completing-ecf (last visited May 8, 2017) ..................................4

Public Service Loan Forgiveness (PSLF): Employment Certification Form,
   https://studentaid.ed.gov/sa/sites/default/files/public-service-employment-
   certification-form.pdf (last accessed May 8, 2017) ................................................11

Remarks of U.S. Secretary of Education Arne Duncan to the 2014 National
    HBCU Conference HBCUs: Innovators for Future Success (Sept. 23, 2014),
    http://www.ed.gov/news/speeches/hbcu-value-proposition ..............................................23, 24

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal
    Texts* (2012) .......................................................................................................................22

Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory
    Construction* § 65.2 (7th ed. 2007) .........................................................................................22

## INTRODUCTION

This is an unfortunate case where the Department of Education ("Department" or "ED") has breathed new life into the old adage that "no good deed goes unpunished."  The Public Service Loan Forgiveness ("PSLF") program was established to encourage a wide variety of professionals, including lawyers, to dedicate themselves to public service.  Plaintiffs Geoffrey Burkhart, Michelle Quintero-Millan, Jamie Rudert, and Kate Voigt (the "Individual Plaintiffs") relied on the promise of federal loan forgiveness and chose public service jobs.  At the Department's urging, they proactively sought certification of eligibility to participate in the PSLF program and received approval certifications.  Then, without warning or explanation, the Department pulled the rug from underneath Plaintiffs by reversing prior eligibility determinations.  To add insult to injury, the Department retroactively stripped them of credit for loan payments already made.  The Individual Plaintiffs are now left facing ever-mounting loan balances with little to no hope for relief.  Moreover, as a result of the Department's actions, Plaintiff American Bar Association ("ABA") and other non-profit organizations are now struggling to attract and retain talented, committed professionals to address critical unmet needs.

The Department's actions are contrary to fundamental principles of fairness.  As set forth below, they amount to arbitrary and capricious agency action, action otherwise not in accordance with law under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), and a violation of due process under the Fifth Amendment to the United States Constitution.  Specifically, the Department:  (1) failed to comport with the PSLF program's authorizing statute and its own implementing regulation; (2) failed to follow required procedures in modifying its regulation and/or its interpretation of its regulation; and (3) applied regulatory changes in an impermissibly retroactive manner.  Accordingly, this Court should grant Plaintiffs' motion for summary judgment and enter a permanent injunction and order restoring the Department's original correct

determination of Plaintiffs' PSLF program eligibility, vacating and reversing the Department's retroactive actions, and awarding further appropriate declaratory relief.

## FACTUAL BACKGROUND

### I.    STATUTORY AND REGULATORY FRAMEWORK OF THE PSLF PROGRAM

Congress created the PSLF program when it passed the College Cost Reduction and Access Act of 2007 ("CCRAA" or the "Act"), which President Bush signed into law on September 27, 2007.   The provisions of the Act relevant to the PSLF program are codified at 20 U.S.C. § 1087e(m).   The Act directs the Secretary of Education to cancel the remaining principal and interest due on any Federal Direct Loan for a borrower not in default who (1) has made 120 monthly payments since October 1, 2007, on any such loan and (2) is employed in a public service job at the time each payment was made and at the time of forgiveness.   20 U.S.C. § 1087e(m). "Public service job" is defined to include a full-time job in numerous categories, including but not limited to "public interest law services (including prosecution or public defense or legal advocacy in low-income communities at a non-profit organization)," "public education," "public service for individuals with disabilities," and "public service for the elderly."   *Id.* § 1087e(m)(3)(B).   The Act does not further define these terms.   *Id.*   The required 120 monthly payments must be made under one or more Direct Loan Program repayment plans.   *Id.* § 1087e(m)(1)(A).

In October 2008, the Department promulgated a regulation to implement the PSLF program, codified at 34 C.F.R. § 685.219, highlighting that the program "is intended to encourage individuals to enter and continue in full-time public service employment by forgiving the remaining balance of their Direct loans after they satisfy the public service and loan payment requirements of this section."   34 C.F.R. § 685.219(a).   The regulation defines "[p]ublic interest law" as "legal services provided by a public service organization that are funded in whole or in part by a local, State, Federal, or Tribal government."   *Id.* § 685.219(b).   In turn, the regulation

defines "[p]ublic service organization" to include, among other categories, governmental entities,

non-profit organizations organized under 26 U.S.C. § 501(c)(3), and

> A private organization that—
>
> (i)     Provides the following public services: Emergency management, military service, public safety, law enforcement, public interest law services, early childhood education (including licensed or regulated child care, Head Start, and State funded pre-kindergarten), public service for individuals with disabilities and the elderly, public health (including nurses, nurse practitioners, nurses in a clinical setting, and full-time professionals engaged in health care practitioner occupations and health care support occupations, as such terms are defined by the Bureau of Labor Statistics), public education, public library services, school library or other school-based services; and
>
> (ii)    Is not a business organized for profit, a labor union, a partisan political organization, or an organization engaged in religious activities, unless the qualifying activities are unrelated to religious instruction, worship services, or any form of proselytizing.

34 C.F.R. § 685.219(b)(5).  The regulation does not define the terms "public education" or "public

service for individuals with disabilities and the elderly."

To date, the Department has not published any notice of intent to modify or narrow the

definitions of qualifying employment for the PSLF program beyond this current language.

## II.    ADMINISTRATION OF THE PSLF PROGRAM

The Department relies in part on student loan servicer Pennsylvania Higher Education

Assistance Agency ("PHEAA"), which operates as FedLoan Servicing, to administer the PSLF

program.  Once a borrower seeks to participate in the program by submitting an initial

Employment Certification Form ("ECF"), all of her eligible loans are transferred to FedLoan

Servicing—provided that the Department determines that the borrower's employment qualifies

for PSLF.[1]  Public Service Loan Forgiveness:  Questions and Answers for Federal Student Loan Borrowers ¶ 48 (AR178).  Borrowers are encouraged to submit the ECF on an annual basis to confirm that the borrower is "on the right track to receive PSLF."[2]  *How Do I Know I'm on the Right Track to Receive PSLF?*, Federal Student Aid, https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service#track-eligibility (last visited May 8, 2017).  In cases where the borrower's employer is neither a government entity nor a 501(c)(3) nonprofit, the Department makes the final eligibility determination.  Dec. 10, 2014 Letter from ED to Kate Voigt (AR335); Instructions for Reviewing a PSLF Employment Certification Form (ECF) (AR160-61).  FedLoan Servicing's website permits borrowers to track the number of qualifying payments made during their certified employment periods.  Other Eligibility Requirements for PSLF:  Make 120 Qualifying Payments, FedLoan Servicing, https://myfedloan.org/borrowers/special-programs/pslf/pslf-completing-ecf (last visited May 8, 2017).

## III.    THE AMERICAN BAR ASSOCIATION

Plaintiff ABA is a private, not-for-profit 501(c)(6) organization.  Declaration of Jack L. Rives ("Rives Decl.") ¶ 5, attached hereto as Exhibit A.[3]  The ABA operates several sections and

---

[1] Prior to 2012, there was no formal way for borrowers to certify their employers' eligibility. *Employment Certification for Public Service Loan Forgiveness Form*, Federal Student Aid (Jan. 31, 2012), https://ifap.ed.gov/dpcletters/GEN1202.html.

[2] Although submission of an ECF *before* applying for forgiveness is optional, any borrower who ultimately does apply for forgiveness will be required to submit an ECF for each qualifying employer covering the entire 120-month period as part of the application.  *See* Public Service Loan Forgiveness:  Questions and Answers for Federal Student Loan Borrowers ¶ 51 (AR179) ("If you did not submit any [ECFs], did not submit forms for some of your employers, or submitted forms for only a portion of your qualifying employment, you will need to provide one or more [ECFs], as necessary, to cover your entire period of qualifying employment (including your current employment) at the time you submit your loan forgiveness application.").

[3] The ABA is not a labor union, partisan political organization, or organization engaged in religious activities.  *Id.*

divisions to further public education.  Specifically, the ABA furthers legal education at all levels, from K-12 to law school, to continuing legal education for career attorneys.  *Id.* ¶¶ 6-10.

The ABA also provides direct public interest legal services.  *Id.* ¶ 11.  One of the most prominent examples of such efforts is its South Texas Pro Bono Asylum Representative Project ("ProBAR"), which serves as the nation's largest provider of legal services and legal rights education for detained unaccompanied immigrant children.  *Id.* ¶ 12.  ProBAR provides legal information, *pro se* assistance and direct representation to detained, indigent children and adults facing removal proceedings in the Rio Grande Valley.  ProBAR serves adults held by the Department of Homeland Security and children held by the Department of Health and Human Services Office of Refugee Resettlement (DHHS ORR) shelters in South Texas.  There are currently about 1,850 shelter beds for unaccompanied children in the Rio Grande Valley.  In 2015, ProBAR served more than 15,000 unaccompanied children in these shelters by providing a combination of "Know Your Rights" presentations, individual screenings, direct representation, and referrals.  Approximately ninety percent (90%) of ProBAR's funding is federally sourced, primarily from DHHS-ORR and the Department of Justice grants directed through the Vera Institute of Justice.  ProBAR also receives additional revenue from the State Bar of Texas, Texas Bar Foundation, Texas Access to Justice, and other private foundations and donors.  *Id.*

The ABA further supports legal representation of children, the elderly, the disabled, veterans, victims of domestic and sexual violence, families recovering from natural disasters, and similar constituencies.  *Id.* ¶ 13.  The ABA's Fund for Justice and Education ("FJE"), which is a separate Fund within the ABA, is a 501(c)(3) tax exempt charitable fund that receives, and then dispenses, all grants the ABA receives from federal and state governments. The FJE supports over 200 of the ABA's public service and educational programs each year, including ProBAR, and

receives over $40 million dollars of its annual funding from federal government grants.  *Id.* ¶¶ 5, 20.

Following the creation of the PSLF program, the ABA informed its employees of the program's existence, and ABA employees filed ECFs and received confirmation that they were employed in qualifying public service jobs.  *Id.* ¶¶ 21-22; *see, e.g.*, Geoffrey Burkhart July 2, 2014 ECF (AR208-09); July 14, 2014 Letters from FedLoan Servicing to Geoffrey Burkhart (AR210-13).  Aware of these confirmations, the ABA informed prospective employees that it was a qualifying employer for the PSLF program.  Rives Decl. ¶ 23.

Beginning in early 2015, without advance notice from the Department or FedLoan Servicing regarding a change in eligibility criteria, ABA employees began receiving PSLF certification denials.  *Id.* ¶ 24.  Consequently, the ABA had to inform prospective hires who asked about PSLF eligibility of the denial notices, which has prompted candidates to decline to work for the ABA.  *Id.* ¶ 25.  These denials have also impaired the ABA's ability to retain existing employees.  Some have left the ABA in order to find qualifying employment.  Others have indicated they intend to leave if the ABA continues to be deemed ineligible.  *Id.* ¶ 26.

In 2016, the ABA initiated communications with Department officials about the reversal of prior approvals of ABA employees and the retroactive application of these denials.  *See* Correspondence between ABA Executive Director and Chief Operating Officer Jack Rives and ED (AR187-93).  ABA staff met with Under Secretary Mitchell in September 2016, in an unsuccessful attempt to resolve the issue.  *See* Dec. 1, 2016 Letter from Ted Mitchell to Jack Rives (AR192-93).  In December 2016, Under Secretary Mitchell sent a letter to the ABA to "follow[] up . . . regarding the steps the Department may take to address some of the concerns you raised" in the meeting.  The Department agreed "that more detailed information on the PSLF webpage

would be helpful to borrowers" and "that notifications to borrowers should provide more detailed explanations for the decisions." But the Department refused to reestablish the ABA's eligibility because it had "not received documentation to date that shows ABA's primary purpose is to provide 'public interest law services' as defined in the PSLF regulations." *Id.*

## IV.   INDIVIDUAL PLAINTIFFS

### A.   Jamie Rudert

Jamie Rudert graduated from American University Washington College of Law in 2010. Declaration of Jamie B. Rudert ("Rudert Decl.") ¶ 1, attached hereto as Exhibit B. Upon graduation, his student loan balance totaled more than $130,000. *Id.* ¶ 2. He has Federal Direct Loans and is enrolled in the Income-Based Repayment ("IBR") plan, both of which are qualifying factors for participation in the PSLF program. *Id.* ¶¶ 2-3; 20 U.S.C. § 1087e(m)(1).

In April 2012, Mr. Rudert began working at Vietnam Veterans of America ("VVA"), a 501(c)(19) organization that works with, and on behalf of, Vietnam War veterans to educate the public on issues facing the Vietnam veterans community and to provide a range of support services to Vietnam veterans, including direct representation of aging and elderly veterans in claims for benefits from the Veterans Administration for their service-related disabilities. Rudert Decl. ¶ 4; A Short History of VVA (AR312-13); Vietnam Veterans of America (AR314-16). During the interview process, Mr. Rudert asked whether VVA employees qualified for the PSLF program, and was informed that VVA employees had so qualified. Rudert Decl. ¶ 5. Mr. Rudert remained employed at VVA until September 2015, during which time he represented Vietnam veterans before the Board of Veterans' Appeals, challenging denials of their benefits for service-related disabilities. *Id.* ¶¶ 6-7, 11.

While employed at VVA, Mr. Rudert twice submitted ECFs to confirm his eligibility for the PSLF program. *Id.* ¶ 8; Jamie Rudert June 27, 2012 ECF (AR241-42); Jamie Rudert Oct. 21,

2014 ECF (AR260-61).  Following each of these submissions, Mr. Rudert received notices from FedLoan Servicing that his monthly payments made during his employment for the time periods indicated on his ECFs (April 1, 2012 through June 18, 2012 and June 19, 2012 through October 21, 2014) qualified under the program.  Jan. 31, 2013 Letter from FedLoan Servicing to Jamie Rudert (AR247-48); Oct. 30, 2014 Letter from FedLoan Servicing to Jamie Rudert (AR264-65). As of January 24, 2015, Mr. Rudert had made 30 qualifying payments.  Jan. 24, 2015 Letter from FedLoan Servicing to Jamie Rudert (AR266-67).

In September 2015, Mr. Rudert left VVA and started working at his current employer, Paralyzed Veterans of America ("PVA"), a 501(c)(3) organization.  Rudert Decl. ¶ 11.  In this role, Mr. Rudert continues to represent Vietnam veterans appealing denials of benefits for service-related disabilities before the Board of Veterans' Appeals.  *Id.*

On April 1, 2016, Mr. Rudert submitted another ECF to account for his payments since his previous certification in October 2014.  AR268.  This time, Mr. Rudert received a letter from FedLoan Servicing on April 19, 2016, informing him that VVA "does not qualify" under the PSLF program.  AR277-79.  As a result, his payments made between October 22, 2014 and September 11, 2015 did not count toward the 120 payments required to obtain forgiveness.  *Id.*  On the same day, Mr. Rudert received a letter from FedLoan Servicing retroactively denying his payments made while working at VVA from April to June 2012.  AR280-81.  On April 21, 2016, he received yet another letter from FedLoan Servicing stating that, "[b]ased upon our further research and after consulting with the Department we have reversed your previously approved employment period under the PSLF program because [VVA] does not provide a qualifying service."  AR282-83. However, FedLoan Servicing informed him that his period of employment at Paralyzed Veterans of America was certified as qualifying employment.  Apr. 16, 2016 Letter from FedLoan Servicing

to Jamie Rudert (AR271-72).

Mr. Rudert called FedLoan Servicing, filed a complaint with the Consumer Financial Protection Bureau ("CFPB"), and contacted his U.S. Representative, Eleanor Holmes Norton, to determine the reasons for the reversal.  Rudert Decl. ¶ 13. FedLoan Servicing and the Department provided varying explanations, the last of which was that the VVA did not qualify due to its funding source and that, "while [VVA] facilitate[s] the provision of disability-related services to Vietnam Veterans, they do not provide the services outright."  Aug. 8, 2016 Letter from Juanita Ford, Federal Student Aid Manager to Rep. Eleanor Holmes Norton (AR330-31).

Had Mr. Rudert originally been informed that his employment with VVA did not qualify for PSLF, he would have left the organization and sought other employment that did qualify because, despite his commitment to the role, he believed the PSLF program provided his only path to financial stability.  Rudert Decl. ¶ 14.  Mr. Rudert's outstanding federal student loan balance is $161,985.02 with an interest rate of 7.375 percent as of May 2017.  *Id.* ¶ 18.

### B.    Kate Voigt

Kate Voigt graduated from Boston College Law School in 2011.  Declaration of Kate A. Voigt ("Voigt Decl.") ¶ 1, attached hereto as Exhibit C.  In December 2011, Ms. Voigt started working at the American Immigration Lawyers Association ("AILA"), a 501(c)(6) organization, where she currently serves as Associate Director of Liaison.  *Id.* ¶ 4.  The Liaison Department performs a number of functions to serve immigrants.  One of its functions is to provide public education—*i.e.*, educating the public about issues affecting immigrants through the publication on its website of news, summaries of and comments on relevant legislation and regulations, updates on communications with government officials, legal briefs and opinions, and information received through Freedom of Information Act ("FOIA") requests.  *Id.* ¶ 5.

Shortly after starting work at AILA, Ms. Voigt asked the Department whether her position

at AILA would make her eligible for the PSLF program.  On June 20, 2012, Ms. Voigt received

an email from the Department stating:

> The policy staff in [Federal Student Aid] and [the Office of Postsecondary
> Education] believe that [AILA] meets the definition of public service
> organization in 34 CFR 685.219(b) of the regulations because it is a private
> organization that provides public services, it is not a business organized for
> profit, nor is it engaged in partisan or religious activities.  As a full-time
> employee of an eligible public service organization, Ms. Voigt's service
> would be considered eligible as long as she meets the rest of the eligibility
> requirements in 34 CFR 685.219(c) [pertaining to borrower eligibility].

June 20, 2012 Email from ED to Kate Voigt, Compl. Ex. F at 5-6; AR337.  Largely as a result of

this confirmation, Ms. Voigt decided to continue working at AILA.  Voigt Decl. ¶ 7.

In December 2014, the Department reversed course.  It acknowledged that it had previously

recognized AILA as a qualifying employer in 2012.  Dec. 10, 2014 Letter from ED to Kate Voigt

(AR335-36).  However, the Department reversed its earlier determination and stated that AILA

did not qualify because it did not, in the Department's view, provide public interest law services

or public education.  *Id.*  The Department further stated that "employees of AILA do not provide

public interest law services[;] [r]ather, such services are provided by AILA's member attorneys,"

and that, with respect to public education, "AILA's educational activities are directed primarily to

its members and to the public in general, not to students or families, and are not provided in a

school or school-like setting."  *Id.*

In denying Ms. Voigt's eligibility, the Department relied on a definition of "public

education" that first appeared in the "Definitions" section of an updated version of the ECF, which

was made available only after Ms. Voigt was notified that AILA does not qualify as a public

service organization for purposes of the PSLF program.[4]  The Department had not previously

---

[4] *Compare* AR255-58 (earlier version of ECF featuring no limiting definition for "public
education") *with* Public Service Loan Forgiveness (PSLF): Employment Certification Form at 3,

required that educational activities be provided only in a "school-like setting" to qualify as "public education" under the PSLF.  Nor did the Department provide any explanation for the new definition or use notice-and-comment rulemaking.   The Department's reversal applied retroactively such that Ms. Voigt's payments made while employed at AILA—30 payments as of the December 2014 letter—no longer counted.  Voigt Decl. ¶¶ 10, 12, 18.  Despite Ms. Voigt's subsequent attempts to gain further insight into the Department's PSLF eligibility determination process by submitting a FOIA request to the Department and a complaint to the CFPB, she has been unable to obtain further information.  *Id.* ¶¶ 14-16.

Ms. Voigt's student loan obligations include Federal Direct Loans.  *Id.* ¶ 1.  She is enrolled in the IBR plan, and her total loan balance has grown from $206,546 in October 2011 (shortly before starting employment at AILA) to $247,638.55 as of May 2017.  *Id.* ¶ 18.

## C.    Geoffrey Burkhart

Geoffrey Burkhart graduated from DePaul University College of Law in 2008.  Declaration of Geoffrey T. Burkhart ("Burkhart Decl.") ¶ 1, attached hereto as Exhibit D.  He joined the ABA in June 2014 as Attorney and Project Director for the Division for Legal Services, a position he held until assuming his current post on December 21, 2016, as Deputy Director of the ABA's Center for Innovation.  *Id.* ¶ 4.  At the Division for Legal Services, which receives approximately forty percent (40%) of its funding from government entities, Mr. Burkhart sought to improve indigent defense throughout the United States and to educate the wider legal community on issues related to indigent defense.  *Id.* ¶ 5.  In his current role, Mr. Burkhart focuses on improving civil legal services and criminal justice for the poor.  *Id.* ¶ 4.

Mr. Burkhart would not have accepted his job offer with the ABA had he been informed

---

https://studentaid.ed.gov/sa/sites/default/files/public-service-employment-certification-form.pdf (last accessed May 8, 2017) (current version containing "school or school-like setting" limitation).

his job would not make him eligible for the PSLF program.  *Id.* ¶ 6.  Prior to beginning work, he obtained assurances that other ABA employees had been deemed eligible, and he received confirmation from FedLoan Servicing that his ABA employment would qualify for the program. *Id.* ¶ 7.  Soon after starting work, Mr. Burkhart submitted an ECF, which was quickly approved. AR208-09; July 14, 2014 Letter from FedLoan Servicing to Geoffrey Burkhart (AR210-11).

On October 12, 2016, ***more than two years after*** his original approval, FedLoan Servicing informed him that, following "further research and after consulting with the Department," it had reversed his previously approved employment period because his employer "do[es] not provide a qualifying service."  AR214.  As a result of the Department's reversal, none of Mr. Burkhart's prior loan payments qualified toward the 120 payments required to obtain loan forgiveness.  *See id.*  Mr. Burkhart is enrolled in the IBR plan.  Burkhart Decl. ¶ 9.  As a result of accruing interest, the total balance on his Direct Consolidation Loans grew from $155,899.95 in October 2009 to over $200,000 as of May 2017.  *Id.* ¶ 11.

### D.    Michelle Quintero-Millan

Michelle Quintero-Millan graduated from the Sturm College of Law at the University of Denver in 2012.  Declaration of Michelle D. Quintero-Millan ("Quintero-Millan Decl.") ¶ 1, attached hereto as Exhibit E.  She joined the ABA's ProBAR initiative in June 2012, serving as a Staff Attorney and then Supervising Attorney until her departure in May 2015.  *Id.* ¶¶ 4, 6-7.  At ProBAR, Ms. Quintero-Millan provided direct pro bono legal services for unaccompanied, undocumented immigrant children near the U.S.-Mexico border in southern Texas.  *Id.* ¶¶ 5-6.  She appeared in immigration and state courts, represented children in removal proceedings, assisted in filing for visas, filed complaints against Border Patrol officers for verbal and physical abuse, and counseled children who expressed a desire to return to their home countries.  *Id.* ¶ 5.

Ms. Quintero-Millan left ProBAR to move to Washington, D.C. for family reasons in May

2015.  *Id.* ¶ 7.  She first obtained a position with Catholic Charities, a 501(c)(3) organization, and then moved to the United States Citizenship and Immigration Services ("USCIS"), a component of the United States Department of Homeland Security.  *Id.* ¶¶ 7-8.

In late 2015 and early 2016, Ms. Quintero-Millan filed three ECFs to certify the eligibility of her three most recent employers.  AR217-20; AR227-28.  Within weeks, she received notices indicating that her employment with Catholic Charities and USCIS qualified for the PSLF program.  Dec. 29, 2015 & Feb. 2, 2016 Letters from FedLoan Servicing to Michelle Quintero-Millan (AR222-23; AR232-33).  A decision regarding her employment at ProBAR, however, was delayed due to FedLoan Servicing's request for a copy of a W-2 form from ProBAR.  *See* Dec. 29, 2015 & Jan. 28, 2016 Letters from FedLoan Servicing to Michelle Quintero-Millan (AR224-26; AR230-31).  Ms. Quintero-Millan subsequently submitted a W-2 for ProBAR to FedLoan Servicing (AR234).  Finally, on November 19, 2016, FedLoan Servicing informed her that employment at ProBAR did not qualify under the PSLF program, with the result being that her two-and-a-half years of loan payments did not count for PSLF purposes.  *See* AR237-39; Quintero-Millan Decl. ¶ 13.

Ms. Quintero-Millan has been enrolled in the IBR plan since January 2013.  Quintero-Millan Decl. ¶ 16.  The balance of her PSLF-eligible Direct Consolidation Loans, which totaled approximately $340,000 when she entered repayment after law school, stands at $430,446.48 as of May 2017.  *Id.* ¶ 17.

The existence of the PSLF program was a key factor in Ms. Quintero-Millan's decision to pursue a law degree, as she was concerned about adding to the debt burden she accrued when obtaining her master's degree.  *Id.* ¶ 3.  Her fears were eased after a financial aid advisor told her about the PSLF program.  *Id.*  Had Ms. Quintero-Millan known the ABA was not a qualifying

13

employer for the PSLF program, she would have pursued employment elsewhere.  *Id.* ¶ 18.

## LEGAL STANDARD

A moving party is entitled to summary judgment when the pleadings and the record demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Judicial review of agency action under the APA is based on the agency record.  *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009).  Under the APA, a reviewing court must set aside a challenged agency action that is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.  The reviewing court must determine whether the reason for the agency's decision was "both rational and consistent with the authority delegated to it by Congress."  *Water Quality Ins. Syndicate v. United States*, No. CV 15-789 (BAH), 2016 WL 7410549, at *13 (D.D.C. Dec. 22, 2016) (quotation marks and citation omitted).

## ARGUMENT

For the reasons set forth below, the Department's arbitrary and capricious reversal of its prior eligibility approvals must be set aside.  First, as a threshold matter, the Department's eligibility denials are final agency actions subject to this Court's review.  Second, the Department's changed interpretation cannot be squared with the plain language of the enabling statute or its own implementing regulation.  Third, even if the Department could have adopted its changed interpretation, it failed to follow an adequate or appropriate process.  Fourth, even had the Department's change been procedurally sound, it lacked the requisite statutory authority to impose the new interpretation retroactively.

## I. THE DEPARTMENT'S EMPLOYMENT ELIGIBILITY DETERMINATIONS ARE PROPERLY SUBJECT TO JUDICIAL REVIEW

Plaintiffs' claims are cognizable under the APA because they properly challenge final agency actions. In its Answer, the Department appears to take the position that the Department's determinations regarding employment eligibility are merely tentative, non-final agency actions not subject to judicial review. *See* Answer ¶¶ 58, 141, 152, 163. However, the career- and life-changing legal and practical consequences of the Department's actions leave no doubt that they are final for the purposes of the APA. Nor can the Department claim Plaintiffs failed to exhaust their administrative remedies. No such requirement exists in this case. Neither the statute nor the Department's regulation provides an agency process for appeal or reconsideration of adverse decisions. Plaintiffs' claims are thus properly before this Court.

## A.     The Department's Eligibility Denials Constitute Final Agency Actions

Under 5 U.S.C. § 704, judicial review of agency decisionmaking under the APA is limited to review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." To be considered "final," an agency action (1) "must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and (2) "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Importantly, the inquiry into finality is of a "pragmatic and flexible nature." *Friedman v. FAA*, 841 F.3d 537, 541 (D.C. Cir. 2016) (quoting *Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1027 (D.C. Cir. 2016)); *see U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016) (referring to "the 'pragmatic' approach we have long taken to finality" (quoting *Abbott Labs v. Gardner*, 387 U.S. 136, 149 (1967)).

The Department's eligibility denials are undoubtedly final. These denials are not subject to further agency review. To be sure, even in the absence of formal channels for intra-agency appeal, several Plaintiffs still pursued review and reconsideration of their denials through various

means—all to no avail.  *See* Rives Decl. ¶¶ 27-36; Rudert Decl. ¶ 13; Voigt Decl. ¶¶ 13-17.  But "[t]he mere possibility that an agency might reconsider in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012).  "[T]he applicable test is not whether there are further administrative proceedings available, but rather whether the impact of the order is sufficiently 'final' to warrant review in the context of the particular case."  *Friedman*, 841 F.3d at 542.  The enormous ramifications of the Department's denials cannot be disputed.  For the ABA, the denials have undermined the organization's ability to recruit and retain the talented professionals needed to carry out its public service mission.  For the Individual Plaintiffs, the denials have summarily stripped them of years of qualifying loan payment credits and left them with no option other than to find other qualifying employment and restart their efforts to reach the 10-year (120-month) payment requirement in order to obtain forgiveness of their growing loan balances.

Nor can the Department wash its hands of the denials and suggest that these are merely tentative products of Fed Loan Servicing's administrative errors.  *See* Answer ¶¶ 58, 163.  First, with respect to the ABA and Plaintiffs Rudert and Voigt, the Department itself directly communicated its eligibility denial decisions.[5]  Second, the Department's instructions to FedLoan Servicing mandate that, in all cases in which a borrower submits an ECF indicating that she is

---

[5] Indeed, the ABA presented its grievances and arguments for eligibility to the very highest levels of the Department.  *See supra* pp. 6-7; Rives Decl. ¶¶ 28-35.  A clearly expressed decision from agency leadership that bears the hallmarks of finality is subject to APA review.  *See Student Loan Mktg. Ass'n v. Riley*, 104 F.3d 397, 405 (D.C. Cir. 1997) (letter expressing agency interpretation of statute was final agency action when it (1) was signed by a high-level agency official, (2) was based on full deliberation and took into account the petitioner's arguments, and (3) stated the agency's unequivocal position); *NRDC v. Thomas*, 845 F.2d 1088, 1094 (D.C. Cir. 1988) (memorandum from "subordinate agency officials" deemed final "where the subordinate is the director of the relevant component unit of the [agency], where no further action by the [agency head] is directly implicated, and where no further proceedings are noticed").

employed by a non-501(c)(3) nonprofit that provides qualifying services, FedLoan Servicing is to immediately elevate such ECFs **to the Department** for approval. *See* AR160-61 (instructing FedLoan Servicing under the heading "Verifying qualifying employment for PSLF" that when a borrower indicates on an ECF that he or she works for a "[p]rivate organization providing public services," FedLoan Servicing should first "search the IRS database to see if it is actually listed as having 501(c)3 [*sic*] status," and if it is not, to "escalate to the Department for approval"). No basis exists for the Department to suggest that FedLoan Servicing's determinations were made without the Department's imprimatur.[6]

Similarly without merit is the Department's suggestion that it does not make a final determination regarding employment eligibility until a borrower—after the end of 10 years in a public service job—ultimately submits her application for loan forgiveness. *See* Answer ¶¶ 141, 152. Where, as here, the Department's determinations have a practical "binding effect," they may be considered final. *Philip Morris USA Inc. v. FDA*, 202 F. Supp. 3d 31, 46 (D.D.C. 2016) (quotation marks and citation omitted). In such cases, a court should consider "(1) whether the agency has taken a 'definitive legal position' regarding its statutory authority; (2) whether the case presents a 'purely legal question of statutory interpretation;' and (3) whether the action 'imposes an immediate and significant practical burden on the regulated entity.'" *Id.* (citing *PhRMA. v. HHS*, 138 F. Supp. 3d 31, 42 (D.D.C. 2015)).

---

[6] Perplexingly, despite repeatedly using the term "PSLF servicer" on its website and in its instructions to its loan servicers, *see* AR142-50, the Department denies in its answer that FedLoan Servicing acts as the "PSLF servicer" and instead avers that the Department "contracts with FedLoan Servicing to perform certain services in regard to the loans of borrowers who submit ECF forms and PSLF applications to the Department." Answer ¶¶ 60, 66. In any event, the fact that the Department retained final reviewing authority for determinations with respect to Plaintiffs' ECFs indicates that the decisions were squarely its own.

Here, the Department has decided that the Individual Plaintiffs and ABA employees occupied jobs that do not qualify under the statute and regulation governing the PSLF program. These decisions involve "purely legal question[s] of statutory interpretation."  A predicate determination as to whether particular employment qualifies for the PSLF program can be (and was) made prior to the ultimate decision of whether a borrower has fulfilled *all* of the necessary requirements—after the end of 10 years of qualifying employment—for forgiveness of outstanding loan balances.  It is well-established that an agency action "need not necessarily be the very last" in order to be final.  *Fidelity Television, Inc. v. FCC*, 502 F.2d 443, 448 (D.C. Cir. 1974).   It also is beyond dispute that the Department's actions have imposed "immediate and significant practical burden[s]" on the ABA as an employer and on the Individual Plaintiffs.  These plaintiffs pursued public service careers and made life decisions based on the promise of loan forgiveness, only to have their futures and financial stability thrown into disarray.

As a practical matter, the Department's suggestion that a PSLF employment eligibility determination is tentative and not final contravenes the entire rationale for the program.  If an eligibility determination is merely tentative—and can be reversed at any point prior to the final application for loan forgiveness—it introduces substantial uncertainty into the process that deters participation in the PSLF program and the pursuit of public service careers.  It is unreasonable to expect that a borrower who has been informed that her employment does not qualify for PSLF will nonetheless remain in the same employment, wait for the full 10-year period to pass (thereby incurring ever-mounting loan balances), and then apply for forgiveness hoping that the Department will somehow change its mind.  It is also implausible to suggest that the Department would make an eligibility decision upon receipt of the ECF, and then revisit this fundamental question again

18

when the borrower submits a final application for forgiveness.[7]   To the extent the Department

suggests its employment eligibility decisions are "merely tentative," borrowers receiving *either* an

approval or denial are placed into limbo or a "holding pattern"—since the Department could

potentially reverse course at any time prior to the final loan forgiveness decision.

      The D.C. Circuit has held that a government agency may not seek to avoid judicial review

by simply denying that it has taken final action.   In *Friedman*, the FAA failed to issue or deny a

certificate sought by a pilot for an upgraded license, and instead continued to request supplemental

information that the pilot was unable to provide.   841 F.3d at 542.   The court explained that the

agency's actions "placed Friedman in a holding pattern" that had the effect of "thwarting the

Court's interest in reviewing those agency actions that, in practical effect if not formal

acknowledgment, constitute 'the consummation of the agency's decisionmaking process' and

determine 'rights or obligations.'"   *Id.* (quoting *Bennett*, 520 U.S. at 177-78).   The court observed

that the FAA "has made up its mind, yet it seeks to avoid judicial review by holding out a vague

prospect of reconsideration."   *Id.* at 543.   Such action amounted to an improper attempt to "ignor[e]

the power of the Court to ensure justice in an area of law governed by a 'pragmatic and flexible'

approach."   *Id.* (quoting *Rhea Lana*, 824 F.3d at 1027).   The Department's explicit denials in this

case indicate finality more clearly than the "holding pattern" at issue in *Friedman*.

      **B.**      **Exhaustion of Administrative Remedies Is Not Required**

      Under the APA, once an agency has made an adverse decision, the affected party is

required to make "an appeal to superior agency authority" only when "expressly required by

---

[7] Notably, the Department's guidance to borrowers appears to refute this possibility.  *See* Public Service Loan Forgiveness:  Questions and Answers for Federal Student Loan Borrowers ¶ 51 (AR179) (indicating that a borrower who has submitted ECFs "during the entire period when [the borrower was] making [her] 120 qualifying payments" need only submit "*one additional [ECF]* to verify that [she is] employed full-time with a qualifying public service organization *at the time s[he] submit[s] [the] PSLF application*") (emphasis added).

statute" or "otherwise require[d] by rule."  5 U.S.C. § 704; *see Darby v. Cisneros*, 509 U.S. 137, 157 (1993).  Neither the statute nor the regulation at issue here contains any such requirement or establishes any process by which a denied borrower may contest the Department's decision.  *See* 20 U.S.C. § 1087e(m); 34 C.F.R. § 685.219.  Therefore, any suggestion by the Department that Plaintiffs failed to exhaust available administrative remedies is unfounded.

In its answer, the Department denies any formal appeals process exists and avers that "a borrower may request reconsideration by the Department of FedLoan Servicing's response to the borrower's submission of a certification form."  Answer ¶ 64.  While several Plaintiffs did indeed seek reconsideration and/or an explanation upon receiving their denial notices (*see* Rives Decl. ¶¶ 27-36; Rudert Decl. ¶ 13; Voigt Decl. ¶¶ 13-16), they were not required to do so.  Moreover, there is no set path for pursuing an appeal laid out in the statute, the regulation, or any of the Department's guidance available to borrowers on its website.[8]  Plaintiffs thus have gone above and beyond in attempting to restore their qualifying status before resorting to litigation.  Their claims are properly before this Court.

## II. THE DEPARTMENT UNLAWFULLY DETERMINED THAT ABA EMPLOYEES AND THE INDIVIDUAL PLAINTIFFS WERE NOT ELIGIBLE TO PARTICIPATE IN THE PSLF PROGRAM

The Department's sudden reversal of Plaintiffs' eligibility for the PSLF program cannot be squared with any fair reading of the authorizing statute or of the Department's own implementing regulation.  Moreover, to the extent the Department claims that its determinations should be accorded deference by this Court, such deference is not warranted here.

### A. The Department's Changed Interpretation Is Contrary to the Statute

---

[8] Even with respect to a borrower's ultimate application for loan forgiveness, there is no prescribed option to pursue an intra-agency appeal in the event that loan forgiveness is denied.  *See* 34 C.F.R. § 685.219(e)(3); Public Service Loan Forgiveness:  Questions and Answers for Federal Student Loan Borrowers ¶ 54 (AR168-80).

The plain language of the statute precludes Defendants' strained interpretation. When interpreting statutory language, "[t]he primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used." *In re D.F.*, 70 A.3d 240, 243 (D.C. Cir. 2013). The text of the Act makes clear that the definition of "public service job" is intentionally broad and encompasses the Individual Plaintiffs' employment.

The jobs that satisfy the definition of "public service job" are listed in 20 U.S.C. § 1087e(m)(3)(B):

> The term "public service job" means—(i) a full-time job in emergency management, government (excluding time served as a member of Congress), military service, public safety, law enforcement, public health (including nurses, nurse practitioners, nurses in a clinical setting, and full-time professionals engaged in health care practitioner occupations and health care support occupations, as such terms are defined by the Bureau of Labor Statistics), **public education**, social work in a public child or family service agency, **public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a nonprofit organization)**, early childhood education (including licensed or regulated childcare, Head Start, and State funded prekindergarten), **public service for individuals with disabilities**, **public service for the elderly**, public library sciences, school-based library sciences and other school-based services, or at [a 501(c)(3)] organization . . . .

*Id.* § 1087e(m)(3)(B)(i) (emphasis added). The statute does not contain any additional narrowing language.

When the statutory text shows that Congress intended a statute to apply broadly, the agency may not impose a narrowing construction. The ordinary rules of statutory construction govern administrative enabling statutes, requiring that courts interpret statutes according to their plain meaning and the scope Congress inteded. *See* Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* § 65.2 (7th ed. 2007). "Limitations or conditions which depart from its plain meaning" may not be "read into" a statute. *Id.* § 46.4; *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 101 (2012) ("Without

some indication to the contrary, general words . . . are to be accorded their full and fair scope. They are not to be arbitrarily limited.").  Thus, while the Department may provide clarifying definitions consistent with Congress' intended scope of the program, it may not abrogate the plain-language reading of the enumerated categories that fit the definition of "public service job."  *See Bowers v. Federal Express Corp.*, 96 F.3d 200, 208 (6th Cir. 1996) ("[I]f [a] statutory term is unambiguous, the agency is bound by the plain meaning of the statutory term and has no authority to issue a regulation that contradicts that plain meaning." (citing *Chevron, U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843 (1984))); *Consol. Edison Co. v. Dep't of Energy*, 870 F.2d 694, 696 (D.C. Cir. 1989) (where statutory language is "clear and unambiguous[,] . . . the statute's plain meaning must be given effect because . . . an agency administering a statute . . . is [not] at liberty to override Congress's clearly expressed intent." (citation omitted)).

One of those enumerated categories is "public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a nonprofit organization)."  20 U.S.C. § 1087e(m)(3)(B)(i).  While this clause provides some examples of qualifying employment, it does not purport to limit the scope of "public interest law services" beyond its plain-language meaning.  With respect to such other enumerated categories as "public education," "public service for individuals with disabilities," and "public service for the elderly," *id.*, Congress similarly did not see fit to provide narrowing language.  If Congress had wanted to further limit these definitions, it could have easily done so.  It could, for example, have required that the employer organization have a particular "primary purpose."  Alternatively, it could have required that the job be at only a 501(c)(3) organization.  Indeed, Congress mentions 501(c)(3) organizations specifically within the same paragraph, but makes jobs in 501(c)(3)s an *alternative* qualifying category.  *Id.*  Congress clearly intended for employment at other 501(c) nonprofit

organizations to be considered "public service jobs" under the PSLF program.[9]

Under any fair reading of the statute, the Individual Plaintiffs' jobs are or were "public service jobs" for the purposes of the PSLF program.  Mr. Rudert provided direct representation to veterans seeking benefits from the Veterans Administration before the Board of Veterans' Appeals.  In his position, Mr. Rudert provided a public service for elderly individuals, many of whom were also suffering from service-related disabilities.  Ms. Voigt serves the immigrant community by educating the public about immigrant issues, drafting legal briefs and commentaries, and communicating with government officials to advocate for public policy that benefits the immigrant population.  Mr. Burkhart has worked to advance the cause of access to justice for the poor in both criminal and civil settings by filing briefs, providing testimony, and educating the wider legal community on relevant issues.  Ms. Quintero-Millan provided free direct legal representation to unaccompanied, undocumented immigrant children near the Mexican border, frequently appearing in immigration and state courts, representing children in removal proceedings, and filing applications for immigration relief.  During the periods for which they were denied, all of the Individual Plaintiffs worked full-time for private, nonprofit organizations that are tax-exempt under Section 501(c) of the Internal Revenue Code.

The text of the statute, coupled with the relevant legislative history, shows that Congress clearly favored a broad construction of the term "public service job."[10]  Thus, a broad reading of

---

[9] The Department itself has previously recognized the breadth of the definition of "public service jobs."  In 2014, then-Secretary Arne Duncan remarked on the scope of the statute: "The definition of public service jobs is broad."  Remarks of U.S. Secretary of Education Arne Duncan to the 2014 National HBCU Conference HBCUs: Innovators for Future Success (Sept. 23, 2014), http://www.ed.gov/news/speeches/hbcu-value-proposition.

[10] The legislative history supports the view that the definition of "public service job" is intentionally broad.  Senator Jay Rockefeller stated:  "this legislation reflects our goals and expands it to cover a broader range of public service careers."  153 Cong. Rec. S9574-02, S9575 (July 19, 2007).  Senator Edward Kennedy emphasized:  "Our society needs more . . . public

the statute plainly includes the Individual Plaintiffs' employment.   Under rules of statutory construction, the Department may not interpret a statute in a way that contravenes its plain language and congressional intent.

**B.      Even Were the Court To Uphold the Department's Statutory Interpretation, the Changed Interpretation Remains Inconsistent with the Department's Own Implementing Regulation**

The Department's changed interpretation is inconsistent even with its own regulation.  In drafting the regulation, the Department decided to uphold broad congressional intent in defining the term "public service organization."[11]   To qualify as a "public service organization," an employer may be a private organization that provides any of a host of qualifying services, including, among others, "public interest law services," "public service for individuals with disabilities and the elderly," and "public education."   These qualifying services, as defined in the regulation, do not contain "primary purpose" requirements or any narrowing constructions.[12] Thus, any such services, in accordance with the ordinary meaning of these terms, will qualify.

For reasons explained above, *see supra* pp. 23-24, the jobs held by the Individual Plaintiffs here qualify under the plain-language definitions of these terms.   Likewise, the functions performed by the ABA qualify under the plain-language definitions of these and other terms enumerated in the regulation.  For example, both the ABA's Division for Public Education and its

---

interest lawyers . . . .   Under our bill, we will produce more of them, because they—and all the groups I have just mentioned—will be eligible for loan forgiveness."  *Id*. at S9597.

[11] *See* 34 C.F.R. § 685.219(b) ("Public service organization" means: . . . (3) a non-profit organization under section 501(c)(3) of the Internal Revenue Code . . . or (5) a private organization that—(i) provides the following public services: . . . public interest law services, . . . public service for individuals with disabilities and the elderly, . . . [and] public education . . . .").

[12] The term "public interest law" is defined in a circular manner, referring back to "legal services provided by a public service organization."  *Id*.   Those activities must also be "funded in whole or in part by a local, State, Federal, or Tribal government."  *Id*.   This definition suggests that any public interest law services, in accordance with the ordinary meaning of that term and the funding source requirement, will qualify.

Section of Legal Education and Admissions to the Bar provide training for attorneys and legal education for the broader public. Rives Decl. ¶¶ 7-8. The ABA's ProBAR initiative supports direct legal representation of historically underrepresented communities. *Id.* ¶ 12. The ABA's Commissions on Homelessness and Poverty, Disability Rights, and Law and Aging advocate for the rights of these often-overlooked populations. *Id.* ¶¶ 14-16. The ABA's Rule of Law Initiative works to support human rights and the rule of law globally. *Id.* ¶ 17. The ABA's Young Lawyers Division, under a Memorandum of Understanding from the Federal Emergency Management Administration, is also responsible for coordinating Disaster Legal Services, a public assistance program for low-income disaster survivors under the Robert T. Stafford Disaster Relief and Emergency Assistance Act. *See* FEMA, Fact Sheet: Direct Legal Services, https://www.fema.gov/media-librarydata/1465336147412c73997975bfa304bdc8ea28e4c35554e/ FACT_SHEETDisasterLegalServices2016.pdf.

Both the statute and the regulation preclude the Department's changed interpretation of the qualifications for PSLF program eligibility. The Department's actions are therefore not in accordance with law and should be set aside.

## C.      The Department's Changed Interpretations Are Not Entitled to Deference

The Department's changed interpretations were neither authorized by Congress nor the product of reasoned consideration, and they were implemented without public notice. Accordingly, the Department cannot invoke deference from this Court. With respect to its interpretation of the statute, under *United States v. Mead Corp.*, 533 U.S. 218 (2001), an agency receives *Chevron* deference only when Congress has expressly delegated authority to the agency to make rules carrying the force of law. *Id.* at 226-27. Moreover, "[t]o trigger deference, . . . the agency must also show 'that the agency interpretation claiming deference was promulgated in the

exercise of that authority.'" *Fogo de Chao (Holdings) Inc. v. Dep't of Homeland Sec.*, 769 F.3d 1127, 1136 (D.C. Cir. 2014) (quoting *Mead*, 533 U.S. at 227).  Here, the Act expressly delegates regulatory authority to the Secretary of Education solely with respect to determinations regarding qualifying employment as a faculty member at certain institutions of higher education.[13]  The Act does not expressly delegate any other regulatory authority to the Secretary.  "The absence of those relatively formal administrative procedures that tend to foster the fairness and deliberation that should underlie a pronouncement of legal interpretation weighs against the application of *Chevron* deference."  *Fogo de Chao*, 769 F.3d at 1136-37 (quotation marks and internal citation omitted).

While an agency need not necessarily reach its interpretation through formal notice-and-comment rulemaking to receive *Chevron* deference, it must at least demonstrate, among other factors, that it has given "careful consideration" to the question at issue "over a long period of time" to merit such deference.  *Barnhart v. Walton*, 535 U.S. 212, 221-22 (2002).  No evidence exists here that that the Department engaged in such "careful consideration" in this case. The Department offered varying post-hoc "explanations" only after Plaintiffs demanded answers as to why their eligibility had been revoked.  *See Fox v. Clinton*, 684 F.3d 67, 78 (D.C. Cir. 2012) (denying *Chevron* deference to State Department's denial of a Certificate of Loss of Nationality ("CLN") where "the Department offered little more than uncited, conclusory assertions of law in a short, informal document that does not purport to set policy for future CLN determinations").

Nor does the Department's interpretation of the statute merit deference under the standard laid out in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).  An agency's interpretation is entitled to *Skidmore* deference only in proportion with "the thoroughness evident in its consideration, the

---

[13] *See* 20 U.S.C. § 1087e(m)(3)(B)(ii) ("The term 'public service job' means . . . teaching as a full-time faculty member at a Tribal College or University . . . and other faculty teaching in high-needs subject areas or areas of shortage . . . *as determined by the Secretary*." (emphasis added)).

validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* at 140.  Here, the Department has not demonstrated thorough consideration.  To the contrary, its reasoning for its about-face remains entirely undisclosed, and the administrative record is completely devoid of any evidence of careful deliberation.   Its changed interpretation is entirely at odds with its earlier pronouncements, as evidenced by its initial certifications of eligibility for several ABA employees and three of the Individual Plaintiffs.   And, as discussed *supra* pp. 21-24, this changed interpretation does not comport with the text, history, and purpose of the statute.

The D.C. Circuit's opinion in *Fox* is instructive.  There, the court examined a provision of the Immigration and Nationality Act of 1952 ("INA") relied upon by the State Department to deny the plaintiff a CLN and observed that, contrary to the State Department's contentions, the term "naturalization" as used in the INA had an "express, expansive definition" that could not have precluded the plaintiff from obtaining a CLN simply because he had applied for Israeli citizenship "by return" instead of "by naturalisation" under Israeli law.  684 F.3d at 79.  In addition, the explanations that the State Department offered in its letter explaining the denial differed from those it presented later in the litigation, and it failed to demonstrate that its interpretation had been consistent with past agency decisions.  *Id.* at 79-80.  Accordingly, the court found the State Department's letter to be unpersuasive and not entitled to deference under *Skidmore*.[14]  *Id.* at 80. Likewise here, the Department's interpretation of the Act attempts to narrow the statute's broad language, relies on a range of explanations that have no basis in the statutory language, and is at

---

[14] *See Fogo de Chao*, 769 F.3d at 1141 (concluding that the Department of Homeland Security's Appeals Office "failed to ground its newly adopted [interpretation] . . . in statutory text, statutory purpose, regulatory guidance, or reasoned analysis" and that such interpretation "accordingly lacks the power to persuade under *Skidmore*").

odds with its past determinations.  The Court should not afford the Department any deference to its interpretation of the statute under either *Chevron* or *Skidmore*.

The Department also is not entitled to deference with respect to its changed interpretation of the regulation where, as here, such interpretation contradicts its own prior interpretation and the Department has failed to provide notice and reasons for the deviation.  *United Student Aid Funds, Inc. v. King*, 200 F. Supp. 3d 163, 170-71 (D.D.C. 2016); *see Auer v. Robbins*, 519 U.S. 452, 461-62 (1997) (agency not entitled to deference in interpretation of its regulation where such interpretation is "plainly erroneous or inconsistent with the regulation" and "does not reflect the agency's fair and considered judgment on the matter in question").  Prior to its issuance of the denial notices, the Department routinely informed ABA employees and informed three of the four Individual Plaintiffs that their employment qualified for PSLF.  The first "notices" of any kind that Plaintiffs received from the Department regarding a change in interpretation were the denials themselves, which immediately rescinded what the Individual Plaintiffs relied upon in good faith as years of accumulated payment credits toward obtaining loan forgiveness.  Only when pressed for an explanation after the fact did the Department attempt to justify its sudden about-face, which it did in a largely inconsistent and incoherent manner.  *See infra* p. 31.  Such disregard for traditional notions of fairness and transparency renders the Department ineligible for deference.

## III.   THE DEPARTMENT FAILED TO FOLLOW ADEQUATE PROCESS AND PROCEDURE IN CHANGING ITS INTERPRETATION OF THE REGULATION

Even if the changed interpretation were consistent with the statute and the regulation, its application would be invalid because the Department did not use the required procedures in departing from the previous interpretation.  Past agency practice had firmly established that the ABA was a PSLF-eligible public service organization, and that the Individual Plaintiffs were employed by such organizations.  As a result of the Department's past practice, the ABA and

Individual Plaintiffs engendered serious reliance interests on the agency's prior interpretation.  But the Department reversed this past practice without notice or explanation.  The Department ostensibly based its reversals on a changed interpretation of its implementing regulation.  The effect of the Department's new interpretation was to create a new rule, which it applied by reversing its previous eligibility certifications.  As such, the Department's changed interpretation unlawfully impinges on Plaintiffs' reliance interests.  Specifically, the action is arbitrary and capricious (Count I), fails to comply with the APA's notice requirements (Count II), and violates Plaintiffs' due process rights under the Fifth Amendment (Count V).

### A.      The Department Departed from Past Agency Practice Without Providing a Reasonable Explanation

An agency's interpretation of its regulation "must bear the mark of consistency."  *Eisai, Inc. v. FDA*, 134 F. Supp. 3d 384, 391 (D.D.C. 2015).  When agency action "departs from agency precedent without explanation," it is arbitrary and capricious under the APA.  *Ramaprakash v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003).

When an agency changes its interpretation of its regulations such that the agency's new position is a "surprise deviation from its long-acquiescence to a standard industry practice," it has adopted a new rule.  *See United Student Aid Funds*, 200 F. Supp. 3d at 170 (internal quotation marks omitted).  An agency is not entitled to deference under either *Chevron* or *Auer* where it "fails to acknowledge a change and adequately explain it."  *Id.* at 171.  The explanation requirement ensures that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).  "Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action."  *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C. Cir. 1999) (quotation marks and citation omitted).

29

From 2012 to 2014, the Department certified the eligibility of the ABA and Individual Plaintiffs for the PSLF program.   The ABA was certified as a qualifying public service organization by way of its numerous employees having received confirmation of eligibility for loan forgiveness from FedLoan Servicing.   *See* Rives Decl. ¶ 22; July 14, 2014 Letter from FedLoan Servicing to Geoffrey Burkhart (AR210-11).   Three of the four Individual Plaintiffs received confirmation from the Department that their employment made them eligible for PSLF. *See* AR210-11; July 7, 2012 & Oct. 30, 2014 Letters from FedLoan Servicing to Jamie Rudert (AR245-46; AR262-63); June 20, 2012 Email from ED to Kate Voigt, Compl. Ex. F at 5-6.

Beginning in 2014, the Department inexplicably changed its interpretation of its regulation in several important ways.   As a result, all four Individual Plaintiffs received notice from the Department that their employment no longer qualified for purposes of the PSLF program.   *See* AR277-79; AR335-36; AR214-15; AR237-39.

The Department's changed position constitutes a new rule and "surprise deviation" from its past practice of certifying the ABA and the Individual Plaintiffs as eligible for PSLF.[15]   *See United Student Aid Funds*, 200 F. Supp. 3d at 170.   The changed interpretation triggered the obligation that the Department provide an explanation demonstrating that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."   *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quotation marks and citation omitted).   Instead, the Department

---

[15] If the Department in fact sought to promulgate a new rule, it clearly did not follow the required notice-and-comment procedures as set forth in the APA.   *See* 5 U.S.C. § 553(b) (requiring that "[g]eneral notice of proposed rule making shall be published in the Federal Register"); *id.* § 553(c) ("After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of [information].   After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.").

failed to offer any explanation.  *See, e.g.*, AR277 (providing no explanation beyond the phrase "Not Eligible:  Organization Does Not Qualify").  Merely notifying an individual who was once eligible for PSLF that she is no longer eligible does not rise to the level of an explanation, much less a satisfactory explanation of the underlying rationale for the sudden change.  Only after the ABA, Mr. Rudert, and Ms. Voigt pressed for clarification did the Department offer any explanations—but those explanations generated more confusion than clarity.  In each of these cases, the Department's changed interpretation appears to be founded on standards pulled from thin air.

### 1.    *Public Interest Law Services*

The Department articulated a new standard for "public interest law services" in its correspondence with ABA Executive Director Jack Rives.  In response to a letter from Mr. Rives requesting reconsideration of the ABA's PSLF eligibility as a public service organization providing public interest law services, the Department replied that ABA employees are not eligible for PSLF because the Department "ha[s] not received documentation to date that shows ABA's *primary purpose* is to provide 'public interest law services' as defined in the PSLF regulations." AR193 (emphasis added).  Neither the statute nor the regulation provides any basis for the Department's "primary purpose" standard, let alone explains how such a standard is to be applied. Additionally, there is no established process by which an employer or employee can submit supplemental documentation to meet the nebulous "primary purpose" standard.[16]  Mere mention of a "primary purpose" standard does not rid the Department of the requirement that it adequately explain its change of interpretation.

---

[16] Indeed, there is no reasonable basis on which employees of ProBAR could be deemed not to meet the "primary purpose" standard even if this standard was appropriate.  The sole purpose of ProBAR as an organization is to provide free legal services to indigent and vulnerable populations.

In a letter to Kate Voigt, the Department reversed its decision that AILA qualified as a provider of public interest legal services using a standard different from that applied to the ABA. The Department wrote, "After further review, we determined that employees of AILA do not provide public interest law services.  Rather, such services are provided by AILA's member attorneys."  AR336.  The Department drew a distinction between assisting individuals in finding an attorney and providing legal advice.  *See id.*  The letter made no mention of the "primary purpose" standard it used in reconsidering the eligibility of the ABA.  Even in applying this new standard, the Department again failed to explain why it changed its interpretation.

### 2.    *Public Education*

The Department applied a wholly different standard in assessing AILA's eligibility as a provider of "public education."  In its letter to Ms. Voigt, the Department stated that AILA does not provide qualifying "public education services" because "AILA's education activities are directed primarily to its members and to the public in general, not to students or families, and are not provided in a school or school-like setting."  *Id.*  The definition of "public education services" to which the Department referred did not exist when Ms. Voigt was first deemed eligible for loan forgiveness by the Department.  Rather, the definition was added to a later iteration of the ECF, well over a year after Ms. Voigt had been told she qualified for PSLF.  *See supra* p. 10-11 n.4. Once again, the Department's use of the "school or school-like setting" standard was introduced without explanation, and the Department ignored its obligation to provide a reasoned analysis for its changed position.

### 3.    *Public Service for Individuals with Disabilities and the Elderly*

The Department applied yet another standard in Mr. Rudert's case.  Notably, the Department articulated this standard only after Representative Eleanor Holmes Norton requested an explanation on Mr. Rudert's behalf.  In its reply, the Department stated, "while [VVA]

facilitate[s] the provision of disability-related services to Vietnam Veterans, [VVA] do[es] not provide the services outright." AR331. Again, the "outright provision of services" requirement is absent from the statute and regulation, and the Department provides no guidance on what "outright" means and what is necessary to meet the threshold. While the Department thought to articulate a new standard, it did not adequately explain its changed position.

The spectrum of standards applied by the Department evidences the absence of a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). In each of its reversals, the Department failed to adequately explain *why* it had changed its interpretation, instead articulating new standards to reach new outcomes. The Department's post-hoc rationalizations do not replace the requirement that it "supply a reasoned analysis for the change." *United Student Aid Funds*, 200 F. Supp. 3d at 169. Because the Department's interpretation of the statute and regulation departs from past precedent, as demonstrated by its reversals of borrowers' prior eligibility for PSLF without explanation, the Department's actions are arbitrary and capricious. *Ramaprakash*, 346 F.3d at 1124.

**B.     The Department Ignored Settled Reliance Interests when Changing its Interpretation of the Statute and Regulation**

The requirement that an agency explain its change in position does more than ensure that the agency is aware of its changed position and that there are good reasons for the new policy—it also seeks to ensure that the agency is cognizant that longstanding policies may have "engendered serious reliance interests that must be taken into account." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2012) (citation omitted). An agency's change in interpretation "that does not take account of legitimate reliance on prior interpretation" can, on its own, be arbitrary, capricious, or an abuse of discretion. *See Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) (citations omitted). "[D]isregarding facts and circumstances . . . engendered by the prior policy"

demands a reasoned explanation. *Fox TV Stations*, 556 U.S. at 515.

The ABA relied on the Department's longstanding policy that the ABA was a qualifying employer. Since the establishment of the PSLF program, the ABA believed that it was a qualifying public service organization. Rives Decl. ¶¶ 22-23. Before 2012, employees had no established way of certifying their employer's eligibility. *See supra* p. 4 n.1. Once the Department released the ECF, the ABA informed its employees of the form's availability and several employees filed ECFs to confirm their eligibility. *Id.* Numerous ABA employees subsequently received confirmation that their ABA employment qualified them for PSLF. *Id.* It was not until 2015 that ABA employees began receiving notifications from the Department that their prior approvals had been reversed because the ABA did "not provide a qualifying service." *E.g.*, Oct. 12, 2016 Letter from FedLoan Servicing to Geoffrey Burkhart (AR214).

The ABA took several affirmative steps in reliance on the Department's prior confirmation that the ABA provided a qualifying public service. The ABA used the knowledge that its jobs qualified under the PSLF program when recruiting new staff. Rives Decl. ¶ 23. Prospective employees regularly asked the ABA whether it qualified as an employer for PSLF purposes. *Id.* The ABA answered in the affirmative, relying on the Department's routine approval of ABA employees' ECFs. *Id.* When the Department began issuing denials of ABA employees' ECFs, the ABA had to convey this change in practice to prospective employees. *Id.* ¶ 24. The uncertainty surrounding the ABA's PSLF eligibility caused breakdowns in negotiations with candidates who then opted to go elsewhere. *Id.* ¶ 25. In addition, the Department's unexplained changed position has had a significant impact on the ability of the ABA to retain existing employees. As a result of the Department's new interpretation, the ABA lost employees to other organizations. *Id.* ¶ 26.

Similarly, the remaining Individual Plaintiffs took affirmative steps in reliance on the

Department's prior interpretation of its regulation that qualified their employers for purposes of the PSLF program.  Mr. Burkhart, Ms. Voigt, and Mr. Rudert decided either to accept or to remain in their now-ineligible positions as a result of the Department's prior interpretation.  In deciding to accept a position with the ABA, for example, Mr. Burkhart relied on the ABA's qualification as a public service organization for purposes of the PSLF program, even choosing to give up more lucrative employment opportunities available to him.  Burkhart Decl. ¶ 6.  In fact, Mr. Burkhart contacted both the ABA and FedLoan Servicing prior to joining the ABA to confirm that his job would qualify for the PSLF program.  *Id.* ¶ 7.  Both organizations told him that it would.  *Id.*

Like Mr. Burkhart, Ms. Voigt sought early confirmation that her employment with AILA qualified for the PSLF program.  Shortly after beginning work at AILA, Ms. Voigt contacted the Department in June 2012 to confirm AILA's eligibility.  Email from Kate Voigt to ED (AR337-39).  The Department confirmed that AILA "meets the definition of public service organization in [the regulation]."  AR337.  In her reply email, Ms. Voigt stated, "Thank you so very much!  This is really helpful.  I had many of the same thoughts as your colleagues, but it is so reassuring to hear that others are on the same page."  Email from Kate Voigt to ED, Compl. Ex. F at 4.  As a result of the Department's reassurance, Ms. Voigt continued to work at AILA.  Voigt Decl. ¶ 7. Two years later, the Department notified Ms. Voigt of its changed interpretation, and reversed its prior approval of AILA as a qualifying public service organization.  AR335-36.  Notably, Ms. Voigt might have been kept in the dark even longer, as the Department only informed Ms. Voigt of its changed position after she proactively asked whether AILA was a qualifying organization because her coworker had recently been denied.  Compl. Ex. F at 4-5.

Mr. Rudert also obtained certification of his eligibility for PSLF while working at VVA. Mr. Rudert worked at VVA from April 2012 until September 2015.  Rudert Decl. ¶¶ 4, 11.  The

Department twice certified the eligibility of his employment with VVA from April 2012 to October 2014 for purposes of the PSLF program.  AR245-48; AR262-65.  It was only after Mr. Rudert sought certification of his employment period from October 2014 to September 2015 that he was notified that VVA no longer qualified.  AR282-83.  Had Mr. Rudert been notified in the first instance that his employment with VVA did not qualify, he would have found a job that did, as he believed that the PSLF program was his only path to financial stability.  Rudert Decl. ¶ 14.

All of the Individual Plaintiffs relied on either prior certification or the reasonable expectation of certification by the Department of eligibility for PSLF.  Even though Ms. Quintero-Millan sought certification of her employment at ProBAR only after she found another job, she held a reasonable expectation of certification due to the Department's past practice of routinely certifying her colleagues.  Quintero-Millan Decl. ¶¶ 9-10.  The decision of all Individual Plaintiffs to enroll and continue enrollment in IBR plans based on the Department's past practice demonstrates the grave consequences of their reliance.  *Id.* ¶¶ 16-17; Rudert Decl. ¶¶ 3, 18; Voigt Decl. ¶¶ 8, 18; Burkhart Decl. ¶¶ 9, 11.  While one benefit of the IBR plan is that monthly loan payments are capped at a percentage of a borrower's discretionary income, a major detriment is that the borrower will pay more interest over time if she is not ultimately eligible for loan forgiveness under PSLF.  The loans of Ms. Quintero-Millan, who has been enrolled in the IBR plan since January 2013, for example, grew from $340,000 when she first started making payments after law school to $409,869.41, plus $20,577.07 in unpaid interest as of May 2017.  Quintero-Millan Decl. ¶¶ 16-17.  All of the Individual Plaintiffs enrolled in IBR plans with the understanding that their loans would ultimately be eligible for loan forgiveness under PSLF.  *Id.* ¶¶ 16, 18; Rudert Decl. ¶ 3; Voigt Decl. ¶ 8; Burkhart Decl. ¶ 9.

The Department's prior interpretation of its regulation that recognized for years the

eligibility of the Individual Plaintiffs' employers for purposes of the PSLF program engendered serious reliance interests. *See Fox TV Stations*, 556 U.S. at 515. Ignoring these reliance interests would be arbitrary and capricious. *See id.* These interests include the ABA's ability to recruit and retain employees, the Individual Plaintiffs' decisions to accept employment or remain with once-eligible employers, and Individual Plaintiffs' choice of repayment plans with terms suitable only for those ultimately eligible for loan forgiveness. The Department implemented a "change that d[id] not take account of legitimate reliance on [its] prior interpretation." *Smiley*, 517 U.S. at 742. As such, the Department failed to follow adequate process and procedure, and its changed position is arbitrary and capricious.

## IV.    THE DEPARTMENT HAS UNLAWFULLY IMPOSED RETROACTIVE CONSEQUENCES ON PLAINTIFFS

Even if the statute and the regulation allowed the Department to change its interpretation, and even if the Department followed proper procedures to make a prospective change, the application of the new interpretation is unlawful because it imposes retroactive effects on Plaintiffs without congressional authorization. When the Department notified the Individual Plaintiffs of its reversals, it also informed them that their prior payments would not accrue toward the loan forgiveness requirement of 10 years. Apr. 21, 2016 Letter from FedLoan Servicing to Jamie Rudert (AR282-83); Dec. 10, 2014 Letter from ED to Kate Voigt (AR335-36); Oct. 12, 2016 Letter from FedLoan Servicing to Geoffrey Burkhart (AR214-15). The Individual Plaintiffs invested years of their lives in public service in reliance on the Department's former interpretation that their jobs qualified for PSLF. In turn, they relied upon this knowledge in deciding to remain in those jobs while their loan balances increased. Cancellation of this time—which forces the Individual Plaintiffs to restart their efforts to achieve the promised financial security from loan forgiveness—is a harsh, retroactive effect which the law does not permit.

A statutory grant of rulemaking authority does not include the power to act retroactively unless that power is expressly conveyed.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  Agencies have little discretion to impose retroactive effect:  "Even where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant."  *Id.* at 208-09.  Only if the language of the statutory grant *requires* this result should courts permit this interpretation of agency authority.  *Id.* at 208.  In this case, the statutory grant to the Department is devoid of any authorization to act retroactively.  Therefore, the Department's retroactive enforcement of its policy change is not in accordance with law and must be invalidated.

### A.      Congress Did Not Authorize the Department To Act Retroactively

The language of 20 U.S.C. § 1087e(m) simply does not contemplate retroactive application of a change in policy, much less require such a result.  The statute states only that a borrower must be employed in a "public service job" when each of the required 120 loan payments are made and must be employed in such a job at the time of forgiveness.  20 U.S.C. § 1087e(m)(1)(B).  The statute contains no language permitting the Department to ignore payments made under a past interpretation of "public service job" if the Department subsequently changes its interpretation.  As such, the statute cannot reasonably be read to "require[] this result."  *Bowen*, 488 U.S. at 208.  To do so would "permit unreasonably harsh action without [the] very plain words" required to permit retroactive application of a new rulemaking.  *Id.* (quoting *Brimstone R.R. & Canal Co. v. United States*, 276 U.S. 104, 122 (1928)).

### B.      The Department's Change of Policy Applies Retroactively to Impair Vested Rights and Deprives Plaintiffs of Reasonable Reliance on Past Agency Policy

When the Department informed the Individual Plaintiffs that their employment no longer qualified as a "public service job," it sought not only to change the future accrual of time toward

loan forgiveness, but to cancel the time accrued under the Department's previous, express interpretation.  Effectively, the Department sought to impose a decision that the Individual Plaintiffs never, at any time, worked in "public service jobs," and they now must begin again their efforts to accrue 10 years of service.

Courts have articulated several standards for determining when an agency acts retroactively:  impairment of vested rights; attachment of new legal consequences to past events; deprivation of reliance interests; and substantive inconsistency with past agency practice.  In light of these standards and the undisputed fact that the Department previously approved Plaintiffs' employment, the Department's actions are an unequivocally retroactive exercise of power without authorization.

The Department's change of policy retroactively alters the Individual Plaintiffs' vested rights in their accrued progress toward forgiveness.  An agency cannot act retroactively to impair vested rights, *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 859-60 (D.C. Cir. 2002), yet the undisputed facts show this to be precisely the result of the Department's actions.

As the Department implemented the PSLF program, FedLoan Servicing on its website explicitly encouraged borrowers to submit the ECF annually:

> We recommend that you submit your first ECF after you are confident that you have qualifying loans and have made some qualifying payments.  If you so do, you get early confirmation that you are on the right track.  Once your first ECF is approved, we recommend that you submit a new ECF annually. This will help you track your progress in the PSLF Program.  Each time we approve an ECF, we will update the count of qualifying payments that you have made to include payments made during the updated period of employment that has been certified.

Completing the Employment Certification Form (ECF), https://myfedloan.org/borrowers/special-programs/pslf/pslf-completing-ecf (last accessed May 8, 2017).  In offering express, written "confirmation" that individuals have made progress toward receiving loan forgiveness, the

Department created a vested legal right, which it now seeks to alter after the fact. The Individual Plaintiffs received this confirmation that their employment qualified, thus establishing that they were "on the right track" toward forgiveness. Two of these Plaintiffs—Mr. Rudert and Mr. Burkhart—also received the promised statements tracking and updating their number of qualifying payments. AR212-13; AR247-48; AR264-67. The Department credited these Plaintiffs, in writing, with progress toward a benefit which they were lawfully due, only to strip them of that credit when it changed the rules.

Just as an agency may not alter vested legal rights, an agency may not act retroactively by "attach[ing] new legal consequences to events completed before [a new rule's] enactment." *Arkema Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010). The Department's changed interpretation unquestionably alters the legal consequence of the Individual Plaintiffs' past actions by cancelling their credit toward loan forgiveness, as described above. When the Individual Plaintiffs received notice that their employment no longer qualified, they had already completed years of service in "public service jobs." Mr. Rudert, for instance, had completed over three years of service at VVA and made 41 qualifying loan payments—30 of which had been confirmed as such—before being notified that his past employment no longer qualified.[17] *See* Jan. 24, 2015 Letter from FedLoan Servicing to Jamie Rudert (AR266-67); Rudert Decl. ¶¶ 10-11. He, like other Individual Plaintiffs, served these years with the belief that these payments counted toward forgiveness.

---

[17] Defendants deny that Mr. Rudert and others were deemed to have made any qualifying payments. Answer ¶¶ 119, 152, 206. This is presumably because the Department takes the position that these determinations are not "final" for purposes of determining eligibility for forgiveness. *See supra* pp. 17-19. As explained above, such a contention is erroneous. Moreover, the suggestion that no Plaintiffs made qualifying payments flatly contradicts language in the Department's own guidance to borrowers, which states that after reviewing a borrower's ECF, "the PSLF servicer will let you know how many qualifying payments you have made toward PSLF." Public Service Loan Forgiveness: Questions and Answers for Federal Student Loan Borrowers ¶ 47 (AR178).

The Individual Plaintiffs' past decisions to accept qualifying employment had the legal consequence of initiating the path toward loan forgiveness, as evidenced by the Department's certification letters.  The Department's regular tracking communications gave legal consequence to each qualifying payment, certifying the significant incremental progress each Individual Plaintiff made toward fulfilling the required 10 years' worth of payments.  When the Department reversed its position and cancelled this progress, it revoked the legal consequences of these past actions and left the Individual Plaintiffs powerless to remedy their circumstances.

The Department's decision to change its interpretation and policy also unlawfully deprives all Plaintiffs of settled reliance interests to which they are entitled.  The Supreme Court has stated that when considering the exercise of retroactive authority, "familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994).  Prohibiting retroactive effects may be necessary to protect the settled expectations of those who relied on the previous rule.  *See Williams Natural Gas Co. v. FERC*, 3 F.3d 1544, 1554 (D.C. Cir. 1993).  As discussed above, *supra* pp. 34-38, Plaintiffs relied upon the previous rulemaking and its express application to their individualized circumstances.  In the case of the ABA, it communicated with current and former employees about the availability of the PSLF program, and, in the case of the Individual Plaintiffs, they decided to accept and/or remain in public service jobs and enroll in the IBR plan.

These decisions by Plaintiffs are largely irrevocable and irreparable.  When attorneys, in particular, choose to enter the public service sphere, they begin a career trajectory that typically forecloses higher-paying opportunities in the private sector.  *See, e.g.*, Burkhart Decl. ¶¶ 6, 12.  Moreover, when individuals enter payment plans that cover only part of the monthly interest, and not the principal, they continue to accumulate astronomical loan balances.  The promise of loan

forgiveness was therefore a material factor in multiple important decisions made by Plaintiffs—including the decision to accept public service jobs and the decision to enter into capped loan payment plans.  Plaintiffs relied to their detriment on express communications from the Department when it reversed its policy with retroactive effect.

Finally, the Department's changed interpretation is substantively inconsistent with its own past practices, further illustrating its retroactive effect.  *See Arkema Inc.*, 618 F.3d at 7 (noting that an agency acts retroactively if it attempts to enforce a new policy on past circumstances that is "substantively inconsistent with a prior agency practice").  When an agency "changes the legal landscape" and imposes that new landscape on past acts, it acts retroactively and requires express authorization in statute.  *Nat'l Mining Ass'n v. Dep't of Interior*, 177 F.3d 1, 8 (D.C. Cir. 1999) (quoting *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F. 3d 412, 423 (D.C. Cir. 1994)).  As discussed above, the Department expressly qualified the ABA and other employers of the Individual Plaintiffs as "public service organizations."  This inquiry—whether the job qualifies as public service—is the critical substantive inquiry of the statute and regulation, and an individual's success in receiving loan forgiveness under the PSLF program depends almost entirely on this determination.  When the Individual Plaintiffs received their certifications from the Department, the legal landscape unequivocally supported and confirmed their progress toward obtaining loan forgiveness.  Defendants then reversed their own previous decisions, which can reflect only a substantive, retroactive change to the legal landscape.

Taken together, these reasons clearly illustrate that the Department acted retroactively without authorization when it reversed its interpretation of the definition of a public service job. The Department impaired vested legal rights; attached new legal consequences to past, completed actions; deprived Plaintiffs of their reasonable reliance on the Department's express certifications;

and substantively departed from its previous policy.  The undisputed facts therefore confirm that the Department acted retroactively, and it did so in the complete absence of express statutory authorization.  This unlawful agency action requires invalidation.

## V.   THE DEPARTMENT DEPRIVED PLAINTIFFS OF CONSTITUTIONALLY PROTECTED PROPERTY INTERESTS

The Fifth Amendment provides:  "No person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  This guarantee safeguards the "interests that a person has already acquired in specific benefits."  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972).  A person has a legally cognizable property interest in a benefit if she has "a legitimate claim of entitlement to it," which may be evidenced by "rules or understandings that secure certain benefits and that support" such claims.  *Id.*  The Due Process Clause thus "protect[s] those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined."  *Id.*

Prior qualification for benefits authorized under a statute is the best evidence for existence of a property interest.  *See Nicholas v. Riley*, 874 F. Supp. 10, 14 (D.D.C. 1995) (citing *Atkins v. Parker*, 472 U.S. 115 (1985)).  The ABA and three of the four Individual Plaintiffs had been deemed PSLF-eligible by the Department.  The Department acknowledged that the ABA had previously been considered a qualifying public service organization in a letter to ABA Executive Director Jack Rives.  AR191.  Similarly, Mr. Burkhart, Mr. Rudert, and Ms. Voigt all received confirmation that their employment qualified for purposes of the PSLF program.  AR210-11; AR245-46; AR262-63; AR337.  These confirmations created an understanding between the Department and these individuals that their past employment satisfied the criteria for loan forgiveness and created a legitimate claim of entitlement.  *See Roth*, 408 U.S. at 577.

Mr. Burkhart, Mr. Rudert, and Ms. Voigt did not merely have "unilateral expectation[s]"

that their payments qualified for PSLF—these expectations were explicitly affirmed by the Department—or an "an abstract need or desire" for their past-approved payments to qualify. *See* AR210-11; AR245-46; AR262-63; AR337. They relied on those determinations in choosing loan repayment plans that caused their loan balances to increase, not decrease, and in deciding to remain with their now-ineligible employers. Burkhart Decl. ¶¶ 8-9, 11; Rudert Decl. ¶¶ 3, 8-10, 14; Voigt Decl. ¶¶ 7-8, 12, 18. The ABA relied on its status as a PSLF-eligible employer in its recruiting and retention efforts. Rives Decl. ¶ 23. Thus, the Department's changed interpretation deprives the Plaintiffs of property interests by arbitrarily undermining the legitimate claims of entitlement relied on by these Individual Plaintiffs in their daily lives. *See Roth*, 408 U.S. at 577.

To comport with due process requirements, an agency must provide a party "an opportunity for a hearing *before* he is deprived of any significant property interest." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). Any opportunity to present supplemental evidence of eligibility for the PSLF program occurred only *after* the ABA, Mr. Burkhart, Mr. Rudert, and Ms. Voigt had been notified that they did not qualify. *See supra* pp. 6-7, 9, 11. In fact, as explained *supra* p. 20, there is no formal process to object to, or appeal, ineligibility decisions. Additionally, the Department failed to allow Plaintiffs to challenge the application of its changed interpretation before depriving them of their legitimate claims of entitlement to PSLF qualification. For these reasons, the Department's actions deprived Plaintiffs of their constitutionally protected property interests in violation of the Fifth Amendment's guarantee of due process.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for summary judgment and order appropriate relief.


Dated:  May 24, 2017

Respectfully submitted,

Chong S. Park (D.C. Bar No. 46050)
John T. Dey (D.C. Bar No. 1029475)
Edward F. Roche (D.C. Bar No. 1029012)
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 508-4600
Chong.Park@ropesgray.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of May, 2017, I electronically filed the foregoing

Memorandum of Points and Authorities with the Clerk of the Court using the Court's electronic

filing system, which will send a notice of electronic filing to all Counsel of Record.


 */s/     Chong S. Park*

Chong S. Park