## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN BAR ASSOCIATION, *et al.*, | ) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. 16-2476-TJK |
| UNITED STATES DEPARTMENT OF EDUCATION, *et al.*, | ) **ORAL ARGUMENT** |
| Defendants. | ) **REQUESTED** |

## PLAINTIFF AMERICAN BAR ASSOCIATION'S MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65(a) and LCvR 65.1(c), Plaintiff American Bar Association ("ABA") hereby moves for a preliminary injunction prohibiting Defendant U.S. Department of Education (the "Department") from continuing to adhere to its changed interpretation of the Public Service Loan Forgiveness ("PSLF") program's governing statute and regulation and thereby ordering the Department to reinstate the ABA's status as a PSLF-eligible public service organization pursuant to 34 C.F.R. § 685.219(b).

For reasons explained in the accompanying Memorandum of Points and Authorities, and as already argued in the briefing on summary judgment, the ABA has a substantial likelihood of success on the merits in this case. Furthermore, the balance of equities and public interest considerations weigh in favor of a preliminary injunction. As explained in detail in the accompanying Memorandum of Points and Authorities, immediate relief is required to prevent significant irreparable organizational harm to the ABA, including an inability to carry out its organizational mission, substantial reputational harms, and the imminent risk of being forced to cease operations. To prevent this irreparable harm, an expedited hearing is essential. Therefore,

pursuant to LCvR 65.1(d), Plaintiff ABA respectfully requests that a hearing on this motion for preliminary injunction be scheduled for no later than 21 days after the filing of this motion.

In addition to the Memorandum of Points and Authorities, Plaintiff ABA submits the accompanying Declarations of Kimi Jackson, Natalie Cadwalader-Schultheis, and Carlos Hernandez in support of its Motion.

Dated:  September 11, 2018

Respectfully submitted,

 _/s/ Chong S. Park_
Chong S. Park (D.C. Bar No. 46050)
John T. Dey (D.C. Bar No. 1029475)
Edward F. Roche (D.C. Bar No. 1029012)
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 508-4600
Chong.Park@ropesgray.com

*Attorneys for Plaintiffs*

## LOCAL CIVIL RULE 7(m) STATEMENT

On September 10, 2018, undersigned counsel for Plaintiffs conferred in good faith with counsel for Defendants regarding this Motion for Preliminary Injunction.  Defendants oppose this Motion.

 _/s/     Chong S. Park_
Chong S. Park (D.C. Bar No. 46050)
John T. Dey (D.C. Bar No. 1029475)
Edward F. Roche (D.C. Bar No. 1029012)
ROPES & GRAY LLP

2099 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 508-4600
Chong.Park@ropesgray.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of September, 2018, I electronically filed the foregoing Motion with the Clerk of the Court using the Court's electronic filing system, which will send a notice of electronic filing to all Counsel of Record.

/s/     *Chong S. Park*

Chong S. Park

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN BAR ASSOCIATION, *et al.*, | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Civil Action No. 16-2476-TJK |
| | ) |
| UNITED STATES DEPARTMENT OF EDUCATION, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFF AMERICAN BAR ASSOCIATION'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF ITS MOTION FOR
<u>PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS .................................................................................................. 4

I.     CONGRESS CREATED THE PSLF PROGRAM TO ENCOURAGE
EMPLOYMENT IN A BROAD RANGE OF PUBLIC SERVICE PROFESSIONS,
AND THE DEPARTMENT'S IMPLEMENTING REGULATION REFLECTS
THIS INTENTION. ............................................................................................. 4

II.    THE DEPARTMENT CREATED THE EMPLOYMENT CERTIFICATION
FORM TO ALLOW BORROWERS AND THEIR EMPLOYERS TO
DETERMINE WHETHER THE EMPLOYER QUALIFIES AS A PSLF-
ELIGIBLE PUBLIC SERVICE ORGANIZATION. ............................................ 6

III.   THE DEPARTMENT CONFIRMED THAT THE ABA WAS AN ELIGIBLE
EMPLOYER FOR PSLF PURPOSES. ................................................................ 7

IV.   THE DEPARTMENT'S ABOUT-FACE AND REVOCATION OF THE ABA'S
PSLF ELIGIBILITY. ........................................................................................ 8

V.    THE ABA'S PROBAR PROGRAM FACES IMMINENT INSTITUTIONAL
HARM DUE TO THE DEPARTMENT'S ACTIONS AND THE RECENT
BORDER CRISIS. ............................................................................................ 10

LEGAL STANDARD ...................................................................................................... 12

ARGUMENT .................................................................................................................. 13

I.     THE ABA HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE
MERITS OF ITS CLAIM .................................................................................. 14

      A.    The Department Impermissibly Seeks to Limit the Plain Language of the
PSLF Statute and Implementing Regulation ............................................. 15

      B.    The "Primary Purpose" Interpretation Does Not Merit *Chevron*, *Auer*, or
*Skidmore* Deference ................................................................................ 16

      C.    The Department Failed to Follow Proper Process and Procedure in
Implementing the New Interpretation ....................................................... 18

      D.    The Department's Actions Impermissibly Impose Retroactive Consequences
on the ABA's Employees Without Congressional Authorization ............... 19

      E.    The Department's Actions Violate the ABA's Due Process Rights ............ 19

II.     PROBAR WILL FACE IRREPARABLE HARM ABSENT A PRELIMINARY
INJUNCTION ................................................................................................... 19

    A.     The Department's Actions Have Prevented ProBAR from Carrying Out the
Organization's Primary Mission .............................................................. 20

    B.     ProBAR's Reputation Has Suffered Due to Its Inability to Respond
Adequately to the Border Crisis .............................................................. 22

    C.     The Harms Resulting from the Department's Actions Have Put ProBAR's
Continued Existence in Jeopardy ............................................................. 24

III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST CONSIDERATIONS
WEIGH IN FAVOR OF A PRELIMINARY INJUNCTION ........................... 26

CONCLUSION ....................................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcresta Therapeutics, Inc. v. Azar*,
  Civ. Action No. 18-243 (TJK), 2018 WL 3328577 (D.D.C. June 28, 2018) ........................12

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters*,
  280 F. Supp. 3d 59 (D.D.C. 2017)........................................................................................23

*Auer v. Robbins*,
  519 U.S. 452 (1997)..............................................................................................................17

*Barnhart v. Walton*,
  535 U.S. 212 (2002)..............................................................................................................16

*Bd. of Regents of State Colls. v. Roth*,
  408 U.S. 564 (1972)..............................................................................................................19

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988)..............................................................................................................19

*Brandt v. Burwell*,
  43 F. Supp. 3d 462 (W.D. Pa. 2014).....................................................................................24

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016)..........................................................................................................18

*English v. Trump*,
  279 F. Supp. 3d 307 (D.D.C. 2018).......................................................................................12

*Fogo de Chao (Holdings), Inc. v. Dep't of Homeland Sec.*,
  769 F.3d 1127 (D.C. Cir. 2014).............................................................................................16

*Jericho Baptist Church Ministries, Inc. (D.C.) v. Jericho Baptist Ministries, Inc. (Md.)*,
  No. 16-CV-00647 (APM), 2016 WL 4487730 (D.D.C. Aug. 25, 2016)................................23

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)........................................................................ *passim*

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  134 S. Ct. 1377 (2014)..........................................................................................................14

*Movement Mortg., LLC v. Ward*,
  No. 3:14-CV-23-RJC-DCK, 2014 WL 461137 (W.D.N.C. Feb. 5, 2014).............................24

*Nicholas v. Riley*,
  874 F. Supp. 10 (D.D.C. 1995) ..................................................................................19

*Nken v. Holder*,
  556 U.S. 418 (2009) ....................................................................................................26

*Open Communities Alliance v. Carson*,
  286 F. Supp. 3d 148 (D.D.C. 2017) ..............................................................20, 21, 24, 26

*Proctor v. D.C.*,
  310 F. Supp. 3d 107 (D.D.C. 2018) ..............................................................................13

*Ramaprakash v. FAA*,
  346 F.3d 1121 (D.C. Cir. 2003) ...................................................................................18

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ....................................................................................................17

*Smiley v. Citibank (S. Dakota), N.A.*,
  517 U.S. 735 (1996) ....................................................................................................18

*United Student Aid Funds, Inc. v. King*,
  200 F. Supp. 3d 163 (D.D.C. 2016) ........................................................................17, 18

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008), The D.C. .........................................................................................12

*Wis. Gas Co. v. F.E.R.C.*,
  758 F.2d 669 (D.C. Cir. 1985) .....................................................................................24

## Constitutional Provisions, Statutes and Rules

U.S. Const. amend. V .......................................................................................................14, 19

5 U.S.C. §§ 701-706 ..............................................................................................................14

20 U.S.C. § 1087e(m) ..........................................................................................................4, 15

20 U.S.C. § 1087e(m)(1)(A) .....................................................................................................4

20 U.S.C. § 1087e(m)(3)(B) .....................................................................................................4

26 U.S.C. § 501(c)(3) ...............................................................................................................5

34 C.F.R. § 685.219 .................................................................................................................5

34 C.F.R. § 685.219(a) .............................................................................................................5

34 C.F.R. § 685.219(b) .........................................................................................................5, 16

34 C.F.R. § 685.219(b)(5)...............................................................................................................5

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 101 (2012) ...................................................................................................................15

Employment Certification for Public Service Loan Forgiveness Form, Federal Student Aid (Jan. 31, 2012), https://ifap.ed.gov/dpcletters/GEN1202.html (last accessed Sept. 6, 2018) ..........................................................................................................6

Public Service Loan Forgiveness: Employer Resource Center, FedLoan Servicing, https://myfedloan.org/borrowers/special-programs/pslf/pslf-employer-resource-center (last accessed Sept. 6, 2018)...........................................................................7

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. § 2948.1 (3d ed.) ...................................................................................................................23

## PRELIMINARY STATEMENT

The American Bar Association (the "ABA"), one of the Plaintiffs in this case, respectfully requests that the Court grant a preliminary injunction preventing the irreparable harm the ABA will suffer if the U.S. Department of Education (the "Department") continues retroactively and illegally denying eligibility for loan forgiveness under the Public Service Loan Forgiveness ("PSLF") program to the ABA's employees.

For years, the Department affirmed that employment with the ABA qualified as public service employment and thus satisfied the requirements for participation in the PSLF program, allowing these employees to obtain forgiveness of their eligible student loan balances after making on-time payments for ten years while employed by the ABA.  Then, suddenly, without warning or notice of any kind, the Department reversed course entirely and started to deny requests for approval from ABA employees.   Since this unexplained turnaround in the Department's interpretation of the eligibility criteria, the ABA has suffered mounting harm.  As the ABA has previously explained to this Court, this has included significant harm to the ABA's South Texas Pro Bono Asylum Representation Project ("ProBAR"), an organization that provides a wide range of free legal services to immigrants detained by the U.S. government in southern Texas.  In addition to representing individuals in asylum proceedings, ProBAR provides removal defense, assistance to adults and children in detention centers in understanding their rights and securing assistance, and individual screenings to unaccompanied immigrant children. The ABA's PSLF concerns have jeopardized all aspects of ProBAR's mission.  In the more than twenty months since this case was filed, the harm to ProBAR has continued to worsen.  Critical attorney positions have remained unfilled, and existing lawyers have departed, because attorneys have been unwilling to take the risk that they would not be entitled to PSLF relief.

The recent crisis at the U.S.-Mexico border has intensified the harm to ProBAR.  The

project is no longer just in a precarious position; its very existence is threatened.  In response to

the large flow of immigrants to the border, the administration implemented a policy of referring

all adults crossing the border without inspection for criminal prosecution.  This occurred even if

the adult border-crossers had children in their care, resulting in the separation of parents from

children.  Nearly 3,000 children were initially separated from their parents.  A federal judge then

ordered the government to reunite all these children with their parents, which sparked an

expansive reunification mission that, as of the time of the present filing, is far from complete.

The border crisis has stretched ProBAR's already scarce resources to the breaking point.

ProBAR always has a heavy caseload—representing asylum applicants, working in detention

centers, and working with unaccompanied children—but ProBAR has since been called upon to

respond to the formidable task of reuniting separated children with their families.  As one of the

major organizations in South Texas specializing in representing both adults and children in

immigration proceedings, ProBAR should have been well positioned to assist.  It has so far

attempted to reunite over 300 parents with their children.  But ProBAR's lack of resources has

severely constrained its impact.  It currently has vacancies in critical positions throughout the

organization, including the position of Legal Director for ProBAR's Children's Project, which

would be spearheading many of the efforts in response to the border crisis, and several Staff

Attorney positions.   ProBAR simply cannot recruit the staff it needs to fill the positions.

Attorneys continue to leave, and signal their intent to leave, at an alarming rate.

Virtually all of the attorneys to have left ProBAR in recent years, and others who have

turned down job offers from ProBAR, have done so for the same reason:  the uncertainty

regarding ABA employees' eligibility for the PSLF program.  Many attorneys can afford to work

for public interest organizations only if loan forgiveness under the PSLF program—after ten

years of working for the organization and making the required payments on the loans—is assured. Many start their careers with six figures of education debt and, during the first ten years, their debt loads increase as their monthly interest accrual outpaces their income-based payments. This arrangement is financially viable only if the attorney can be assured that her loans will be forgiven after ten years. When an employer is not eligible, or where there is uncertainty, many employees cannot afford to work for that employer without risking financial ruin. Many of ProBAR's actual or prospective attorneys have explicitly told ProBAR that they cannot afford to work for the organization without a guarantee of eventual loan forgiveness. ProBAR's vacancies are the direct result of the Department's denials of PSLF eligibility for ABA employees.

The border crisis has exacerbated ProBAR's staffing concerns, and ProBAR stands to suffer irreparable harm as a result. First, ProBAR cannot adequately respond to a humanitarian crisis that is at the very core of its mission. Vacant positions mean the difference between children being returned to their families versus not being returned, the difference between representation for asylum seekers in credible-fear interviews versus no representation, and the difference between immigrants in detention facilities being advised versus having to fend for themselves in an alien system where they often do not speak the language. As one example, ProBAR has been unable to represent more than a nominal number of asylum seekers, and has even lacked the personnel to train and mentor attorneys in private practice willing to provide *pro bono* representation to the asylum seekers. Second, ProBAR's previously stellar reputation has suffered as a result of its inability to perform its core tasks effectively in a time of great need and high visibility. Finally, the border crisis has created the perfect storm that threatens ProBAR's very existence: significant vacancies leaving needs unmet, existing employees being overworked as a result, and crucial funding dollars left on the table because ProBAR is unable to

implement any meaningful plans it may propose in its grant applications.

In the absence of interim relief, ProBAR will be rendered ineffective at best and non-existent at worst. A preliminary injunction is necessary to prevent the Department's arbitrary and capricious denials of PSLF eligibility and to enable one of the ABA's most important public interest initiatives to function.

## STATEMENT OF FACTS

I.  **CONGRESS CREATED THE PSLF PROGRAM TO ENCOURAGE EMPLOYMENT IN A BROAD RANGE OF PUBLIC SERVICE PROFESSIONS, AND THE DEPARTMENT'S IMPLEMENTING REGULATION REFLECTS THIS INTENTION.**

In September 2007, bipartisan majorities in Congress passed, and President George W. Bush signed into law, the PSLF program's governing statute, the College Cost Reduction and Access Act of 2007 (the "statute"). *See* 20 U.S.C. § 1087e(m). In relevant part, the statute directs the Secretary of Education to cancel the remaining principal and interest due on any Federal Direct Loan for a student loan borrower not in default who (1) has made 120 monthly payments since October 1, 2007 on any such loan and (2) is employed in a public service job at the time each payment was made and at the time of forgiveness. *Id.* The statute defines the term "[p]ublic service job" as a "full-time job" that falls into any of a number of specified categories, including but not limited to "public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a nonprofit organization)," "public education," "public service for individuals with disabilities," and "public service for the elderly." *Id.* § 1087e(m)(3)(B). The statute does not provide any limiting definitions for these terms. *Id.* Eligible borrowers must make the required 120 payments under one or more Direct Loan Program repayment plans. *Id.* § 1087e(m)(1)(A).

In October 2008, the Department published an implementing regulation for the PSLF

program, codified at 34 C.F.R. § 685.219.  The Department stated in the regulation's preamble

that the program "is intended to encourage individuals to enter and continue in full-time public

service employment by forgiving the remaining balance of their Direct loans after they satisfy

the public service and loan payment requirements of this section."  34 C.F.R. § 685.219(a).  The

regulation defines "[p]ublic interest law" as "legal services provided by a public service

organization that are funded in whole or in part by a local, State, Federal, or Tribal government."

*Id.* § 685.219(b).  The regulation further defines "[p]ublic service organization" to include,

among other categories, governmental entities, non-profit organizations organized under 26

U.S.C. § 501(c)(3), and

> A private organization that—
>
> (i)     Provides the following public services: Emergency management,
>          military service, public safety, law enforcement, public interest law
>          services, early childhood education (including licensed or
>          regulated child care, Head Start, and State funded pre-
>          kindergarten), public service for individuals with disabilities and
>          the elderly, public health (including nurses, nurse practitioners,
>          nurses in a clinical setting, and full-time professionals engaged in
>          health care practitioner occupations and health care support
>          occupations, as such terms are defined by the Bureau of Labor
>          Statistics), public education, public library services, school library
>          or other school-based services; and
>
> (ii)    Is not a business organized for profit, a labor union, a partisan
>          political organization, or an organization engaged in religious
>          activities, unless the qualifying activities are unrelated to religious
>          instruction, worship services, or any form of proselytizing.

34 C.F.R. § 685.219(b)(5).  Aside from the definition of "public interest law," the regulation

does not define any of the other categories listed under 34 C.F.R. § 685.219(b)(5).  Nor does the

regulation require that any of the listed types of public service be an organization's "primary

purpose" in order for the organization to qualify as a PSLF-eligible employer.

      The Department has never published any notice of intent to modify or narrow the

definitions of qualifying employment for the PSLF program as they appear in the current language of the regulation.

## II.    THE DEPARTMENT CREATED THE EMPLOYMENT CERTIFICATION FORM TO ALLOW BORROWERS AND THEIR EMPLOYERS TO DETERMINE WHETHER THE EMPLOYER QUALIFIES AS A PSLF-ELIGIBLE PUBLIC SERVICE ORGANIZATION.

On January 31, 2012, the Department issued a "Dear Colleague" letter to stakeholders announcing that the Office of Management and Budget had approved the Employment Certification for Public Service Loan Forgiveness form ("Employment Certification Form" or "ECF").   *See* Employment Certification for Public Service Loan Forgiveness Form, Federal Student Aid (Jan. 31, 2012), https://ifap.ed.gov/dpcletters/GEN1202.html (last accessed Sept. 6, 2018), attached hereto as Exhibit A.   As the Department explained in its letter, "[u]pon submission of a completed [Employment Certification Form] to FedLoan Servicing (PHEAA), the Department's PSLF loan servicer, the borrower will be informed if the employment reported on the form meets the qualifying employment standards for PSLF.   FedLoan Servicing will also provide the borrower with information that will help the borrower keep track of their qualifying employment as well as their qualifying payments on their Direct Loans."   *Id.*   The Department went on to explain that, while submission of the ECF prior to having made ten years' worth of payments "is not required, the Department will only keep track of a borrower's progress toward meeting the PSLF eligibility requirements if the borrower submits the form to FedLoan Servicing," and moreover, that "[i]f the borrower does not periodically submit the form, the borrower will be required . . . to submit an [ECF] for each employer that he or she wants considered for PSLF employment qualification" at the time the borrower submits her application for loan forgiveness.   *Id.*

Consistent with the explanation in the Department's letter, FedLoan Servicing explains

on its website's Employer Resource Center page:  "[w]e will only determine whether an employer qualifies for PSLF based on the submission of the ECF or the PSLF Application for Forgiveness."  Public Service Loan Forgiveness:  Employer Resource Center, FedLoan Servicing, https://myfedloan.org/borrowers/special-programs/pslf/pslf-employer-resource-center         (last accessed Sept. 6, 2018).   On the same page, under the heading "Employer Best Practices," FedLoan Servicing implores public service employers:  "After you know that your organization qualifies for PSLF, use it as a recruiting opportunity!"   *Id.*   Further, FedLoan Servicing recommends that employees submit the ECF on an annual basis, since "an updated ECF is the only way for an employee to be sure that all of the payments made over the course of the last year of employment count toward PSLF," "[e]ven though [the employer] and [the] employee already know whether the employment for [the] organization qualifies."   *Id.*

## III.   THE DEPARTMENT CONFIRMED THAT THE ABA WAS AN ELIGIBLE EMPLOYER FOR PSLF PURPOSES.

Plaintiff ABA is a private, not-for-profit 501(c)(6) organization that is not a labor union, a partisan political organization, or an organization engaged in religious activities.  Declaration of Jack L. Rives ("Rives Decl.") ¶ 5, ECF No. 17-1.  Through its multiple divisions and sections, the ABA operates several programs whose purpose is to educate the public, enhance legal education, and/or provide direct legal services to low-income and disadvantaged populations.  *See id.* ¶¶ 6-19.  Federal government grants account for a substantial portion of the funding for these programs.  *Id.* ¶ 20.

One of the programs most emblematic of the ABA's public service mission is its South Texas Pro Bono Asylum Representative Project ("ProBAR"), a project based in Harlingen, Texas that provides free legal services directly to migrants facing immigration removal proceedings.  *Id.* ¶ 12.  ProBAR serves adults detained by the Department of Homeland Security

and children held in Department of Health and Human Services Office of Refugee Resettlement ("DHHS ORR") shelters in South Texas.  *Id.*; *see* Declaration of Michelle Quintero-Millan ("Quintero-Millan Decl.") ¶¶ 4-5, ECF No. 17-5; Declaration of Kimi Jackson ("First Jackson Decl.") ¶ 4, ECF No. 25-1; Declaration of Kimi Jackson ("Second Jackson Decl.") ¶ 3, ECF No. 38-1.  The demand for ProBAR's services has increased markedly in the last few months as a result of the administration's "zero tolerance" and family separation policies at the U.S.-Mexico border.  *See* Declaration of Kimi Jackson ("Third Jackson Decl.") ¶ 7, attached hereto as Exhibit B; Declaration of Carlos Hernandez ("Hernandez Decl.") ¶ 4, attached hereto as Exhibit C.

Shortly after the creation of the PSLF program, and aware that the statute and regulation would benefit its employees due its extensive public service activities, the ABA began informing its current and prospective employees about the program's availability.  Rives Decl. ¶ 21.  Later, following the Department's issuance of the Employment Certification Form, several ABA employees completed and submitted ECFs to verify that their ABA employment qualified for the PSLF program.  *Id.* ¶ 22.  In response, the Department informed each of these employees that the ABA did so qualify.  *Id.*  Armed with this knowledge, and aware that PSLF eligibility would likely prove to be an important factor for new hire candidates, the ABA informed prospective employees that the ABA was a qualifying PSLF employer.  *Id.* ¶ 23.

## IV.   THE DEPARTMENT'S ABOUT-FACE AND REVOCATION OF THE ABA'S PSLF ELIGIBILITY.

Beginning in 2015, and without providing any advance notice to the ABA or its employees, the Department started issuing denials to ABA employees in response to their ECF submissions and informing those employees that any prior payments they made while employed by the ABA would not count toward the required 120 needed to obtain loan forgiveness.  Rives Decl. ¶ 24.  Because of this change, the ABA suddenly had to reverse course and explain to

prospective employees who inquired about PSLF that the Department had started issuing denial notices to its employees, which in turn has prompted several such candidates to seek employment with organizations that remain PSLF-eligible. *Id.* ¶ 25; First Jackson Decl. ¶¶ 14-15; Second Jackson Decl. ¶¶ 9, 17. In addition to hampering the ABA's ability to recruit new employees, the Department's retroactive ECF denials drove some existing employees to leave the ABA to work at PSLF-eligible organizations, and have been a source of great concern for other employees who have either left or indicated they would leave the ABA if the Department failed to reinstate the ABA's qualifying status. Rives Decl. ¶ 26; First Jackson Decl. ¶¶ 9, 19; Second Jackson Decl. ¶¶ 9, 11, 18.

Throughout 2016, the ABA attempted to resolve the issue of its revoked PSLF eligibility by meeting and corresponding with senior Department officials on numerous occasions. Rives Decl. ¶¶ 27-34. During the course of these communications, for the first time, the Department stated its reasoning for revoking the ABA's eligibility, namely, that neither the ABA nor any of its PSLF-applicant employees had produced documentation demonstrating that the "primary purpose" of the ABA is to provide public interest law services. *Id.* ¶¶ 31-32. The "primary purpose" requirement is absent from both the statute and the regulation. The new requirement first appeared on the Department's website in mid-2017, approximately six months after the inception of this litigation. *See* Pls.' Reply in Supp. of Pls.' Mot. for Summ. J. at 18-19 n.6, ECF No. 27. It first appeared on a new version of the Employment Certification Form and the newly released application for loan forgiveness shortly thereafter. *See* Pls.' Reply in Supp. of Pls.' Mot. to Allow for Extra-Record Review or, in the Alternative, to Allow for Judicial Notice at 5, ECF No. 32.

V.   **THE ABA'S PROBAR PROGRAM FACES IMMINENT INSTITUTIONAL HARM DUE TO THE DEPARTMENT'S ACTIONS AND THE RECENT BORDER CRISIS.**

Combined with the Department's changed stance regarding the ABA's eligibility as a PSLF-qualifying employer, the current administration's "zero tolerance" policy and practice of separating migrant families at the United States' southern border has strained ProBAR's ability to meet the demand for its services, so much so that ProBAR's director, Kimi Jackson, doubts the organization's continued viability.  Third Jackson Decl. ¶ 8.

Prior to the recent change in immigration policy, the Department's stripping of the ABA's PSLF eligibility had already severely hampered ProBAR's ability to hire and retain attorneys to fill roles critical to the success of its mission.  *See* First Jackson Decl. ¶¶ 6-19.  For example, the position of Legal Director of ProBAR's Children's Project, which provides direct, free legal representation to minors detained in DHHS ORR shelters, has remained vacant since February 2017, thereby leaving Children's Project staff attorneys without a leader to issue reports and develop organizational strategy.  *Id.* ¶¶ 7-8; Second Jackson Decl. ¶¶ 9-10.  ProBAR has also been unsuccessful in filling important staff attorney positions for its Adult Project, which provides legal representation, legal orientations, and *pro se* assistance to adult detainees, and recruits and trains *pro bono* attorneys.  First Jackson Decl. ¶¶ 11-16; Second Jackson Decl. ¶¶ 7-8.  Even before the introduction of the current immigration policy, these staffing challenges caused ProBAR to sharply reduce its caseload by turning away potential clients that had strong asylum cases, and to cease offering free Continuing Legal Education courses—a requirement of ProBAR's grant conditions—to local and potential *pro bono* attorneys.  First Jackson Decl. ¶¶ 16-18; Second Jackson Decl. ¶ 12.  In addition, the shortage of qualified ProBAR attorneys, and resulting inability to fulfill ProBAR's mandate, threatened the organization's relationships with its key funders.  Second Jackson Decl. ¶¶ 13-14.

The government's "zero tolerance" and family separation policies have suddenly and dramatically exacerbated the strain on ProBAR's ability to keep pace with demand for its resources. Despite their best efforts, including working with more than 300 separated parents and approximately 600 separated children since the policies' enactment, ProBAR employees lack the support needed to execute their mission fully and effectively on all fronts. Third Jackson Decl. ¶ 8. Instead of providing representation to as many asylum seekers as possible at credible-fear hearings while also training and mentoring *pro bono* attorneys, ProBAR has had to refer most new cases to volunteer attorneys who are capable of providing only *pro se* assistance (as opposed to full representation) to asylum seekers. *Id.* ¶ 9.

The deficiencies in ProBAR's response to the border crisis have caused increased reputational harm to ProBAR among its funders, who have indicated that they will cease providing funds to the organization if it is unable to fill its longstanding staff attorney vacancies. *Id.* ¶¶ 13-14. Relatedly, certain of ProBAR's funding agreements will require it to open even more attorney positions to serve minors held in newly opened detention facilities, and require that ProBAR provide periodic updates on the success of its recruiting efforts. *Id.* ¶¶ 15-16. ProBAR's inability to fill existing and new attorney positions will render funders less likely to consider ProBAR for future grant opportunities. *Id.* ¶ 13.

ProBAR's reputation has also suffered among peer organizations and law schools. *Id.* ¶ 12. As word spreads about the organization's inability to recruit and retain employees central to its mission, and that employment with the ABA does not qualify for PSLF, prospective applicants who might otherwise be enticed to join ProBAR are discouraged from seeking employment there. *Id.* Indeed, certain law schools are now proactively informing their students about the Department's decision to rescind ProBAR's eligibility determination. *Id.* ¶ 11.

In addition to contributing to ProBAR's serious reputational harm, the recent developments at the border, combined with the ABA's continued ineligibility for PSLF, have increased stress and workloads among remaining ProBAR staff, further threatening the organization's ability to function. *Id.* ¶ 17. Aware of this pending litigation, ProBAR employees have requested updates on the status of the ABA's eligibility for PSLF, and an increasing number have indicated they will leave ProBAR altogether in the near future if the Department continues to refuse to recognize the organization as a qualifying PSLF employer. *Id.* ¶ 18; *see, e.g.*, Declaration of Natalie Cadwalader-Schultheis ("Cadwalader-Schultheis Decl.") ¶¶ 8-11, attached hereto as Exhibit D. Several attorneys have left the organization, citing the PSLF uncertainty. Third Jackson Decl. ¶ 18. One attorney just left ProBAR on September 4, 2018 because he could not afford to work for the organization if his employment would not be eligible for PSLF relief. Hernandez Decl. ¶¶ 7, 10-11.

## LEGAL STANDARD

A preliminary injunction is appropriate when the party seeking the injunction makes a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of equities in its favor, and accord with the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016); *see Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008).[1] The purpose of a preliminary injunction is "to preserve the relative positions of the parties until a trial on the merits can be held." *English v. Trump*, 279 F. Supp. 3d 307, 316 (D.D.C. 2018) (Kelly, J.)

---

[1] The D.C. Circuit has not yet decided whether *Winter* mandates abandoning the "sliding-scale" approach to weighing the four preliminary injunction factors. *League of Women Voters*, 838 F.3d at 7; *see also Alcresta Therapeutics, Inc. v. Azar*, Civ. Action No. 18-243 (TJK), 2018 WL 3328577, at *2 (D.D.C. June 28, 2018) (Kelly, J.) (expressing "strong doubts that the sliding-scale approach survives *Winter*.") Because the ABA satisfies all four preliminary injunction factors in this case, it is not necessary for this Court to decide the issue here.

(citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  The D.C. Circuit has "rejected any distinction between [the burdens for] a mandatory and prohibitory injunction," though the plaintiff still bears the burdens of production and persuasion for a preliminary injunction. *League of Women Voters*, 838 F.3d at 7 (noting that "the 'mandatory' injunction has not yet been devised that could not be stated in 'prohibitory' terms").  Although a preliminary injunction is an extraordinary remedy, "a preliminary injunction may be granted based on less formal procedures and on less extensive evidence than in a trial on the merits."  *Proctor v. D.C.*, 310 F. Supp. 3d 107, 113 (D.D.C. 2018) (alterations omitted) (citing *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004)).  "Still, an evidentiary hearing is required if the parties raise a genuine issue of material fact that must be resolved in deciding the motion."  *Id.* (citing *Cobell*, 391 F.3d at 261).

## ARGUMENT

To prevent impending and irreparable harm to the ABA, this Court should grant a preliminary injunction.  The ABA is likely to succeed on the merits of its claims for the reasons it has explained in its summary judgment briefing:  The Department's change of its interpretation of the governing PSLF statute and regulation and subsequent retraction of the ABA's PSLF eligibility are contrary to the implementing statute and regulation, are unlawful agency actions with retroactive consequences, and deprive the ABA of its vested property rights without due process.  The Department's actions have resulted in considerable and irreparable harm to ProBAR in particular.  The recent administration policy of separating migrant children from their parents as they entered the United States has highlighted precisely how much damage the Department's reversal has caused ProBAR and exacerbated this harm to the point where ProBAR will no longer be able to function.  Finally, the balance of the equities and public interest both strongly favor the grant of a preliminary injunction, as there is substantial ongoing harm to the asylum seekers ProBAR should be representing but no longer can because of the

Department's actions. There is no hardship to the Department from being required to follow the law, and indeed, there is a strong public interest in ensuring the Department does so. Because the ABA can establish all four factors necessary for a grant of a preliminary injunction, the ABA respectfully requests this Court grant the preliminary injunction restraining the Department from continuing to apply its changed interpretation of the PSLF eligibility criteria to employees of the ABA.

## I.     THE ABA HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS CLAIM

As fully set forth in Plaintiffs' summary judgment briefs, *see* Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Mot. Summ. J."), ECF No. 17 & Pls.' Reply in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Reply"), ECF No. 27, which are incorporated here, the Department's arbitrary and capricious actions in this case violate the PSLF authorizing statute and implementing regulation, are contrary to law under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), and violate due process under the Fifth Amendment to the United States Constitution.

As a preliminary matter, the Department's retraction of eligibility bears all the hallmarks of a final agency action subject to review. *See* Pls.' Mot. Summ. J. at 14-19; Pls.' Reply at 3-12. Not subject to any further agency review, the retraction of eligibility marked the consummation of the Department's decision-making process and has resulted in practical and legal consequences for ProBAR, which faces serious recruiting and retention problems that will cause permanent damage to the organization. Furthermore, the ABA is directly affected by the PSLF program and its claims fall squarely within the statute's zone of interests. Pls.' Reply, ECF No. 27, at 13-15. As a not-for-profit organization whose employees perform the very public service jobs laid out in the PSLF statute, the ABA is directly—not incidentally—affected by the program. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1389 (2014)

(quotation marks omitted) (noting that the zone-of-interests test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue").

The ABA has demonstrated that it is likely to succeed on the merits because: (1) the Department's "primary purpose" interpretation is contrary to the plain language of both the PSLF statute and the implementing regulation; (2) the Department's interpretation warrants no deference under any standard; (3) the Department failed to follow proper process and procedure in changing its interpretation of the statute; (4) the Department's interpretation is impermissibly retroactive; and (5) the Department's interpretation deprives the ABA of a constitutionally protected property interest.   The ABA's demonstration of the likelihood of success on these fronts counsels in favor of granting the preliminary injunction.

### A. The Department Impermissibly Seeks to Limit the Plain Language of the PSLF Statute and Implementing Regulation.

The "primary purpose" interpretation is not supported by the plain language of either the PSLF statute or the implementing regulation and instead seeks to alter the language of the statute and regulation.   The Department's new interpretation of the statute as requiring that the employer's "primary purpose" be to provide public interest law services is contrary to the PSLF authorizing statute, 20 U.S.C. § 1087e(m).   *See* Pls.' Mot. Summ. J. at 20-24; Pls.' Reply at 16-30.   The plain language of the statute precludes this "primary purpose" interpretation.   The statute's definition of "public service job" is broad and encompasses the work done by ProBAR's employees.   Nowhere does the statute itself limit eligibility only to those who work at organizations whose primary purpose is to provide public interest law services.   Such a limitation is contrary to the plain meaning of the statute and the rules of statutory interpretation.   *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 101 (2012)

("Without some indication to the contrary, general words . . . are to be accorded their full and fair scope.  They are not to be arbitrarily limited.").  Had Congress meant to limit eligibility beyond the plain meaning of the categories it listed, it could have included this "primary purpose" language in the statute.   The Department's "primary purpose" test also contradicts the Department's own implementing regulation.  *See* Pls.' Mot. Summ. J. at 24-25; Pls.' Reply at 24-30.  The implementing regulation mirrors the broad language of the statute, and does not limit these definitions to the organization's primary purpose.  *See* 34 C.F.R. § 685.219(b).  As such, under a plain-language reading of both the statute and the regulation, the ABA qualifies as providing "public interest law services," as ProBAR provides direct legal representation to unaccompanied minors and indigent adults and children facing deportation proceedings.

### B.      The "Primary Purpose" Interpretation Does Not Merit *Chevron*, *Auer*, or *Skidmore* Deference.

Because the Department's changed interpretation was not authorized by Congress, not the product of reasoned consideration, and implemented without public notice, this Court should accord that interpretation no deference.  Pls.' Mot. Summ. J. at 25-28; Pls.' Reply at 17-21.  "The absence of those relatively formal administrative procedures that tend to foster the fairness and deliberation that should underlie a pronouncement of legal interpretation weighs against the application of *Chevron* deference."  *Fogo de Chao (Holdings), Inc. v. Dep't of Homeland Sec.*, 769 F.3d 1127, 1136-37 (D.C. Cir. 2014) (quotation marks, alterations and internal citations omitted).  To receive *Chevron* deference, the agency must at least demonstrate, among other factors, that it gave "careful consideration" to the question at issue "over a long period of time."  *Barnhart v. Walton*, 535 U.S. 212, 221-22 (2002).  Yet, no evidence exists in the record that the Department engaged in this careful consideration.  Though the Department offers a post hoc rationalization for why it revoked the ABA's PSLF eligibility, the explanation does not support

providing deference to the Department's new "primary purpose" interpretation. Furthermore, because the change of interpretation is at odds with the Department's own prior interpretation and the Department showed no considered judgment in changing the interpretation, the Department also does not merit *Auer* deference. *See United Student Aid Funds, Inc. v. King*, 200 F. Supp. 3d 163, 170-71 (D.D.C. 2016); *see also Auer v. Robbins*, 519 U.S. 452, 461-62 (1997) (quotation marks omitted) (finding that the agency was not entitled to deference in interpretation of its regulation where such interpretation is "plainly erroneous or inconsistent with the regulation" and "does not reflect the agency's fair and considered judgment on the matter in question").

Nor does the Department's changed interpretation even merit any deference under *Skidmore*. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (providing deference to an agency's interpretation only in proportion with the "thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control"). The Department has not demonstrated thorough consideration of the issue, as the impetus for its about-face on eligibility remains undisclosed—indeed, the Department continues to deny the very fact that it changed its interpretation despite the existence of evidence that makes this change clear. Pls.' Reply at 16-24. And the revocation of previous approvals based on this change of interpretation is entirely at odds with the Department's earlier interpretations. There is no evidence that the Department engaged in any consideration, let alone thorough consideration, in changing and implementing this interpretation. This disregard for the traditional notions of fairness and transparency renders the Department's interpretation ineligible for any form of deference.

**C.    The Department Failed to Follow Proper Process and Procedure in Implementing the New Interpretation.**

Even if the primary purpose test were consistent with the statute and regulation, the Department failed to follow proper process and procedure in changing its interpretation. *See* Pls.' Mot. Summ. J. at 28-37; Pls.' Reply at 30-31.   The Department's past practice engendered serious reliance interests on the Department's prior interpretation, yet the Department abandoned this interpretation without any notice or explanation.   For years, the Department certified the eligibility of the ABA for the PSLF program, but starting around 2015, the Department inexplicably changed its interpretation to introduce the "primary purpose" test.   This was a surprise deviation from its prior interpretation that thus triggered the requirement that the Department provide an explanation demonstrating that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quotation marks and citations omitted); *United Student Aid Funds*, 200 F. Supp. 3d at 170.   The Department provided no explanation here.   Nor did it show any evidence of considering the reliance interests created by its past practice.   The ABA relied on the Department's longstanding policy that it was a qualifying employer, especially in recruiting new employees, as the Department through its loan servicer encouraged it to do.   The Department's disregard for these settled reliance interests highlights the impermissibility of this changed interpretation.   A change of interpretation "that does not take account of legitimate reliance on prior interpretation" is arbitrary, capricious, and an abuse of discretion. *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) (citations omitted).   When an agency "departs from agency precedent without explanation," as the Department did here, that action is arbitrary and capricious under the APA. *Ramaprakash v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003).

### D. The Department's Actions Impermissibly Impose Retroactive Consequences on the ABA's Employees Without Congressional Authorization.

Beyond the failure to follow proper procedures, the Department's change of interpretation impermissibly imposes retroactive consequences on ABA employees without congressional authorization.  *See* Pls.' Mot. Summ. J. at 37-43; Pls.' Reply at 31-32.  The power for an agency to impose retroactive consequences must be expressly conveyed by Congress.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 207-208 (1988).  Here, the PSLF statute conveys no such authority.  The Department not only canceled PSLF eligibility prospectively, but also retracted PSLF eligibility for the entire period of time that the Department informed the ABA that it was a qualifying employer.  Without the congressional authorization to impose those retroactive consequences, the Department's action was unlawful.

### E. The Department's Actions Violate the ABA's Due Process Rights.

Finally, the Department's actions deprive the ABA and its employees of their constitutionally protected property interests.  *See* Pls.' Mot. Summ. J. at 43-44; Pls.' Reply at 32-33.  Prior qualification for benefits authorization demonstrates that a property interest protected under the Fifth Amendment exists.  *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576-79 (1972); *Nicholas v. Riley*, 874 F. Supp. 10, 14 (D.D.C. 1995).  The ABA's employees were deemed PSLF-eligible, and the Department acknowledged this eligibility, thus establishing a property interest.  As the Department did not provide the ABA an opportunity for a hearing before depriving it of this interest, the retractions violated the ABA's property interests.

## II. PROBAR WILL FACE IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

ProBAR has worked diligently to respond to the border crisis, but the administration's recent "zero tolerance" and family separation policies have stretched ProBAR's already scant resources to the breaking point.  Without a preliminary injunction, ProBAR will soon be unable

19

to fulfill its primary mission and will likely be forced to cease operations. A plaintiff is irreparably harmed for the purposes of a preliminary injunction when it will suffer "certain and great, actual and not theoretical" harm that cannot be compensated with money damages and is "so imminent that there is a clear and present need for equitable relief to prevent the irreparable harm." *League of Women Voters*, 838 F.3d at 7-8 (quotation marks and alterations omitted). All the plaintiff must show is that the harm is likely: "a preliminary injunction requires only a likelihood of irreparable injury[.] . . . Damocles's sword does not have to actually fall . . . before the court will issue an injunction." *Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148, 175 (D.D.C. 2017) (citing *League of Women Voters*, 838 F.3d at 8-9).

As a result of the ongoing border crisis, ProBAR will suffer irreparable harm without a preliminary injunction. First, the Department's retraction of ProBAR's eligibility has directly and substantially impaired ProBAR's ability to respond to the border crisis. Second, the Department's weakening of ProBAR's ability to effectively respond to the crisis has severely damaged ProBAR's reputation among peer organizations, employees, and the legal community. The harm continues to mount with every day ProBAR remains improperly equipped to respond to the ongoing crisis. Finally, the Department's actions have put ProBAR at substantial risk of being forced to cease operations. Each of these harms serves as an independent basis for a finding of irreparable harm, and the existence of all three categories of harm highlights the true severity of the situation ProBAR is facing.

### A.   The Department's Actions Have Prevented ProBAR from Carrying Out the Organization's Primary Mission.

The resulting tumult from the family separation policy has highlighted the level of harm the Department's actions have caused and will continue to cause to ProBAR's capabilities without a preliminary injunction, as ProBAR is unable to fulfill its mission and respond

adequately to the needs of the population it serves.  An organization is irreparably injured when the defendant's actions have perceptibly impaired the organization's programs and the actions directly conflict with the organization's mission.  *League of Women Voters*, 838 F.3d at 8.  The latter requirement exists to "ensure that organizations cannot engage in activities simply to create an injury."  *Id.*

A law or regulation that hinders an organization from serving its target population demonstrates that an organization's mission has been impaired.  *Id.*  In *League of Women Voters*, a member of the Election Assistance Commission approved state requests to require proof-of-citizenship for voter registration.  *Id.* at 4.  Several voting rights organizations filed suit and sought a temporary restraining order and preliminary injunction, as the new requirements substantially limited the organizations' ability to carry out their mission of registering voters, causing the number of voters registered at the organizations' drives to plummet.  *Id.* at 8.  The D.C. Circuit, in reversing the district court's denial of a preliminary injunction, found that the new requirements created obstacles that "unquestionably make it more difficult for the [organizations] to accomplish their primary mission . . . [which] provide[s] injury for purposes both of standing and irreparable harm."  *Id.* at 9.

Forcing an organization to alter its activities or divert scarce resources further indicates that the agency's action has impaired an organization's ability to carry out its mission.  *Open Communities Alliance*, 286 F. Supp. 3d at 177-78.  As a result of the Department of Housing and Urban Development's delay in implementing a rule, the organization at issue in *Open Communities* was prevented from engaging with clients and was forced to divert "scarce resources away from previously planned projects" to engage in outreach and advocacy instead. *Id.* at 178.  The court thus found that the delay in implementing the rule perceptibly impacted the

organization's programs and directly conflicted with the organization's mission, which supported a finding of irreparable harm.  *Id.*

The Department's retraction of ProBAR's PSLF eligibility has prevented ProBAR from carrying out its primary mission:  to provide legal representation to those seeking asylum at the border.  The long-term vacancies directly caused by the Department's actions, coupled with the immediate need for ProBAR's services in the wake of the ongoing border crisis, have shown that ProBAR no longer has the capacity to fulfill its mission.  Instead of representing asylum seekers in credible-fear hearings during the family separation crisis, as ProBAR should be doing, ProBAR can only triage the applications for assistance and refer them out to volunteer attorneys, who, without ProBAR's training or mentorship, can in turn provide only *pro se* assistance.  Third Jackson Decl. ¶ 9.  Beyond this inability to carry out its central mission, and especially in light of the family separations at the border, ProBAR has been forced to divert its already scarce resources away from its mission-focused programs into employee retention and recruitment. Second Jackson Decl. ¶ 15.  This inability to carry out its mission and the forced diversion of resources resulted directly from the Department's rescission of ProBAR's PSLF eligibility and the ensuing employee departures.  The Department's actions therefore directly conflict with ProBAR's work and "unquestionably make it more difficult" for ProBAR to accomplish its primary mission, resulting in irreparable harm to ProBAR.  *League of Women Voters*, 838 F.3d at 9.

**B.      ProBAR's Reputation Has Suffered Due to Its Inability to Respond Adequately to the Border Crisis.**

As a direct result of the Department's retraction of ProBAR's PSLF eligibility, ProBAR has lost its reputation as a leading and reliable provider of legal services for asylum seekers along the Texas border.  "[I]t is well-settled that reputational injury can be used to establish

irreparable harm in certain circumstances." *Jericho Baptist Church Ministries, Inc. (D.C.) v. Jericho Baptist Ministries, Inc. (Md.)*, No. 16-CV-00647 (APM), 2016 WL 4487730, at *3 (D.D.C. Aug. 25, 2016) (quotation marks omitted).  Such a concrete and corroborated showing of reputational harm is irreparable because injury to reputation is not easily measurable in monetary terms.  *See Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103-04 (D.D.C. 2017) (citing *Trudeau v. FTC*, 384 F. Supp. 2d 281, 297 (D.D.C. 2005) & 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. § 2948.1 (3d ed.)).

ProBAR lacked and continues to lack the ability to respond adequately to the family separation policy, a direct result of the employee recruitment and retention issues caused by the Department's retraction of PSLF eligibility.  ProBAR's weak response has severely damaged ProBAR's reputation among members of the legal community.  That community includes several peer organizations that also have responded to the family separation crisis, but have not faced similar staffing consequences due to PSLF.  Third Jackson Decl. ¶ 12.  Moreover, law schools have begun to inform their students about the Department's rescission of ProBAR's PSLF eligibility, thereby discouraging these students from applying to ProBAR and further impairing ProBAR's ability to recruit new attorneys to assist the influx of clients.  *Id.* ¶ 11.  The damaged reputation causes potential employees to take note of ProBAR's inability to carry out its mission and opt to pursue alternative employers.  The damaged reputation also impacts ProBAR's current employees, who may leave to work for employers whose PSLF status is more certain.  Without a preliminary injunction reinstating ProBAR's PSLF eligibility, ProBAR will continue to be unable to respond to the ongoing border situation, exacerbating these reputational harms.

C.      **The Harms Resulting from the Department's Actions Have Put ProBAR's Continued Existence in Jeopardy.**

Imminent employee departures and the inability to recruit new attorneys—especially in light of the additional strain brought on by the family separation policy—put ProBAR at substantial risk of being forced to cease operations.  Loss of employees, decreased donations and funding, and risk of having to cease operations constitute irreparable harm for the purposes of a preliminary injunction.  *See, e.g.*, *Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985); *Brandt v. Burwell*, 43 F. Supp. 3d 462 (W.D. Pa. 2014) (finding that "decreased donations, loss of employees to other employers, loss of services," and the risk of having to close the organization constituted harm against a nonprofit); *Movement Mortg., LLC v. Ward*, No. 3:14-CV-23-RJC-DCK, 2014 WL 461137, at *2 (W.D.N.C. Feb. 5, 2014) (holding that plaintiff demonstrated irreparable harm where it would lose several employees, key referral sources, revenue, and future business).  Furthermore, unrecoverable monetary losses can support a finding of irreparable harm.  *Open Communities Alliance*, 286 F. Supp. 3d at 178 (reasoning that even if monetary losses would not threaten the very existence of a movant's business, those monetary losses can still support a finding of irreparable harm if the loss is not recoverable).

In the immediate aftermath of the Department's retraction of the ABA's PSLF eligibility, ProBAR lost several employees as a direct result of the Department's action.  Third Jackson Decl. ¶ 18.  Only by reassuring the remaining employees that ProBAR would diligently pursue a resolution to the PSLF issue was the organization able to retain some of its employees, but to date, the organization has vacancies in thirteen of 28 attorney positions.  *Id.* ¶¶ 18-19.  The additional strain and stress resulting from the increased workload brought on by the family separation crisis has accompanied vocal concerns about PSLF raised by more than half—eight out of fifteen—of ProBAR's remaining attorneys, creating a real risk that these attorneys will

soon leave ProBAR.  *Id.* ¶ 19.  Beyond that, the Director of the Children's Project, Meghan Johnson Perez, will soon be leaving ProBAR.  *Id.* ¶ 17.  To this point, Ms. Johnson Perez has been performing not only her role, but also the job of the Legal Director (a position that has been vacant for more than 500 days because of the retraction of PSLF eligibility).  *Id.*  Her impending departure puts a substantial portion of ProBAR's work at immediate risk if ProBAR is not able to fill the positions, which it has been unable to do because of the Department's retraction of PSLF eligibility.  *Id.*; Second Jackson Decl. ¶ 9.  The departure of these employees and the inability to replace them would so compromise ProBAR that the organization would no longer be able to exist.[2]

Beyond the substantial impact on ProBAR's staff and the organization's compromised ability to attract new staff, the threat of monetary loss for ProBAR is real and, coupled with the loss of reputation among funders, is likely to threaten ProBAR's continued operations.   As ProBAR is increasingly unable to fulfill the terms of its grants, its reputation suffers and funders will cease to give ProBAR funding opportunities.  Nor is this harm merely speculative:  ProBAR is on the verge of losing funding from a long-time and substantial donor if it cannot recruit attorneys to fulfill the terms of a grant.  Second Jackson Decl. ¶ 13; Third Jackson Decl. ¶ 14. Losing this funding and reputation among funders, especially coupled with the loss of staff and other missed opportunities, threatens ProBAR's continued operations.   Third Jackson Decl. ¶¶ 13-14, 20.  Even if the monetary loss did not threaten ProBAR's existence, though, this monetary loss still would constitute irreparable harm "as the APA provides no damages remedy"

---

[2] The harms also extend to other sections of the ABA that work on public interest projects.  For example, attorneys are similarly reluctant to work for the ABA's Rule of Law Initiative and Center for Human Rights because working for those sections would mean working for the ABA and thus, based on the Department's interpretation, being ineligible for PSLF.  *See, e.g.*, Cadwalader-Schultheis Decl. ¶¶ 9-11.

and therefore the monetary damages are unrecoverable.  *Open Communities Alliance*, 286 F. Supp. 3d at 178.

The imminent risk of losing employees, especially in light of the substantial likelihood of lost funding, demonstrates the irreparable harm that will befall ProBAR as a direct result of the Department's actions in the absence of a preliminary injunction.

## III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST CONSIDERATIONS WEIGH IN FAVOR OF A PRELIMINARY INJUNCTION

The harm that ProBAR is suffering as a result of the Department's retraction of PSLF eligibility and the resulting impact on the community ProBAR serves demonstrate that the balance of equities and public interest support the grant of a preliminary injunction.  When the defendant is the government, the final two preliminary injunction inquiries—balance of equities and public interest—merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Balance of equities favors the movant when the injunction will not substantially injure the other interested parties. *League of Women Voters*, 838 F.3d at 12.  Defendants cannot suffer harm under the balance of equities prong "from an injunction that merely ends an unlawful practice."  *Open Communities All.*, 286 F. Supp. 3d at 179.  Furthermore, "[t]here is generally no public interest in the perpetuation of unlawful agency action.  To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."  *League of Women Voters*, 838 F.3d at 12 (quotation marks and citations omitted). Substantial harm to the public absent an injunction also counsels in favor of finding that the public interest favors a preliminary injunction.  *Id.* at 12-13.

The balance of equities and public interest strongly militate in favor of granting the preliminary injunction.  Most notably, absent an injunction, hundreds of asylum seekers that ProBAR would otherwise be able to represent in credible-fear hearings will have to proceed *pro*

*se*, which carries a substantial risk of deportation back to the very conditions, sometimes life threatening, that they sought to escape.  Moreover, all the ABA is asking of this Court is to end the Department's unlawful actions, which will not cause the Department to suffer any hardship. There is substantial public interest in ensuring that the Department abides by federal laws and proper procedures.  The ABA's employees who relied on the Department's word deserve to have their PSLF credits restored, and ProBAR's clients are counting on the organization's assistance at a most desperate time.  Therefore, the balance of equities and the public interest both strongly weigh in favor of granting a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Plaintiff ABA respectfully requests that the Court grant its motion for preliminary injunction and order the requested relief.


Dated:  September 11, 2018

Respectfully submitted,

 */s/ Chong S. Park*

Chong S. Park (D.C. Bar No. 46050)
John T. Dey (D.C. Bar No. 1029475)
Edward F. Roche (D.C. Bar No. 1029012)
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 508-4600
Chong.Park@ropesgray.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of September, 2018, I electronically filed the foregoing Memorandum of Points and Authorities with the Clerk of the Court using the Court's electronic filing system, which will send a notice of electronic filing to all Counsel of Record.

_/s/_    _Chong S. Park_

Chong S. Park