IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
AMERICAN BAR ASSOCIATION,          CA No. 1:16-cv-02476
et al.,

          Plaintiffs,          Washington, D.C.
v.                             Wednesday, September 26, 2018
                               10:00 a.m.

UNITED STATES DEPARTMENT OF
EDUCATION, et al.,

          Defendants.
- - - - - - - - - - - - - - - - x
_____

TRANSCRIPT OF MOTION HEARING
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the Plaintiffs:     Chong S. Park, Esq.
                        Edward F. Roche, Esq.
                        John T. Dey, Esq.
                        ROPES & GRAY LLP
                        2099 Pennsylvania Avenue, NW
                        Washington, DC 20006
                        (202) 508-4631

For the Defendants:     Chetan A. Patil, Esq.
                        Marcia Berman, Esq.
                        U.S. DEPARTMENT OF JUSTICE
                        Civil Division
                        Federal Programs Branch
                        20 Massachusetts Avenue, NW
                        Washington, DC 20530
                        (202) 305-4968

Court Reporter:         Timothy R. Miller, RPR, CRR, NJ-CCR
                        Official Court Reporter
                        U.S. Courthouse, Room 6722
                        333 Constitution Avenue, NW
                        Washington, DC 20001
                        (202) 354-3111


Proceedings recorded by machine shorthand; transcript produced
by computer-aided transcription.

1                          **P R O C E E D I N G S**

2                  THE DEPUTY CLERK:  Your Honor, this is civil

3        matter 16-2476, American Bar Association, et al., v. United

4        States Department of Education, et al.

5                  Will counsel please approach the podium and state

6        your appearance for the record.

7                  MR. PARK:  Good morning, Your Honor.  Chong Park

8        of Ropes & Gray on behalf of plaintiffs, the American Bar

9        Association, Jamie Rudert, Kate Voigt, Michelle

10       Quintero-Millan and Geoffrey Burkhart.  And with me at

11       counsel table are my colleagues Edward Roche, John Dey and,

12       with the Court's indulgence, we have a litigation technical

13       specialist, Preston Miller, who will be assisting in the

14       presentation today, Your Honor.

15                 THE COURT:  Absolutely.  And good morning to all

16       of you and welcome.

17                 MR. PARK:  Thank you, Your Honor.

18                 THE COURT:  All right.

19                 MR. PATIL:  Good morning, Your Honor.  Chetan

20       Patil on behalf of the United States.  With me at counsel

21       table are Marcie Berman on -- from the Department of Justice

22       and Brian Siegel from the Department of Education.

23                 THE COURT:  All right.  Good morning to all of

24       you.

25                 All right.  I'm going to start by, first of all,

1    issuing an apology to the parties and particularly to the

2    plaintiffs that this motion sat for so long.  It should not

3    have and despite the fact that I'm new at this job, that's

4    no excuse and it's not -- let's put it this way.  I don't

5    plan on having things sit on my docket that -- this long

6    going forward.  So -- but that's no excuse and, to both of

7    the parties and to the plaintiffs in particular, I offer my

8    mea culpa for not moving this quicker, frankly.

9         All right.  That out of the way, what I'd like to

10   do is just focus on questions that I have.  It sounded like,

11   Mr. Park, from what you just said, you have a, sort of,

12   affirmative -- an affirmative presentation you'd like to

13   give, and that's -- I'm certainly happy to hear that.  I

14   think what -- how I like to structure these is, I, kind of,

15   go topic by topic and I have questions for each side.  I

16   like to offer them, if you would like, at the end of -- when

17   we, kind of, exhaust the topic, to say anything additional,

18   I'm happy to hear it, and then at the end, if we haven't

19   covered something you want to -- you -- a point you want to

20   hit, I'm sure I'll hear from you both before we conclude.  I

21   don't know how that affects, you know, your affirmative

22   presentation --

23        MR. PARK:  Your Honor, I'm more than happy to

24   dispense with any floor presentation that I might have and,

25   in fact, the presentation that we have prepared for the

1    Court really are documents that were set up so that we could

2    actually illustrate for the Court in response to the Court's

3    questions.

4            THE COURT:  Okay.

5            MR. PARK:  So we don't have a planned

6    presentation --

7            THE COURT:  Great.

8            MR. PARK:  -- actually, Your Honor.

9            THE COURT:  Okay.  So obviously, if that -- if

10   those documents help you make your points, you're free to

11   employ that, certainly.

12           So I want to start with the question of finality.

13   And on each circumstance, I'll ask questions of the

14   plaintiffs first.  You're at least the first movant and,

15   certainly, the movant on the preliminary injunction.  So Mr.

16   Park, let me ask you about some of these ECF notice

17   letters -- or ECF -- yeah, notice letters.  Obviously,

18   they're an important part of your, sort of, finality

19   argument.  There's no language anywhere in the regs or the

20   statutes or even those letters that say the Department is

21   bound by those ECF determinations; is that fair?  How does

22   that -- how do you think that impacts your argument that

23   these are, sort of, final and binding?

24           MR. PARK:  Well, Your Honor, first, the

25   observations, obviously, in the recent D.C. Circuit opinion

1    in Friedman, the Court laid out and set forth a flexible and

2    pragmatic standard for assessing finality.  And so

3    obviously, that is -- as Your Honor well knows now that

4    every case is different.  And so to the extent that

5    circumstances bear the hallmarks -- an agency action bears

6    the hallmarks of finality, you know, that is to be taken

7    into consideration.  With respect to Your Honor's specific

8    question relating to the ECF, there's nothing there that I

9    recall -- and my colleagues can correct me -- that says this

10   is actual binding, etcetera; however, on the other hand,

11   there's nothing specifically in the ECF forms, in the

12   guidance or anything with respect to the public

13   pronouncements of the Department, that actually states that

14   these determinations are tentative, interlocutory or mere

15   guidance.  In fact, if we go to the actual language of the

16   "dear borrower" letter -- and if I could have that put up at

17   Administrative Record, I believe, 152 -- this is instructive

18   and, I think, goes to Your Honor's question with respect to

19   the actual language.  And while they pull it up, I will tell

20   you that the language there which is included in the

21   certification package that's sent to each borrower sets

22   forth specific language that talks about verify, validate,

23   determine.  All of those are specific words that have

24   specific meaning.  Now -- and with respect to the binding

25   nature of the --

1          THE COURT:  I mean, the letter -- let me just jump

2     in and say, at the same time, the letter -- I think some of

3     the language in the letter has -- is -- I don't know -- a

4     little bit less than definitive.  I think it says something

5     like, you know, The borrower does not appear to qualify.  I

6     guess, you know -- those words you just used, I agree, kind

7     of, cut in your favor.  The language, Does not appear to

8     qualify, strikes me as cutting --

9          MR. PARK:  And that's why, Your Honor, obviously,

10    we don't arrest our case on finality specifically on any

11    particular language, but, obviously, on the circumstances of

12    the agency action and, obviously, in terms of the pragmatic

13    and flexible standard.  One theme that obviously runs

14    through our briefing, Your Honor, is the fact that this

15    Court needs to review these actions of the agency due to

16    some of the procedural irregularities that we've alleged and

17    with respect to the dearth of reasoning or analysis and

18    reasoned consideration set forth in the administrative

19    record.  So all that with respect to the finality.  And, as

20    a practical matter, Your Honor, this is akin to, sort of,

21    the compliance order that was at issue at Sackett v. EPA, a

22    Supreme Court case in which there was a compliance order and

23    the final consummation action would be an actual enforcement

24    action by the EPA.  In that case, however, the court

25    observed that, you know, the plaintiffs were essentially --

1    and that was an -- also a case in which the EPA, the agency,

2    had invited additional information to point out any -- such

3    as in this case, the agency, you know, persists in

4    representing that, you know, there's additional, you know --

5    We said that you could provide more information to inform

6    our reconsideration; however, in that case, the court felt

7    -- said that was a final agency action.  In that case, they

8    said that the Sacketts were waiting for the hammer to drop.

9    Here, as a practical matter, if this were not held to be

10   final agency action, no eligibility determination made by

11   the Department would ever be reviewable.  And the example is

12   this, Your Honor.  A borrower, she gets a determination year

13   one when she proffers it.  The Department denies it and

14   says, You're no longer eligible, in year one.  There are

15   nine more years to go.  Now, she has a choice.  She's faced

16   with an impossible dilemma which is really no choice at all.

17   Either move on or wait another nine years hoping somehow

18   that the Department would change its mind.  Roll the dice

19   and then see.  Essentially, if this determination were not

20   actually reviewable, it would, in practice, never be

21   reviewable by a court.

22            THE COURT:  I agree with you that the language

23   about flexibility cuts strongly in your favor in that case

24   for the reasons --

25            MR. PARK:  Right.

1              THE COURT:  -- you have just outlined.

2              MR PARK:  And, Your Honor, also, the Philip Morris

3     case --

4              THE COURT:  Yes, I was -- that was going to be my

5     next question.  Perfect.  How does -- tell me how you think

6     the Philip Morris case interacts with the -- kind of, the

7     test it lays out interacts with the broader test that you've

8     argued to me applies.

9              MR. PARK:  Well, in terms of a practical binding

10    effect; right?  The effect is whether or not the agency has

11    taken the definitive position regarding the statutory

12    authority which it --

13             THE COURT:  Yes.

14             MR. PARK:  -- has, obviously.  And this case, like

15    in Philip Morris, presents a question of statutory

16    interpretation and legal -- a legal question.  It's whether

17    or not the interpretations -- the changed interpretations or

18    revised interpretations that the Department apparently has

19    employed to deny the eligibility determination and, in fact,

20    retroactively revoke prior approvals, is consistent with not

21    only the broad statute set forth in 2007, but its own

22    regulations promulgated in 2008.

23             And the third test is, obviously -- the third

24    requirement is very important --

25             THE COURT:  Yes.

1          MR. PARK:  -- whether it has, you know, an

2     immediate, harmful, practical hardship effect on the

3     regulated entity.  Here, in fact, there's no question about

4     that; that, for example, the individual defendants and the

5     employees of the ABA who relied on the determination who

6     went forth and continued in their public service jobs;

7     continued to make payments; and then made life-changing

8     financial, career and life decisions based upon and in

9     reliance upon the approval by the Department, stripping that

10     away and -- unannounced, unanticipated and without any

11     reasoning or explanation, having that rug, you know, taken

12     out from underneath them is clearly an effect.

13          THE COURT:  Let me just play devil's advocate for

14     the moment.  Assuming, you know -- assuming I buy your

15     argument that it was -- that this -- that the third prong of

16     Philip Morris was met here, wouldn't the Government say --

17     they might say something about this prong, too, but as to

18     the other prongs, wouldn't they say, "Gee, this is not

19     really purely a legal question.  This is -- this was

20     something -- this was a case-by-case determination that was

21     made"?  It is applying law -- maybe, it's partly a legal

22     question, but it's also applying that legal framework to

23     each of the individual plaintiffs here.  And, you know,

24     isn't the Philip Morris test really a test for, as you said

25     and as the second prong of the test says, a purely legal

1    question rather than the kind of individualized

2    determinations that were at issue here?  And is there any

3    case you can cite to me where a, you know, agency action

4    grounded in separate individual determinations was subject

5    to this Philip Morris test?

6          MR. PARK:  I can't think off the top of my head.

7    If my colleagues have one, they can pass me a note and we're

8    more than happy to have additional briefing on that point,

9    but, Your Honor -- but to respond to your question with

10   respect to whether or not this case presents to Your Honor

11   questions of individualized interpretation, the answer is

12   yes and no.  Yes, obviously, individual case, but broadly,

13   what the Department did was, in fact, put forth a revised

14   interpretation.  It is a question of legal and statutory

15   interpretation, Your Honor, with respect to the specific

16   language of both the statute and the regulations.  And this

17   is how we know that the Department itself believed that this

18   was a broad interpretation that cut across many public

19   service qualifications and was broadly to be applied not

20   only to individual case determinations but across

21   categories, and here's how we know that, Your Honor.  And,

22   as a matter of housekeeping, again, I want to apprise Your

23   Honor, as you know, that not only does Your Honor have

24   pending before it cross-motions for summary judgment and the

25   ABA's motion for preliminary injunction, but in conjunction

1    and subsequent to the filing of our motion for summary

2    judgment, we filed two motions for this Court to consider

3    extrajudicial evidence or for judicial notice of documents.

4              THE COURT:  Yes.

5              MR. PARK:  And so in that regard, if we could have

6    for the Court the document with respect to the digital

7    societies with respect to the broad -- so as they're popping

8    that up, Your Honor --

9              THE COURT:  All right.  I want to make sure.  Did

10   you test this out beforehand?

11             MR. PARK:  I believe we did.

12             THE COURT:  All right.  Let's cross our fingers.

13             MR. PARK:  As we're doing this, let me explain to

14   you what Your Honor will see.  So -- and explain the

15   context.  So because the administrative record in this

16   case -- so let me explain to you what Your Honor sees on the

17   screen.  Is that clear for you, Your Honor?

18             Can you blow it up.

19             THE COURT:  It is actually not.  I mean --

20             MR. PARK:  Okay.  There we go.  (Indicating.)

21             THE COURT:  Okay.

22             MR. PARK:  And what this is, Your Honor, is a

23   February 23rd, 2017, email between Federal Student Aid, the

24   Department of Education and the FedLoan Servicing.  PHEAA

25   stands for the Pennsylvania Higher Education Assistance

1     Authority, Your Honor, and they're the loan servicer for the

2     Department of Education.  And here -- and Ian Foss, you'll

3     see, appears in the administrative record as well as an

4     employee of the Department of Education who has got a

5     critical role in the Public Service Loan Forgiveness

6     program.  And what this reflects is that -- it's -- Hi, Ian.

7     After reading your most recent changes for Vietnam Veterans

8     of America -- who was Mr. Rudert's employer -- we had some

9     additional concerns.  This also includes Delta Dental and

10    someone else from AARP.  In response to all three

11    organizations, you referenced that the organization's

12    primary purpose has to be to provide one of the qualifying

13    services.  We are now concerned as to whether or not this

14    guidance is directly conflicting to how we have been

15    evaluating certain organizations.

16              And if you could go on to the next.

17              And then -- and this is another email and it

18    reflects, essentially, a request from Ian Foss at the

19    Department of Education to the FedLoan Servicing.  And you

20    can say -- So I looked at Blue Cross Shield [sic] of RI

21    again, and I think we need to do a retraction in this case.

22    I'm truly sorry about the mess-up on my part here.  Can you

23    comb through those organizations that we've approved under

24    public health and provide us a list like you've done for

25    public education and public interest legal services?

1          So what this reflects is a systematic effort by

2     the Department of Education to review all the qualifying job

3     services that they want to insert additional requirements

4     over in addition to what's actually in the statute and the

5     regulations.

6          THE COURT:  It certainly reflects an attempt to

7     apply this interpretation or however you want to

8     characterize it broadly.

9          MR. PARK:  Yes, that's correct, Your Honor.

10          THE COURT:  I agree.

11          MR. PARK:  And, if I might -- can you blow that up

12     a little bit and make it clearer.

13          (Brief pause.)

14          Okay.  Again, this is, again, for health plans,

15     etcetera.  So this is another email.  Based on the guidance

16     FSA -- and that's Federal Student Aid of the Department of

17     Education -- had originally gave us, we were approving

18     organizations such as these as private, not-for-profit,

19     providing health service as long as they had at least one

20     position that would qualify.  For example, a registered

21     nurse.  However, just a few months ago -- January 2017 --

22     FSA introduced a new concept in its review, quote, primary

23     purpose.  We questioned this new guidance and FSA

24     unfortunately agreed that organizations such as this would

25     ultimately not qualify for PSLF purposes and apologized for

1     the guidance they provided us in the past with the

2     understanding we had approved such organizations.

3             So that makes a couple points, Your Honor.  Number

4     one, it's an admission by the Department of Education that

5     in the past, they had approved such organizations and that

6     now they're introducing a new concept in conflict with their

7     prior interpretations, introducing this --

8             THE COURT:  All right.

9             MR. PARK:  And the --

10            THE COURT:  No, go ahead.  Finish up.

11            MR. PARK:  No, no.  And what is, you know,

12    disturbing about this, Your Honor, frankly, is that we had

13    to litigate this in Pennsylvania by filing a public records

14    request under the Right to Know Act in Pennsylvania.  We

15    litigated with the FedLoan Servicing, the Pennsylvania

16    Higher Education Assistance Authority, all the way up

17    through the internal appeals and to the appeal court.  We've

18    received these documents.  And a couple of these documents,

19    some of these postdate our litigation.  We have a document

20    from 2014 relating to Kate Voigt that exists nowhere in the

21    administrative record.  So --

22            THE COURT:  So we're going to get to that.

23            MR. PARK:  Okay.

24            THE COURT:  We're going to get to that.  I'm going

25    to have questions for you about the administrative record as

1     well as your -- these motions that are at issue, but I take

2     your point about how they reflect finality and that point

3     that -- how they apply to the Philip Morris test.

4               MR. PARK:  Thank you, Your Honor.

5               THE COURT:  I hear you.  Let me just ask two other

6     quick questions on finality.

7               In part, you base it on the ECF responses that the

8     digital plaintiffs have received.  And, in part, you base a

9     finality argument on, sort of, correspondence that the ABA

10    received institutionally, and then I think it was Ms. Voigt

11    who also, sort of, got an email, a less -- I would argue at

12    least -- a less formal form of communication --

13              MR. PARK:  That's right, Your Honor.

14              THE COURT:  -- than the ECF responses.  So tell me

15    why, in those two circumstances, ABA and Ms. Voigt, we have

16    final action, even though we have, I think you'd concede at

17    least to some degree, a more informal communication with the

18    plaintiff.

19              MR. PARK:  Well, they may be informal, but they

20    count as formal to the extent that these are -- these bear

21    the imprimatur at least in the ABA case as well as fairly

22    senior officials of the Department of Education.  And so to

23    the extent that -- I know, in the briefing, for example, the

24    Department, in several places, has stated its position that

25    these were regrettable errors that were, you know, taken on

1    behalf of the loan servicer.  Well, that's not true because,

2    obviously, in those cases, these were direct communications

3    from the officials of the Department of Education.  So in

4    some instance -- and I would argue, Your Honor, and submit

5    that this is, in fact, more formal in some places because

6    they don't have a loan servicer or the administrative

7    mechanism of a form submission to rely on there.

8            Moreover, Your Honor's correct.  We do rely on the

9    correspondence, the denials, etcetera, but, frankly, more

10   generally, Your Honor, we rely on the entire scheme and the

11   implementation that the Department of Education itself set

12   up pursuant to its regulations in 2008.  If Your Honor looks

13   at the guidance -- and with respect to, as my colleague

14   notes quite nicely, the ABA's employees also had their ECFs

15   approved, as well.  So it wasn't just simply the

16   pronouncements of the ABA officials, etcetera, but employees

17   such as Jeffrey Burkhart and others had their ECFs actually

18   approved.  And so that was a basis on which the ABA

19   questioned the denials of those ECFs, and that's what

20   precipitated these conversations, Your Honor.

21           But getting back to my prior train of thought, the

22   entire scheme with respect to the implementation of the

23   approvals was such that they were official, binding -- for

24   example, what happens as a matter of course -- for example,

25   let's look at on the other -- from the other perspective,

1    Your Honor.  Let's look at from the perspective not of the

2    denial of the ECF but what happens when someone actually has

3    their ECF originally approved.  What happens then?  There

4    are actual practical legal binding consequences that flow

5    from that.  For example, under the guidance and the

6    instructions set forth -- and this is in the administrative

7    record -- from the Department of Education to Loan

8    Servicing, what happens, then, when that's approved, all of

9    the loans -- direct loans that that borrower has gets

10   transferred to FedLoan Servicing for administration.  And

11   why is that?  Well, according to the documentation, that's

12   so that FedLoan Servicing can, then, track the progress and

13   then provide notice periodically to the plaintiffs and

14   borrowers.  These are how many qualifying payments you have.

15   This is how long you have to do to final loan forgiveness,

16   potentially.  These are how many credits you have in the

17   bank, etcetera.

18        And then -- yeah, I'll note -- if we go to the

19   Paperwork Reduction Act, Your Honor, I want to pop up this

20   document because it shows that, essentially, this was not

21   only for the benefit of the borrowers but for the ease of

22   administration of the Department of Education on the back

23   end, as well.  So essentially -- so what will happen there

24   is these are collected to determine for a qualified employer

25   for the certification period; right?

1                    THE COURT:  Mm-hmm.

2                    MR. PARK:  And they'll notify it --

3                    But I'm talking about the Paperwork Reduction Act.

4       Okay.  And then go on to the --

5                    (Brief pause.)

6                    Okay.  There we go.

7                    So this is something -- If borrowers are not

8       allowed to submit employment certifications until after they

9       have made all 120 required payments and are eligible to

10      apply for loan forgiveness, it would be more difficult for

11      them to track their progress, and then, This would lead to

12      an increase in the time required to process borrowers' loan

13      forgiveness.

14                   And so what happens in practice, I hope, is that

15      once this is done, at the very end, once a borrower -- once

16      she has her own package to go, she has to submit just one

17      more ECF which is to verify that she is in a qualifying

18      employer's employment at that time and then the other

19      requirements are assessed.  And so the entire scheme, Your

20      Honor, you know, bears a hallmark of final -- for example,

21      again, looking at the borrower who gets his certification

22      actually approved in year one as opposed to denied, unless

23      there was some indication this was actually a determination,

24      he could not be assured that this actually counts.  He could

25      be living in fear with the, sort of, Damocles dangling

1     overhead, not knowing at what point in time the Department

2     is going to say, Oh, sorry, our bad.  We messed up, like Ian

3     Foss said.  Let's just pull the rug out from under you.

4     That's no way to administer a scheme and that was not the

5     intention of the Department of Education, as set forth in

6     the documents, the regulations and the documentation that it

7     envisioned.  And so it is final, Your Honor.  This is a

8     final agency action that is reviewable by this Court.

9              THE COURT:  All right.  Anything -- I didn't mean

10    to cut you off.

11             MR. PARK:  No, no, that's fine, Your Honor.

12             THE COURT:  Anything else on finality?  Any --

13             MR. PARK:  No, Your Honor.  I'll step off my

14    soapbox for now.

15             (Laughter.)

16             THE COURT:  No, no, no, you're going to be back up

17    on there shortly.  So don't step down too far.

18             Counsel for the Government, let me -- I have a

19    couple questions on -- before we get off finality.

20             So you heard Mr. Park.  In particular, he

21    referenced that Supreme Court precedent about how I should

22    be flexible and pragmatic when applying the finality

23    standard.  Doesn't that suggest that, under these

24    circumstances, when you've got someone, as he laid out, who

25    could be kept in limbo for 10 -- for a decade, knowing what

1    the practical consequences -- what their situation is --

2    doesn't that, sort of, suggest that I should conclude that

3    we have final agency action here?

4         MR. PATIL:  No, Your Honor.  I believe Mr. Park

5    used the word "hallmarks" to reference the hallmarks of

6    finality.  And if you look at those here, the ECF responses

7    and the informal communications that he has cited -- or

8    excuse me, the plaintiffs have cited don't bear those

9    hallmarks.  I mean, first off, nothing in the statute

10   requires an early certification process.  Indeed, during the

11   rule-making process, the members of the Negotiated Rule

12   Committee -- Rulemaking Committee and commenters suggested

13   that the Department create such a process and the Department

14   rejected that because it would be costly -- or I believe it

15   is -- the language is complex and administrative --

16   costly --

17        THE COURT:  Tell me where that is in the record,

18   because that's a question I had.  I know that's something

19   you argued in your briefs, but I didn't see anywhere in the

20   record evidence that the Department explicitly declined to

21   create that, but you'll point me to it.

22        MR. PATIL:  It's at Page 14 of the administrative

23   record in the discussion in the notice of proposed

24   rulemaking.

25        THE COURT:  Can you quote -- I don't have --

1        MR. PATIL:  Sure.

2        THE COURT:  -- the entire record here in front of

3    me.  I think I actually --

4        MR. PATIL:  I will --

5        THE COURT:  Unfortunately, I have a couple of

6    pages, but I don't have that page.  Can you just quote for

7    me what it says.

8        MR. PATIL:  Sure.

9        It says, The Department considered the

10   negotiator's suggestion but decided not to adopt this

11   approach for several reasons.  The relevant reason that I'm

12   citing is, Tracking and reviewing documents on an annual

13   basis for potentially thousands of borrowers, many of whom

14   might not remain in public service employment or who may

15   never meet the eligibility requirements for final loan

16   forgiveness, would be a complex and costly administrative

17   process.

18       And I think the obvious import of that is, you

19   know, there are a lot of requirements to qualify for this

20   program.  And if the Department was to make final

21   determinations on an annual basis for borrowers that may

22   ultimately never end up qualifying and applying, that would

23   be burdensome.  Not only that, under plaintiffs' theory,

24   each one of those denials on an annual certification would

25   be subject to judicial review.

1          Moreover, as Your Honor pointed out, there's

2     nothing in the ECF notices that states that it's binding.

3     And, in fact, as this case has shown, they are not binding.

4     The agency -- or the Department, excuse me, is free to

5     determine a borrower's eligibility for loan forgiveness

6     under the regulation at the time an application is made.

7          THE COURT:  So they don't say that they're -- they

8     don't specifically say that, of course, but they don't go

9     out of their way to say, Hey, borrower, this is non-binding.

10    Don't, you know -- don't think you've really got any

11    assurance here; isn't that fair to say?

12         MR. PATIL:  Your Honor, I wouldn't dispute that

13    the language could be a little clearer, but I think under

14    the -- both the regulation and the ECF notices state that

15    the borrower -- or a borrower's eligibility criteria --

16    whether a borrower has satisfied the eligibility criteria

17    for loan forgiveness is determined on an application.  It

18    doesn't say -- one of those eligibility criteria is whether

19    a borrower works for a qualifying public service

20    organization.  It doesn't suggest -- nothing in the

21    regulation suggests that the Department makes early

22    certifications at any point in time.

23         THE COURT:  But let me just stop you.  The first

24    point I mention -- and we're going to get into -- we'll get

25    into some of the -- I have a couple of other questions

1    about, sort of, the legislative history and what the

2    Department was intending to do.  But just on this question

3    of flexible and pragmatic and the, sort of, practical

4    effects of my concluding that this is not final agency

5    action if I were to do so, isn't that, kind of, just

6    practically a problem for this whole program?  I mean, is it

7    really -- is the program -- and I, you know -- this is not

8    saying the answer of the question of finality turns on this.

9    But, certainly, the Supreme Court is telling me, look to the

10   practical effects.  And how can I not take into

11   consideration the fact that the whole point of this program

12   is to encourage people to go into public service?  And how

13   couldn't folks, kind of, plan out their lives and their

14   financial -- their financial lives if they really don't have

15   -- they have an idea that, maybe, they'll qualify, but they

16   really -- they're never going to know the answer to that

17   question in any final way for 10 years --

18           MR. PATIL:  Well, Your Honor --

19           THE COURT:  -- or maybe, even more than that;

20   right?  If they come in and out of public service jobs, it

21   could be 15 years.  It could be 20 years before they really

22   get to the point where you're saying a final determination

23   was -- is going to be made.  When you're talking about a

24   program that stretches over someone's life that long, how is

25   that going to really work unless these things have more of

1    an effect?

2              MR. PATIL:  Well, to be clear, the, kind of, gray

3    area issues that are raised in this case and the

4    interpretations that the agency -- the Department has

5    proffered with respect to public service organizations only

6    apply to private organizations.  So the program itself as it

7    applies to universities and applies to the government and

8    501(c)(3)s are not a question.  So borrowers in that

9    position certainly have, you know -- they are not affected

10   by anything that goes on in this case.

11             Secondly, the -- we have to look at the language

12   of the statute.  And nothing in the statute says the

13   Department has to set forth an early certification process.

14   Congress knew that it was setting out a program that no one

15   could apply for until 120 -- or until 10 years had gone by

16   and was free, at that time, to provide for an early

17   certification process.  Similarly, the regulation doesn't do

18   that either.  And plaintiffs here have argued that the

19   regulation itself is arbitrary and capricious for failing to

20   set up that program.  And so what they've instead argued is

21   that the ECF program is that early certification program

22   that the -- process that the Department rejected.

23             So I think, in tandem, there's just not a lot --

24   this is not -- finding these non-final wouldn't call into

25   question the entire program or the value of the entire

```
 1    program.
 2              THE COURT:  Can I -- just to clarify for me, I
 3    have -- on Page 45 of the record is part of the Federal
 4    Register in which the Department commits to developing a
 5    form for borrowers to use to apply for the Public Service
 6    Loan Forgiveness when the borrower believes he or she
 7    qualifies.  Skipping down, The form will include an employer
 8    certification section and instructions, etcetera.  That is
 9    the -- this is Page 45.  That is this program; correct?
10              MR. PATIL:  Yes, I believe that reference is to
11    the ECF process.
12              THE COURT:  Okay.  All right.  So it does say -- I
13    mean, I, you know -- the language "certification" certainly
14    -- again, I think, you know, there's language that cuts in
15    both directions here, but the language "certification"
16    certainly sounds like more than -- it's more than a -- sort
17    of, a suggestion or it's -- or preliminary; is that fair?
18              MR. PATIL:  Your Honor, the, you know -- there's
19    no doubt that some determination happens here; that there is
20    provisional guidance here and that the provisional guidance
21    is -- the purpose of the ECF -- or one of -- I should say,
22    one of the purposes of the ECF process is to serve as an
23    informational tool for borrowers.  And the vast majority of
24    cases, this is going to track what ultimately happens, but,
25    you know, that language that Your Honor just cited needs to
```

1    be read in conjunction with the language I quoted earlier

2    which -- in which the Department rejected as unduly

3    burdensome and complex.  The program that plaintiffs

4    suggest, they, then -- the Department, then, went ahead and

5    instituted.

6              THE COURT:  We got, you know -- this didn't come

7    up in my colloquy with Mr. Park, but the other piece of this

8    that I found somewhat compelling on the other side was this

9    issue that the guidance suggests that borrowers do not have

10   to resubmit ECF forms for periods of employment that may

11   have already been -- that have already been validated by the

12   Department.  So that does suggest a little more permanence

13   than just provisional guidance, yeah?

14             MR. PATIL:  Well, Your Honor, I think the purpose

15   of that -- and this is consistent with the language that Mr.

16   Park quoted from the Paperwork Reduction Act statement -- is

17   that there's value to the borrower in this ECF process,

18   because a borrower at year 10 doesn't have to go back to his

19   or her employer from year 1 and figure out who can certify

20   that they were employed there and that they were working

21   full time.  The Department will -- the language that Your

22   Honor referenced indicates that, essentially, once the

23   borrower has submitted this information, the borrower

24   doesn't have to submit that information again, but it

25   doesn't suggest that the Department isn't going to look at

1    that information again or that the Department is bound by

2    this early provisional statement by FedLoan Servicing or by,

3    you know -- by certain Department staff in emails.  And I

4    also -- another reason for this is, I think -- I believe Mr.

5    Park talked about how there's no real basis for denials

6    given in ECF responses, and that's true and that suggests

7    that this isn't final because, you know, if this were

8    something that was judicially reviewable through the APA

9    because it was a final agency action, the Department well

10   knows that it needs to provide justifications for when it

11   takes agency actions and, indeed, the regulation in

12   subsection (e) makes clear that when there is a denial of an

13   application, the Secretary provides a basis for the denial.

14            THE COURT:  That's a fair argument, too.

15            Let me ask this.  The broader -- I realize it's

16   the Department's position -- we're going to get into this in

17   a moment -- that the interpretations -- I'm going to just

18   call them the primary purpose interpretation and the school

19   or school-like setting interpretation; that it's the

20   Department's view that there wasn't a change.  This was

21   always the position.  Fair enough.  But those, it seems to

22   me, final action both turns on, sort of, this issue of the

23   individual notices plaintiffs are getting but also turns on

24   whether that interpretation, even if it wasn't a change, is

25   final.  Is it fair to say that those interpretations of the

1    regs are final?

2         MR. PATIL:  No, Your Honor, not with respect to

3    these plaintiffs.  Obviously, at the time that this case was

4    brought which was -- the interpretations that were made --

5    or were stated in -- to the ABA in communications or in the

6    denial of ECF notifications were before any application has

7    been made.  And so how the facts and the evidence apply to

8    that standard at that time had not been formally adopted,

9    because the borrower -- no -- at that time, the Department

10   had not applied that standard because no borrower had become

11   eligible anywhere for loan forgiveness until, I believe,

12   October 2017.  Since then, yes, the Department has, you know

13   -- does follow those interpretations -- the primary purpose

14   interpretation, but, again, the fact that the borrowers are

15   free to submit additional information -- the fact that they

16   haven't submitted an application --

17        THE COURT:  Yeah, but that has --

18        MR. PATIL:  -- indicates --

19        THE COURT:  Those have -- the facts changing -- or

20   the facts either changing with regard to a particular

21   applicant or the facts changing because one applicant is

22   different from another applicant don't have anything to do

23   with whether the interpretation that -- of the regs that the

24   Department's putting forward -- whether a primary purpose is

25   required and whether the other types of services have to be

```
1    provided in a school or school-like setting.  The -- one way
2    or the other, I should be able to know whether the
3    Department -- it is a final action or the Department is --
4    whether the Department -- those are final -- whether those
5    interpretations -- those purely regulatory, purely legal
6    interpretations are final and whether, in a month or a year
7    or a day, the Department could turn around and say, You know
8    what?  Actually, we don't need a primary purpose and,
9    actually, those services don't have to be provided in a
10   school or school-like setting.  That is a knowable thing.
11         MR. PATIL:  So Your Honor, I think what -- Bennett
12   has two prongs.  And the first prong, I think, is what
13   you're going to, whether the agency has consummated its
14   decision-making process.  And, at this time, now that
15   borrowers have started to apply for loan forgiveness, the
16   agency has reached an interpretation which is this primary
17   purpose interpretation.
18         THE COURT:  Okay.
19         MR. PATIL:  That doesn't mean that Bennett Prong
20   II is satisfied; that there are legal consequences that flow
21   from that interpretation.  And so even if --
22         THE COURT:  Fair enough.
23         MR. PATIL:  -- Bennett Prong II isn't --
24         THE COURT:  Fair enough, but that's not going to
25   -- I mean, that is a final -- those are -- those two
```

1    interpretations we talked about, those are final as a legal

2    matter from your perspective?

3            MR. PATIL:  No, Your Honor.  It's -- finality

4    requires both --

5            THE COURT:  Well, yes --

6            MR. PATIL:  Yes.

7            THE COURT:  -- I understand.

8            MR. PATIL:  And it's a --

9            THE COURT:  Whether I --

10           MR. PATIL:  It's a consummation of the

11   Department's position.

12           THE COURT:  All right.  Okay.

13           MR. PATIL:  And --

14           THE COURT:  So it's --

15           MR. PATIL:  But I'm --

16           THE COURT:  -- the consummation of the

17   Department's position.  But the Department's position is

18   that, as applies to these particular plaintiffs, the second

19   Bennett prong is still open?

20           MR. PATIL:  Yes, Your Honor.  And it's, you

21   know -- it's relevant to look, I think, here at the

22   pleadings and what relief plaintiffs request.  And they

23   don't -- they are not challenging -- they are challenging,

24   certainly, the interpretation of -- that the Department has

25   now adopted but indicated that it would adopt it at the time

```
1    that this case was brought, but what they -- that is

2    embedded in their overall relief -- the relief that they

3    seek which is a certification that the ABA qualifies as a

4    public service organization; a certification that these

5    borrowers get credit for the time that they worked at their

6    particular -- in those particular organizations, and so that

7    is exactly the sort of application to -- of this

8    interpretation -- or excuse me, the evidence to this

9    interpretation that has not happened and that will not

10   happen until borrowers make an application.

11            THE COURT:  And so your -- to just jump off the

12   point you made earlier, the -- your -- the Government's

13   position is that even as to the time, let's say, when this

14   lawsuit was filed or when these plaintiffs got their

15   particular communications with the Department, that at that

16   time, even the first prong was not satisfied because you

17   didn't have anybody -- it hadn't ripened into a situation

18   where -- not to throw ripeness into this, but -- it hadn't

19   gotten to the point where someone had applied after the 10

20   years and either have been accepted or rejected for the

21   program at that point.  That's -- it -- then and only then,

22   is your argument, did the agency -- did the first prong of

23   Bennett become final.  And so as to these folks in their

24   situations, it hadn't become final when they filed their

25   lawsuit?
```

1          MR. PATIL:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MR. PATIL:  That's correct.

4          THE COURT:  All right.  All right.  Understood.

5          MR. PATIL:  And I do also -- I want to -- if I

6    could mention --

7          THE COURT:  Yes.

8          MR. PATIL:  -- one more thing?

9          THE COURT:  Yes.

10          MR. PATIL:  Mr. Park referenced the Philip Morris

11    case.  And there is, sort of, this set of case law under

12    these pre-enforcement challenges that do recognize, in some

13    circumstances, interpretive guidance can be final, but the

14    court there and the D.C. Circuit in American Tort Reform

15    have recognized that in the typical case, agency statements

16    of interpretation are non-final and can't be challenged

17    until those are actually applied to the plaintiffs, and that

18    -- as Your Honor indicated earlier, this isn't a pure legal

19    question and this doesn't satisfy the test set out in Philip

20    Morris because, A, it's not a pure legal question; B, it was

21    key in Philip Morris and other cases on this line that there

22    were no further proceedings on this issue that were in the

23    definitive -- or the agency's position had been staked out

24    as in a definitive manner that wouldn't change going forward

25    where that isn't the case here because the -- because it's

1    not a pure legal question.  And, at the time, it didn't have

2    the hallmarks of a definitive statement of the agency's

3    position.

4              THE COURT:  And your position is, even today, the

5    second -- Senate -- the second Bennett prong is not

6    satisfied because this is not a determination of the rights

7    of the plaintiffs -- of the individual applicants.  That

8    only happens after the 10 years?

9              MR. PATIL:  That's correct.

10             THE COURT:  Okay.  All right.  Any other points on

11   finality that we haven't hit?

12             MR. PATIL:  No, Your Honor.

13             THE COURT:  All right.  Mr. Park, I'll give you

14   just a brief -- if you have -- I want to move on to the

15   question of whether there is a change -- there was a change

16   in interpretation here, but I want to give you just a quick

17   opportunity to respond to anything --

18             MR. PARK:  Thank you --

19             THE COURT:  -- Government counsel --

20             MR. PARK:  -- Your Honor, and I will take

21   seriously Your Honor's admonition of quick.

22             In terms -- so -- and since my wife was going to

23   be here but is not, I will not heed her admonition not to

24   use this phrase, but the proof is in the pudding here, Your

25   Honor, with respect to the complex -- a system that the

1    Department says they rejected.  Well, that was in 2008 after

2    negotiated rulemaking.  The proof is in the pudding.  In

3    2012, they put in place the certification system.  And even

4    from the administrative record, to call it not complex would

5    be a stretch.

6          Moreover, Your Honor, there's no evidence that --

7    as Mr. Patil said, etcetera, you know, there's no evidence

8    that they actually make any determinations after this

9    particular eligibility determination, you know?  As the

10   courts have held, a mere proffering of potential

11   reconsideration does not undercut the finality of the

12   particular decision.

13         The other point I want to make, Your Honor, is --

14         THE COURT:  Well, what Mr. Patil -- in fairness,

15   what he said is -- I mean, you wouldn't dispute that after

16   10 years, individual applicants submit, you know, their

17   final ECFs that certifies that they are currently still with

18   a qualifying employer and that, then, a final determination

19   or, you know, another determination -- final, however you

20   want to characterize it -- something else happens that

21   results in that person being qualified?

22         MR. PARK:  That's true, but that whole system, as

23   we've discussed, Your Honor, is for the ease of

24   administration.  To the extent that Mr. Patil, sort of,

25   invoked the specter of burdensome administrative review and

1    complex system with respect to the initial eligibility

2    determination, you know, the Paperwork Reduction Act

3    document that we've reviewed actually says the opposite, is

4    that the Department recognizes this entire system is for the

5    ease of administration, Your Honor.

6              So I will stop there.  I have --

7              THE COURT:  All right.

8              MR. PARK:  -- more to say, but, again, I'm going

9    to abide by Your Honor's admonition to be quick.

10             THE COURT:  All right.  I appreciate that.

11             So let's move on to the question of whether

12   they're -- and I do think the next, sort of, logical

13   question I'm going to have to wrestle with is whether we

14   really do have a change in interpretation here or not a

15   change in interpretation.  And I know it's going to be hard

16   to do this without referencing or without talking about -- I

17   know we'll get to the issue of the record and whether we

18   need to go beyond the record in a moment.

19             But, Mr. Park, the Department tells us they did

20   not engage -- their position is they didn't engage in a

21   policy change or an interpretive change.  They -- and they

22   suggest that this was their interpretation -- these two

23   particular interpretations were their interpretations all

24   along.  I suppose what they would say is, Look, we have here

25   a couple of discrete letters -- in this -- at least in this

1    case with regard to these plaintiffs, We've got a couple of

2    discrete letters with the ABA and one of the plaintiffs, we

3    have a couple of discrete ECF responses.  How can I conclude

4    from just those things that what really happened here was

5    some sort of, you know, behind-the-scenes rulemaking?  What

6    case would you say -- are there cases that you would point

7    me to that are analogous where courts have said, you know,

8    "I know the Government has -- is saying this was its same

9    position all along, but really, what happened behind the

10   scenes was a change that amounts to a rulemaking of some

11   kind"?

12             MR. PARK:  Your Honor, we don't have a case right

13   now, but we can have additional briefing on that.  But to

14   answer your questions, Your Honor has to simply go to the

15   actual text of the statute and the regulations.  The text of

16   the statute is clear.  It talks about defining the

17   eligibility of a public servant for loan forgiveness if he

18   or she is employed at a public service job.  That is the

19   term.  And the regulations themselves talk about whether or

20   not they're employed by a public service organization

21   relating to one or more of these functions.  And it states,

22   for example, public education, public service to individuals

23   with disabilities or the elderly, public interest law

24   services, etcetera.  And so to illustrate, one thing we'll

25   put up is what the Department is trying to do.

1              If I could have the --

2              THE COURT:  I mean -- and, Mr. Park, let me just

3    respond to what you've just said so far.  That may well

4    demonstrate that, you know -- you think they went beyond

5    their authority to do this.  That -- and that's, you know --

6    that's a fair argument.  But that doesn't mean this wasn't

7    always their interpretation from day one when this

8    regulation passed, does it?

9              MR. PARK:  Well, it couldn't be, Your Honor,

10   because if it was, they would never have approved the

11   eligibility determinations of these individual plaintiffs,

12   Your Honor.

13             THE COURT:  Well, they say it was a mistake.

14             MR. PARK:  Well, and I understand that, but that's

15   -- that seems not to be borne out by the record or the

16   administrative record.  And, in fact, the letter from the

17   Department of Education to Kate Voigt specifically

18   references that they actually made a determination that her

19   AILA actually qualified.  So they actually reviewed these --

20   that particular instance and made an affirmative decision

21   that the statute and the regulations apply to her

22   organization.  And so they can't disavow their own actions,

23   Your Honor, which is what they're trying to do.

24             Moreover, in terms of -- the entire record

25   reflects that this was, in fact, a change in interpretation.

1    They're saying now that, you know -- after October 2017, now

2    that they have a fixed interpretation.  The record reflects

3    that that determination was made well before with respect to

4    what's in the record.  And the extra record evidence that we

5    seek this Court to take account of -- judicial notice shows

6    that, as we discussed, they were having communications with

7    the FedLoan Servicing with respect to the primary purpose

8    requirement and FedLoan Servicing was saying, Wait a minute.

9    This is not what you told us in the past, and that's

10   evidence that they had a prior interpretation.  If that's

11   not a change of interpretation, Your Honor, I don't know

12   what is.

13          Moreover, as we'll put forward, if Your Honor

14   wishes, the ECF forms now are different.  The public

15   pronouncements on the website; the ECF forms state, Public

16   service.  Before, what they stated was, Check one of these

17   boxes; right?  So check one of these boxes if they apply.

18   And so that clearly is inconsistent with an understanding

19   that you needed a primary purpose of that.  And, in fact, if

20   we could have the regulation, in the regulation, that

21   interpretation's inconsistent with the regulation itself

22   because the regulation itself has a provision that excludes

23   partisan participation of for-profit organizations and has a

24   clause that says -- okay.  Here, if you blow it up, (5)(ii).

25          (Brief pause.)

1          Okay.  It says --

2          THE COURT:  I've got it.

3          MR. PARK:  You've got it?

4          THE COURT:  I can see it.

5          MR. PARK:  It says, Is not a business organized

6     for profit, a labor union, a partisan political or --

7          THE COURT REPORTER:  Can you slow down.

8          MR. PARK:  I'm sorry.

9          Is not a business organized for profit, a labor

10    union, a partisan political organization or an organization

11    engaged in religious activities, unless the qualifying

12    activities are unrelated to religious instruction, worship

13    services or any form of proselytizing.

14          So by definition, this would seem to make an

15    employee's job eligible if they work for an organization

16    whose primary purpose is religious but where the job is not.

17    And so what this is putting forth is a job function test

18    which is consistent with the definition of "public service

19    job" in the statute.  And what the Department is now trying

20    to do with the implementation and assertion of the primary

21    purpose test is actually implement a narrowing construction

22    at odds not only with the statute but its own regulation.

23          THE COURT:  Well, this is -- I mean, I think your

24    argument here is more directed toward, assuming there is a

25    change, what is the nature of that change?  Whether it's a

1    substantive rulemaking or whether it's just an interpretive

2    rulemaking and what flows from that.  You would say --

3              MR. PARK:  Well, also, Your Honor --

4              THE COURT:  You know, you would say it's,

5    obviously, substantive, but --

6              MR. PARK:  Absolutely.  But, you know -- but, Your

7    Honor, also, in terms of the record -- and we can cite to

8    you the portions, but clearly, we think that this is an

9    unusual circumstance where Your Honor would benefit with

10   respect to his review and consideration to account for the

11   extrajudicial evidence that we submitted, because that

12   clearly shows that there was a change in interpretation.

13   And the very communications that we displayed to Your Honor

14   before suggest that both the Department, Ian Foss, and the

15   recipients, FedLoan Servicing, understood there was a

16   change.  In fact, the Department directed FedLoan Servicing

17   to go through the list of other organizations to see whether

18   or not that change needed to be implemented in other

19   instances, as well.  So the argument and the representations

20   the Department is making that there was no change at the

21   time that applies broadly and this is just a consistent

22   interpretation that they've had since the promulgation of

23   the regulation in 2008 really strained the balance of

24   credulity, Your Honor.

25             THE COURT:  Let's -- and, actually, since you --

1     well, one question -- one more question here, and then we'll

2     go to that extra record review and it's a good enough time

3     to talk about it because it's relevant to this point.

4          The -- let me ask you about Mr. -- this question

5     of whether there was any change in interpretation.  It seems

6     to me there's an argument that Mr. Rudert is differently

7     situated than your other plaintiffs here because he doesn't

8     have -- I don't know of any at least alleged change in the

9     Government's interpretation that would apply to Mr. Rudert.

10    He was denied originally and then the reason they -- as I

11    recall, they denied him was that this issue of whether the

12    organization provides the services outright or whether

13    there's some, you know, third party that actually provides

14    the services.  That's something that, kind of -- it does

15    have -- that does seem fairly grounded in the text of the

16    regulation itself as opposed to something the Government --

17    an interpretation that they may have of the regulation.  And

18    so I guess my question is, is Mr. Rudert in a different

19    situation than the other plaintiffs here?  I realize he got

20    denied and -- or he was approved at first --

21          MR. PARK:  He was approved at first --

22          THE COURT:  He was approved at first and then

23    denied.

24          MR. PARK:  Yes.

25          THE COURT:  I get that.  But the -- I don't see

```
 1    anything in the record suggesting that that change was

 2    linked to any new interpretation that the government made

 3    regarding him.  And it may well have been -- in his case, it

 4    may well have been an accident as opposed to your other

 5    plaintiffs.  So --

 6              MR. PARK:  Well, Your Honor, in that regard -- and

 7    if I could have displayed the text of the statute with the

 8    insertions -- the text of the statute and the regulations.

 9              So Your Honor's point in terms of they do not

10    provide the services outright, again, as a simple point,

11    Your Honor, as we'll display, that does not -- that

12    requirement does not appear anywhere in the statute or the

13    regulations.

14              THE COURT:  Well, the regulation says -- I don't

15    have the regulation in front of me.

16              MR. PARK:  We'll --

17              THE COURT:  As I recall, the regulation has

18    language that suggests that -- let's see it here.

19              MR. PARK:  Next one.  Let's go to the -- okay.

20    Can you blow that up.

21              MR. MILLER:  I cannot.

22              MR. PARK:  Okay.

23              THE COURT:  Right.  So the -- you've crossed it

24    out for other reasons, but, Provides the following

25    services --
```

```
1              MR. PARK:  Right.

2              THE COURT:  -- right?

3              MR. PARK:  Exactly.

4              THE COURT:  So I mean, isn't it fair to say that

5    if they're not providing the -- isn't it totally -- comport

6    with that to say, Look, either they provide the services

7    themselves or, if they're just assisting another person or

8    organization that's actually providing the services, that

9    they don't qualify?

10             MR. PARK:  Well, there's a simple --

11             THE COURT:  But I mean, and then --

12             MR. PARK:  There's a simple answer to that, Your

13   Honor.

14             THE COURT:  Let me just say -- okay.  And then the

15   second point is, regardless of how we may agree or disagree

16   about that, I don't see any evidence in the record unlike,

17   let's say -- or the record -- or we'll call it the potential

18   record or the documents you've submitted with the motions.

19   I don't see anything in there that goes to this particular

20   point that they've ever, kind of, had a different

21   understanding of this particular point.  Maybe I'm wrong and

22   you'll correct me, but go ahead.

23             MR. PARK:  Your Honor, and in the record that

24   they've certified, there does not seem to be any

25   consideration of that particular point --
```

1          THE COURT:  Okay.

2          MR. PARK:  -- but with respect to the denial, it's

3     --

4          (Brief pause.)

5          Excuse me, Your Honor.

6          (Brief pause.)

7          So there's a simple point, Your Honor, in that

8     regard in terms of they do not provide the services

9     outright, and Mr. Rudert is here.  And in terms of what the

10    Vietnam Veterans of America does, part of its mission is

11    actually to provide services to veterans seeking to get

12    disability benefits from the Veterans Administration.  So in

13    terms of services outright, those are direct services

14    provided to veterans seeking benefits, Your Honor.

15         THE COURT:  All right.  So that's -- but that's

16    different -- I'm not saying this difference is --

17    necessarily means he's not going to get relief.  He is or is

18    not.  But that is a different animal than your other

19    plaintiffs which are being subject to an interpretation --

20    the Department's interpretation of the regulations in a way

21    -- no one's disputing that, as you apply their

22    interpretation to the facts, that it applies the way it does

23    to you all.

24         MR. PARK:  Well --

25         THE COURT:  That -- what you're -- I think what

1   you're telling me is, Gee, they just got it wrong here as a

2   factual matter.

3          MR. PARK:  Well, they got it wrong as a factual

4   matter in terms of their, you know, implementation and

5   approval, for example, of public services, interest law

6   services, you know?  ProBAR does provide direct services,

7   but they also provide services to other --

8          THE COURT:  Well --

9          MR. PARK:  -- employees, AILA in terms of -- the

10   organizations that are at issue here provide public

11   services, but, you know, as we know, there are various

12   different arms to all non-profit organizations.

13          THE COURT:  Well, this goes to the primary purpose

14   issue --

15          MR. PARK:  Right.

16          THE COURT:  -- right?

17          MR. PARK:  And so to the extent that that -- and

18   here's the point -- and this goes to Your Honor's, I think,

19   next area of inquiry -- is, frankly, based on the

20   administrative record that -- the 300 or so pages that the

21   Department certified, you know, it's unclear what they did.

22   I mean, I'll give you an example, Your Honor, which goes

23   into your next line of inquiry.  In terms of Kate Voigt --

24          Do we have Kate Voigt's actual part of her

25   administrative record?

1          (Brief pause.)

2          Just to illustrate the point, Your Honor, why this

3     is unusual circumstances, in the administrative record that

4     was certified for -- by the Department with respect to the

5     decision-making related to Kate Voigt, this is the sum total

6     with respect to Kate Voigt.  Now, Ms. Voigt sought, after

7     she was denied, some more explanation as to why she had been

8     denied.  The Department -- and we can hand this to the Court

9     -- essentially produced 198 pages of redacted materials and

10    2 pages of materials.  As a result, Ms. Voigt, not satisfied

11    with that, filed her own action with the assistance of

12    Public Citizens before Judge Sullivan of this court and,

13    subsequently, she was provided 4,800 pages of documents as a

14    result of that litigation.  So this and the administrative

15    record certified by the Department in this case, we submit,

16    may not be complete.  It may be deficient.  And that's why

17    we believe this Court needs to consider the extra record

18    evidence submitted to it in consideration of Your Honor's

19    decision.

20          THE COURT:  So you -- that's why you believe it --

21    we agree the standard is so deficient so as to preclude

22    effective review or --

23          MR. PARK:  That's correct, Your Honor.

24          THE COURT:  -- gross procedural deficiencies?

25          MR. PARK:  That's correct, Your Honor.

```
 1              THE COURT:  All right.
 2              All right.  Anything else, then, on whether --
 3    let's just go back.  I just want -- I don't want to lose
 4    this thread before we get off -- before I let Mr. Patil take
 5    a whack at this.  But you're resisting my suggestion that
 6    Mr. Rudert is differently situated than the other
 7    plaintiffs.  Again, maybe, it's a difference that doesn't
 8    bear -- doesn't have any effect on whether, you know -- his
 9    ultimate claims for relief.  But isn't it fair to say
10    there's no -- we don't have any record evidence -- maybe,
11    the record's deficient; put that aside -- but there's no
12    evidence even that you've put forth in -- as evidence that
13    you'd like to have included in the record that suggests that
14    there was a change with regard to Mr. Rudert?  There was a
15    change in the sense that he was, you know -- he got
16    approval --
17              MR. PARK:  Right.
18              THE COURT:  -- and then was denied.
19              MR. PARK:  Right.
20              THE COURT:  But other than that, we don't have
21    anything else reflecting an interpretive change; is that
22    fair?
23              MR. PARK:  Can you bear with me, Your Honor --
24              THE COURT:  Yes.
25              MR. PARK:  -- with the Court's indulgence?
```

1            THE COURT:  Yes, sir.

2            MR. PARK:  Let me just make sure the record's --

3            THE COURT:  Yes.

4            (Brief pause.)

5            MR. PARK:  So Your Honor, number one, there's no

6    suggestion that he was never providing this himself.  And so

7    there's never -- no evidence in the record that there was a

8    third party involved whatsoever in the services he's

9    provided.  But to answer Your Honor's point, we're not aware

10   of anything in the record that's currently before the Court

11   that said, for example, you know, to the negative, etcetera.

12   So we understand Your Honor's point; however, we would still

13   obviously resist because the text of the statute, the

14   regulations are fairly clear, and to the extent that he was

15   approved and then denied suggests there was, in fact, a

16   change of interpretation.  And, again, the one point that I

17   would like to make, Your Honor, is the Department, in its

18   briefing, has never joined battle or engaged on whether or

19   not they actually -- these interpretations of the plaintiffs

20   that we're submitting are, in fact, correct.  They're

21   resting their entire defense primarily on final agency

22   action.

23           THE COURT:  The -- so you want -- the inference

24   you'd like me to draw -- and, maybe, it's true -- is that

25   it's -- it -- is that Mr. Rudert was denied because of this

1   primary purpose issue?

2        MR. PARK:  That and others -- or, you know,

3   frankly, the problem is, Your Honor, the record is so

4   deficient, they have not set forth any sort of reasoned

5   consideration analysis for anything --

6        THE COURT:  Okay.

7        MR. PARK:  -- but I do believe, you know -- if I

8   were a betting man, I think part of it would be the primary

9   purpose, because that seems to be the focus now with respect

10  to the ECF.  In fact, the ECF forms have been changed, as

11  has the website, to actually specifically insert that

12  primary purpose language, Your Honor.

13       THE COURT:  Okay.  All right.  Anything else,

14  then, on the question of whether there has been a change in

15  interpretation?

16       MR. PARK:  All I'll say is, it's -- the statute,

17  the regulation and the past and prior implementations for

18  the Department suggest, in fact, you know -- compel the

19  conclusion that it has been.

20       THE COURT:  All right.  Mr. Patil, I'll hear from

21  you on this issue.  And I have a couple of specific

22  questions, and then I'll certainly hear anything you want to

23  say in response to Mr. Park.

24       MR. PATIL:  Yes, Your Honor.

25       THE COURT:  The -- is there any evidence in the

1    record that -- kind of, collectively, what I think the

2    plaintiffs would think is a fair characterization of their

3    case is that, you know, since 2015, all of a sudden, they

4    and others, perhaps, have been denied on these bases -- on

5    the bases that we've been talking about, these interpretive

6    alleged changes, and that that's evidence that, in fact,

7    there has been a change.  So do I -- is there any evidence

8    in the record or, frankly, that the Government wants to add

9    to the record that say prior to 2015 or prior to 2014, that

10   the government issued any sort of denials on these two

11   bases?  On the primary purpose basis and then the other

12   issue is the, sort of, school or school-like setting

13   interpretation.  Is there any evidence that, in fact, folks

14   were being denied earlier on those bases?  And if the answer

15   is no, how do you all square that with your interpretation

16   that, really, there was nothing new here?  That the

17   government always interpreted the regs in this way.

18            MR. PATIL:  Your Honor, standing here, I'm not

19   actually aware -- or I shouldn't say that.  I don't know one

20   way or the other if that's the case.  I'm happy to consult

21   with the Department and, if we -- if Your Honor would like,

22   we can submit something on that particular point.  But I

23   think here, finality is -- kind of, rears its head again.

24   What the plaintiffs have argued are this supposed prior

25   interpretation are things found in informal communications

1    or things found in these ECF responses which don't bear the

2    hallmarks of finality.  And the case law that we've cited --

3    Select Specialty which is a decision of this court and

4    Smiley which is a decision of the Supreme Court -- both

5    indicate that plaintiffs can't point to change in

6    interpretations in situations where the only prior,

7    quote-unquote, interpretation is found in informal

8    communications.  What you see here is nothing more than

9    just, sort of, a development of a standard over time that --

10   as to how the Department wants to look at this statute -- or

11   sorry, excuse me, the regulation, but in a situation where

12   that has never -- had not been applied to anyone.  So you

13   know, here, again, Mr. Park referenced how it's very

14   difficult to figure out what the Department did in this

15   case, and that is because, you know, there's no -- because

16   these aren't final, the agency hasn't provided a basis for

17   the denial like it would on an application.

18          Yes, of course, we -- there were errors here.  We

19   fully concede that, and they were certainly regrettable and

20   unfortunate, but this wasn't -- you can't just extrapolate

21   from the fact that there were errors in -- or hiccups in the

22   way that this statute -- or the regulation was interpreted

23   and applied -- or excuse me, interpreted but not applied

24   before any application was made to say that, you know, there

25   must have been -- before X date, Department had a definitive

1       position on this and then, after X date, they changed that.

2                   THE COURT:  So is it fair to say -- I mean, so

3       your argument here really does come back to finality?

4                   MR. PATIL:  On this change in interpretation

5       part --

6                   THE COURT:  Yes.

7                   MR. PATIL:  -- yes, but, you know, it is certainly

8       the case that the Department did argue in its papers and

9       continues to argue today that its interpretation of the

10      regulation is reasonable.  I can --

11                  THE COURT:  Sure.  No, we'll get to that.  So --

12      okay.  So you -- all right.  And how would you -- how would

13      -- what's your response to the documents Mr. Park put up

14      here, and also, attached to those motions?  Again, I guess

15      it's that -- well, what is your response to those documents

16      that do appear to suggest -- again, you may argue those were

17      not official interpretations and etcetera.  But, certainly,

18      there's someone rattling around in the Federal Government

19      who had one idea of how to apply this and then that idea

20      changed.  That we're a long way from official final action,

21      I get it, but they certainly suggest that, at a minimum.

22                  MR. PATIL:  Well, again, Your Honor, a couple

23      responses.

24                  First, to -- we might be getting there in a couple

25      minutes, but to suggest that these materials should be part

1    of the administrative record is not correct.  I mean, they

2    either -- all but one of them, I think, postdate the actual

3    filing of the complaint; several of them don't involve any

4    Department staff; and one of them involves societies -- I

5    think it's Digital Societies of America which is not --

6    neither an employer nor a borrower relevant to this case.

7            THE COURT:  So if they shed -- I agree, they

8    are -- they postdate it, and that's a problem for the

9    plaintiffs.  But is there authority out there for the

10   proposition that a document that postdates -- again, we're,

11   kind of, assuming for purposes of this on some level that

12   there was a -- I don't know -- assume the final action,

13   but -- the action in question -- the governmental action in

14   question -- is there any authority out there for the

15   suggestion that -- for the proposition that a document that

16   postdates and, obviously, couldn't have been before the

17   decisionmaker but that, nonetheless, seems to reflect how

18   that decision unfolded, that that could be or should be part

19   of the administrative record?

20           MR. PATIL:  Your Honor, we cite numerous cases in

21   our opposition papers on that -- those two -- the motion and

22   the supplemental motion that explain that, you know, in

23   administrative review cases, as this is, the question is,

24   what was before the agency?  And, you know, finding --

25   inherent or implicit in that concept is that it must

1    actually have been there at the time and not something, you

2    know -- something sent out in 2017 couldn't have been before

3    the agency in 2015, but, again, Your Honor, we don't deny

4    that the emails show that there were errors, and that's

5    exactly what they show; that FedLoan Servicing had told

6    certain individuals or some -- I don't know if any of them

7    -- I don't believe -- I believe there's a reference to VVA,

8    but I don't know that there's any other reference to any of

9    the particular borrowers or borrowers' employers here, but

10   there certainly were errors where FedLoan Servicing told

11   people that they had -- that their employer qualified, and

12   that was incorrect based on the Department's interpretation

13   of the regulation.

14        Now, that -- again, Your Honor, going back to

15   finality here, there isn't a position of the -- that

16   plaintiffs can point to of the agency's -- of the

17   Department's that show any -- a concrete position that -- a

18   definitive legal statement -- or definitive statement of the

19   Department's legal position at that time, and that is what

20   Select Specialty and Smiley say; that, essentially, you

21   can't just point to informal communications or informal

22   statements and say, That's -- that must have been the

23   Department's position.  Now, it's changed.

24        THE COURT:  Did the -- I noticed, again, the

25   frequently asked questions document, obviously, changed at

1      some point.  When -- do you know when that changed?

2              MR. PATIL:  I believe it changed in 2016 after --

3      in part, after the Department met with representatives from

4      the ABA and came to the conclusion that more clarifying

5      language about the agency's -- or about the Department's

6      position would be helpful to borrowers.

7              THE COURT:  And, again, it's your position from

8      our prior conversation that that did not become -- and I

9      don't want to say final, but -- it didn't become the end of

10     the -- it didn't meet the first Bennett prong?  It didn't

11     become the -- it didn't -- it wasn't the end of the internal

12     processes of the Department until 10 -- until 20 -- I guess

13     it would be '17 -- '17 or '18 -- but until the 10 years hit

14     and you had someone finally apply and reject it; is that

15     accurate?

16             MR. PATIL:  Yes, Your Honor, although, certainly,

17     that, I think, would be a closer case with a statement of

18     the Department's position that -- on Bennett Prong I than

19     what we have here which is informal responses in emails or

20     ECF responses from FedLoan Servicing.

21             THE COURT:  Have -- other than that document, has

22     the Department ever made an announcement or provided any

23     kind of public rationale for these interpretations of the

24     regulations?

25             MR. PATIL:  Yes, Your Honor, in the briefs in this

1    case, and cases like Auer and its progeny recognize that

2    agencies can set forth interpretations of their regulations

3    in legal briefs.

4            THE COURT:  Okay.  But the legal briefs in this

5    case, then --

6            MR. PATIL:  In the -- yes, Your Honor --

7            THE COURT:  -- are the first time that that's --

8    there's been a, kind of -- yeah -- a rationale in

9    interpretation?

10           MR. PATIL:  Yes.  Yes, Your Honor.

11           THE COURT:  Okay.  All right.  All right.

12   Anything else -- any other points you want to make me -- to

13   me on this point about whether there has been a change?  And

14   then we've, sort of, bled into the issue of extra record

15   review and whether extra record review is appropriate here.

16           MR. PATIL:  Yes, Your Honor.  Briefly, I want to

17   respond to Mr. Park's reference to pages that were produced

18   in response to a FOIA request.

19           THE COURT:  Yes.

20           MR. PATIL:  You know, FOIA and the administrative

21   -- and an administrative record process are very different.

22   For example, most notably, deliberative materials are not

23   included in administrative records, whereas those materials

24   can be produced subject to redactions in the FOIA.  So a

25   bunch of pages that might have been deliberative and never

1   been produced pursuant to -- or certified in an

2   administrative record do not show that the administrative

3   record were deficient -- was deficient.

4          THE COURT:  I mean, deliberative and predecisional

5   records, of course, can be exempted from FOIA.

6          MR. PATIL:  Typically, there's an obligation under

7   the FOIA to segregate information.

8          THE COURT:  Yes.

9          MR. PATIL:  So those materials -- I believe Mr.

10  Park pointed to the page -- the number of pages.  I don't --

11         THE COURT:  Yes.

12         MR. PATIL:  -- obviously, was not part of that

13  case, so don't have a sense of what proportion of that was,

14  you know, material withheld in full pursuant to exemptions

15  or material that were heavily redacted subject to the

16  exemptions, but that doesn't call into -- those are

17  different analyses and it doesn't call into question what

18  was certified as the administrative record in this case.

19         THE COURT:  Okay.

20         MR. PATIL:  Last thing -- and, Your Honor, if

21  you'll -- obviously, feel free to stop me if this is not --

22  the road you don't want to go down, but I did want to

23  respond to a couple points that Mr. Park made about, you

24  know, the purported inconsistency of these interpretations

25  that the Department -- the -- as Your Honor's referenced,

1    the primary purpose determination or the direct provision of

2    service.

3          You know, there's nothing about these

4    interpretations that are inconsistent with the regulation.

5    Plaintiffs have taken an unduly broad view of what these

6    terms mean.  I mean, the clearest example of that comes from

7    AILA which purports to be, according to the plaintiffs, a

8    public education organization because it posts articles and

9    news updates online.  By that -- if that were the standard,

10   then it's hard to think of what couldn't be included; what

11   wouldn't be subject to loan forgiveness.  And the

12   Department, very reasonably, has understood that there needs

13   to be some sort of limitation on that before -- unless this

14   program sweep in -- basically, as plaintiffs suggest, any

15   employer who does any little bit of public service would

16   have all of their employees, then, covered.

17         And I also wanted to point out that Mr. Park

18   referenced language in the regulation that he pointed to

19   about qualified activities which he suggested, I believe,

20   that this was a job-focused regulation and not -- or a

21   position-and-duties-focused regulation as opposed to a

22   public-service-organization-focused regulation, and that's

23   not correct for two reasons.

24         One, the Department very clearly stated in issuing

25   this rule that what it was doing was changing the focus of

1    the -- or defining public service jobs in the context of

2    public service organizations because it would be clearer and

3    more efficient to do so, presumably because the --

4    otherwise, the Department would have to sift through and

5    parse every individual's description of their job duties to

6    figure out whether or not they were involved in public

7    service.

8              But, secondly, the cited language that Mr. Park

9    references doesn't suggest that the qualifying activities

10   there are anything other than the organizations.  I mean,

11   the whole thing is under the definition of "public service

12   organizations".  It doesn't -- I don't believe a borrower is

13   mentioned anywhere in that entire definition, and so it

14   would be odd, to say the least, to pour in the word

15   "borrower" in front of -- the qualifying activities of the

16   borrower.  Rather, what that regulation is doing is saying

17   that if -- and this is perfectly consistent with the primary

18   purpose interpretation -- which is, essentially, if an

19   organization does -- has its primary purpose in public

20   service but also does a little bit of religious activity,

21   it's not going to be carved out because the qualifying

22   activities there are not related to religious instruction,

23   worship services or any form of proselytizing.

24             THE COURT:  Okay.

25             MR. PATIL:  And then lastly, as Your Honor pointed

1      out, the statute -- or the regulation itself states what --

2      defines "public service organization" in terms of whether it

3      provides the following public services.  It doesn't say,

4      Facilitate some other organization.  That is a much fuzzier

5      concept that would be very difficult to administer and, as

6      with plaintiffs' other interpretations of the regulation,

7      would sweep in virtually every non-profit organization.

8              THE COURT:  Okay.  All right.  Thank you.

9              Mr. Park, let me just ask if you have any quick

10      response to that, and then we'll move on to the next topic.

11              MR. PARK:  Well, I do have a response.

12              THE COURT:  Okay.

13              MR. PARK:  I may not be able to be quick, but --

14      so just a point, Your Honor, in terms of Mr. Patil --

15      especially since I feel duty bound, since Mr. Rudert's

16      actually in the courtroom here.  He didn't facilitate

17      provision.  He provided these services.  And so that's, you

18      know --

19              THE COURT:  Yes.

20              MR. PARK:  What I find mystifying and, to use the

21      Department's own words, unfortunate and regrettable about

22      this entire case is that the Department seems to want to

23      shirk its responsibility for its actions.  The point about

24      the FOIA request -- and I understand fully about the

25      deliberative process privilege since I was at the FTC for

1   some period of time.  But in terms of deficiency of the

2   record, it's the sheer volume that we're pointing to as

3   well, Your Honor, the sheer volume that I demonstrated to

4   you of what was actually certified in the record; what was

5   produced; and that what Judge Sullivan's rulings ultimately

6   determined would have to be produced from -- by -- to Ms.

7   Voigt with respect to deliberations of her case by the

8   Department of Education.  That small packet of documents --

9   and I actually thought about it, but we thought it would be

10   overboard to bring in the entire 4,800 pages that were

11   actually produced by the Department, but there's no

12   comparison there, Your Honor.

13          So in terms of the case law with respect to the

14   unusual circumstances, in Escher v. -- Esch v. Yeutter

15   specifically states that when there are procedural

16   irregularities, obviously, there's more deference given to

17   the supplementation of the record, but here, we're not even

18   asking for the administrative record -- the decision-making

19   issue to be -- the record to be supplemented.  We're asking

20   -- just asking this Court to take into account factual

21   documents that show there were, in fact, changes of

22   interpretation.

23          And then in that regard, Your Honor, if I may show

24   August 2014, this is before this litigation was initiated;

25   before anyone actually, in October 2017, filed a final loan

1   forgiveness application; and this is related to -- this is

2   dated August 19th, 2014.  This is from Ian Foss, again, from

3   the Department, from FSA.  Sorry for the delay on this one.

4   We wanted to run it by our attorney, but he was on leave for

5   a while.  We've settled, however, on a definition of "public

6   education," exclamation mark.  For PSLF, public education

7   services are those that provide educational enrichment or

8   support directly to students or their families in a school

9   or school-like setting.  That's a change.

10          THE COURT:  I mean, you know, as Mr. Patil

11  mentioned, it all -- this is why finality, as he said, rears

12  its head again.  I mean, either -- if you think of some of

13  these earlier determinations as final, then that's a change.

14  If it's not final, then it's not a change.  So I mean, I

15  take your point.  I take your point.  I take your point.

16  Obviously, internally, what they would say is, internally,

17  things were fluid, but -- and it really does -- a lot of

18  this really does come down to, are -- do I have a final

19  agency action early on for your clients or not; fair?

20          MR. PARK:  And I -- well, I think you definitely

21  do, Your Honor.

22          THE COURT:  I know you -- I know that's your view,

23  but that -- I'm saying, all of these things ultimately, in

24  many ways, turn on that question --

25          MR. PARK:  Well, and that's part of, you know --

1    again, if you review the briefs -- I mean, and I agree.  I

2    think we're enjoined on the battle of, what's a final agency

3    action?  And contrary to what the Department has set forth

4    today -- I mean, if you look at the briefs, they have not

5    disputed the accuracy of the interpretations that we've set

6    forth.  All they're relying on is that their proffered

7    interpretation is, quote-unquote, reasonable.  And what --

8    Your Honor asked a very important question to Mr. Patil at

9    the end in terms of, where has the Department ever actually

10   announced this, you know -- what we call a new

11   interpretation -- a changed interpretation?  Where, pursuant

12   to the normal procedures, where an agency, through notice

13   and rulemaking --

14             THE COURT:  It's --

15             MR. PARK:  -- comment --

16             THE COURT:  It's only important if it's final

17   action, though; right?

18             MR. PARK:  Well --

19             THE COURT:  But, again, what you -- I'm not

20   disputing that, but, yeah.

21             MR. PARK:  And the answer he provided you was, In

22   these legal briefs --

23             THE COURT:  Right.

24             MR. PARK:  -- which is no answer at all, Your

25   Honor.

1          THE COURT:  Let me -- I want to -- fair enough.

2     Let me just ask you about some of the potential downstream

3     parts of this analysis.

4          If they -- if -- assume -- just assume for the

5     moment -- obviously, if there's no final agency action, then

6     end of analysis.  Assuming for the moment I agree with you

7     and there is final -- there was final action that your

8     clients were subject to, what is the -- don't I, then, have

9     to decide whether -- what type of rulemaking this was?  You,

10    I know, argued in the briefs, Gee, this is a substantive

11    rulemaking; this is a change that is to the point where they

12    would have to do notice and comment.  I'm just, sort of,

13    curious.  Let's assume I thought there was final action, but

14    I thought this was merely an interpretive rulemaking that

15    wouldn't require full-blown notice and comment.  Again, I'm

16    telling the Government -- I'm not saying that I agree with

17    that -- that I -- that that's my view right now.  But if

18    that were to be the case, what process would they need to

19    give?  In other words, process short of notice and

20    commenting -- notice and comment; process that wouldn't be

21    the kind of process that a substantive rulemaking would

22    require but that just an interpretive rulemaking would

23    require.

24          MR. PARK:  Well, Your Honor, I think that

25    generally, the process would be to give some formal notice

1    to the borrowers and the public that this is going to be a

2    new standard, but, again, I think, in order to -- the issue

3    is -- and it's actually reflected in the administrative

4    record -- that -- and to change the regulations, they

5    actually -- in this particular regulation, they actually

6    entered into three different negotiated rulemakings to

7    change the regulations.  Here, we would submit that they

8    would need to do the same.

9          With respect to the interpretive rulemaking,

10   etcetera, it, you know -- their actions stand for themselves

11   and are arbitrary and capricious and otherwise not in

12   accordance with the law, regardless of how the Department

13   wants to characterize it, Your Honor.  And there have

14   been -- there's cases -- and we will brief it and we're

15   happy to submit additional briefing -- but the caselaw

16   supports our position that regardless of how you want to

17   interpret their change of interpretation, revise it, that

18   there's -- they're arbitrary and capricious and otherwise

19   not in accordance with the law, Your Honor.

20          THE COURT:  How -- you argue in your briefs that

21   the Department was required to take into account the

22   reliance interests here.

23          MR. PARK:  That's correct, Your Honor.

24          THE COURT:  How --

25          MR. PARK:  And so --

1          THE COURT:  How -- tell me about -- what does that

2     really mean?  I mean, I, you know -- what does taking into

3     account the reliance interests really mean?  Does that --

4     just to acknowledge that they exist?  What's a situation

5     where an agency -- again, we're, sort of, assuming there's

6     some sort of final action here for the purposes of these

7     questions.  On what -- are there any grounds on which an

8     otherwise lawful agency action could be found unlawful

9     because -- on -- solely on the basis of, "Gee, the

10    government didn't take into -- didn't take these -- take

11    reliance interests into account"?

12          MR. PARK:  Well, in terms of an arbitrary and

13    capricious standard, I think, when the -- you depart from

14    agency precedent and when you don't consider the reliance

15    interests.  I think that's in Ramaprakash v. FAA.  I think

16    that's set forth in our briefing, and we'd be more than

17    happy to submit additional briefing on that.  But the

18    reliance interests, I think the question -- your answer --

19    Your Honor is asking is, what sort of reliance interests are

20    there to take into account?  Again, as Your Honor said, just

21    a mere acknowledgment?  Well, you know, that's a start.

22    They didn't do that here, even, but to the extent that

23    there's actually a change in position that the plaintiffs

24    have made in reliance on the action of the Department, and

25    that's something that is clear from here.  For example, as I

1   said, you know, there are legal consequences.  I know the

2   second part of the Bennett test is, you know, where

3   rights/obligations are determined or changed and the legal

4   consequences will flow.  All of that, as we've briefed, is

5   present here with respect to each of the individual

6   plaintiffs and the employees of the ABA taking actions both,

7   you know, professionally, life-changing, etcetera, but also

8   understanding and going forward in terms of their employment

9   situation.  There are a -- whole sorts of factors that show

10  that there's actual reliance here and the understanding that

11  the Department -- there's nothing in the record.  It's

12  evidence in the administrative record.  I mean, it cuts both

13  ways.  One way the evidence is deficient is any sort of

14  reasoned consideration or anything that would provide

15  deference to the agency for its determinations here.  As

16  Your Honor knows, under Skidmore, you know, any deference is

17  in proportion to the thoroughness of the reasoning and

18  validity; the past, you know -- the consistency with past

19  and prior interpretations or actions; and anything that

20  would give weight and factors that give weight to the

21  persuasive value here.  That is completely deficient from

22  the administrative record.

23          And the point that Mr. Patil was trying to raise

24  in the ECF is in terms of the -- as we point out, the lack

25  of explanation, you know?  Just because they didn't do their

1    job doesn't absolve them of responsibility and does not

2    undercut the finality of the agency action set forth.  And

3    while the Department likes to characterize these

4    communications as informal -- I mean, Your Honor -- and this

5    is -- the documents and the information speak for itself.

6    And I won't be presumptuous to, you know, put myself in Your

7    Honor's shoes, but I think you can assess them with respect

8    to the appropriate imprimatur that the Department, both in

9    terms of the scheme it set up and in terms of the actual

10   communications, has put forward with respect to those

11   communications.

12            THE COURT:  Well, they are -- I'll just, you know

13   -- they are internal -- I mean, they are informal in format

14   in many ways, but I think the thing that weighs on your side

15   is, kind of, the impact on your clients and the overall

16   scheme, but certainly, you know, emails and things like that

17   are typically less formal than other modes of communication.

18            MR. PARK:  Although, these days, Twitter tweets

19   are potentially formal, Your Honor.

20            THE COURT:  I don't know anything about what

21   you're talking about.

22            (Laughter.)

23            All right.  Mr. Patil, do you have anything on

24   that -- on those topics?  And, in particular, I guess I'd

25   just raise, again, the same question I raised with Mr. Park

1    which is simply just this issue of -- again, I guess, for

2    purposes of these questions, we're assuming for the moment

3    that we do have agency action here.  I'm not at all

4    suggesting I've concluded that, but just, you know, hear me

5    out.  The question is, what -- I guess, first of all, again,

6    assuming that for the moment, this was a situation where I

7    thought that this was -- I concluded we did have final

8    action but we don't have a substantive rulemaking such that

9    notice and comment would be required, what would be

10   required, number one?  And then under -- in either type of

11   analysis, again, what would the Government have to do to

12   take into account these reliance interests?  Just

13   acknowledge them and say, We understand there's reliance,

14   but here's our interpretation, more or less?

15            MR. PATIL:  Yes, Your Honor.  So I guess,

16   responses to those in order.

17            First, with respect to your question about what

18   sort of -- what process would be required, Mr. Park

19   referenced -- suggested that we did not, you know -- the

20   legal briefs here are insufficient as a statement of the

21   agency's interpretation, but that's not true under Auer,

22   under Christensen and other cases in that line of case law

23   that recognized that agencies can set forth considered

24   interpretations of their regulations through the legal

25   briefs.  So we would -- the Department's position is that it

1    has done so here and that no further process is required

2    because this is not something that is required -- that

3    notice and comment rulemaking is --

4              THE COURT:  Right.

5              MR. PATI:  -- required here.  Indeed --

6              THE COURT:  And -- okay.  And short of notice and

7    comment, it's satisfied by the briefs --

8              MR. PATIL:  Yes.

9              THE COURT:  -- whatever process would be needed?

10             MR. PATIL:  Yes.

11             THE COURT:  Okay.

12             MR. PATIL:  And just -- right.  And so your second

13   question was reliance interests, you know?

14             Your Honor, again, not to hit -- continue to go

15   back to finality, but I think that is important here as well

16   because any notion of reliance is, kind of, dependent on the

17   idea that --

18             THE COURT:  Right.

19             MR. PATIL:  -- there was a preliminary --

20             THE COURT:  Right.

21             MR. PATIL:  -- certification.

22             THE COURT:  Right.  Right.

23             MR. PATIL:  Moreover, it's also relevant to note

24   that reliance doesn't apply here to every plaintiff.  There

25   were -- Mr. Burkhart, Ms. Voigt and Mr. Rudert received

1      either ECF notifications or informal emails erroneously

2      indicating that they would be approved, but

3      Ms. Quintero-Millan did not, and the ABA certainly does not

4      have any entitlement to a, sort of -- to prospectively rely

5      on a position that its borrowers might have received in a

6      few instances.

7              THE COURT:  Do you -- just to clarify this from

8      the briefs and given the position you've taken here, what's

9      the Government's position on Skidmore deference's

10     application here?

11             MR. PATIL:  We believe -- Skidmore deference turns

12     on -- I think the primary considerations are whether there's

13     a thorough determination and whether there's -- whether

14     that's persuasive.  And we think, for the reasons set forth

15     in our brief, that we are entitled to Skidmore deference

16     here.  We also believe that Auer deference would also be

17     appropriate here.

18             THE COURT:  But isn't -- at least on Skidmore, the

19     question is, what was the rationale at the time of the

20     agency action, isn't it?  I mean --

21             MR. PATIL:  Right.

22             THE COURT:  -- how -- if the briefs didn't exist

23     then, how can I give Skidmore deference to an interpretation

24     that -- I don't know that I have much in the record at all

25     about, sort of, what was going on in the agency at the time.

1          MR. PATIL:  Right.  And that's a fair point, Your

2     Honor; however, that, sort of -- that disconnect -- I think

3     there's a disconnect between the suggestion -- between that

4     and the way that the regulation works here.  I mean, the

5     reason why there isn't a fulsome statement for the basis of

6     the denial is because the agency does that at the time of an

7     application.  Under subsection (e), that's when the

8     Secretary sets forth --

9          THE COURT:  Right.

10         MR. PATIL:  -- the denial.  That -- at that

11    moment -- I'm not sitting here -- I'm not sure whether APA

12    review or whether there's a separate provision under the HEA

13    that would authorize --

14         THE COURT:  Right.

15         MR. PATIL:  -- judicial review, but that's the

16    instance when a borrower would be able to seek judicial

17    review and you'd have a full statement of the agency's

18    rationale.

19         THE COURT:  Right.  Well, that's why I asked what

20    the position was on that kind of deference, given the

21    position you're taking on, sort of, final action and

22    everything.  So I mean, I -- you're saying -- I guess you're

23    saying now your interpretation is required -- is -- should

24    be given that deference, although I, you know -- again, I

25    think the case law says it's at the time of the action.  So

```
 1     I don't -- that is a disconnect, I think.  And, again,

 2     given, kind of, the fact that this does appear like it's

 3     going to turn on whether we have final action or not, this

 4     may be an academic question, but okay.  Fair enough.

 5               MR. PATIL:  And to be clear, Your Honor, because

 6     it's an APA case, if Your Honor has questions about the

 7     basis for -- ultimately decides that these are final and

 8     then has questions about the basis for it, the proper remedy

 9     would be a remand to the agency for reconsideration.

10               THE COURT:  Right.

11               MR. PATIL:  It wouldn't be, as plaintiffs have

12     requested --

13               THE COURT:  Right.

14               MR. PATIL:  -- an order that they are qualified

15     under --

16               THE COURT:  Right.  Understood.  Understood.

17     Okay.  Thank you.

18               Any other questions -- any other points you want

19     to make on those topics?

20               MR. PATIL:  No, Your Honor.

21               THE COURT:  All right.

22               Mr. Park, let me -- my next question was going to

23     be something that Government counsel did raise just now,

24     this issue of Ms. Quintero-Millan.  Is it your position that

25     the Department acted retroactively with regard to her, given
```

```
 1     that she never received a notification form from the

 2     Department that she was eligible?

 3               MR. PARK:  That's right, Your Honor.  I don't

 4     think we say that, as to her, there was retroactive agency

 5     action, but in terms of the reliance point, Your Honor --

 6               THE COURT:  Okay.  You do not?

 7               MR. PARK:  We do not.

 8               THE COURT:  Okay.  All right.  Just --

 9               MR. PARK:  In Cause of Action III, we have --

10               THE COURT:  Right.

11               MR. PARK:  -- all plaintiffs except for --

12               THE COURT:  All right.

13               MR. PARK:  -- Michelle Quintero-Millan with --

14               THE COURT:  Okay.

15               MR. PARK:  -- retroactivity; however, on the point

16     of reliance, that she and others and the ABA generally, you

17     know -- one point in terms of reliance interests is that the

18     Department and the FedLoan Servicing induced reliance with

19     respect to all borrowers and public service organizations in

20     terms of the advertisement that, quote, You should use this

21     as a recruiting tool once an employee is, in fact, certified

22     as eligible.  Again, that goes to the point that we've been

23     discussing in terms of what sort of weight the

24     Department/FedLoan Servicing was placing on that particular

25     determination.
```

1        THE COURT:  And she did, if I recall, in her

2   declaration, say that she had information or --

3        MR. PARK:  That's correct.

4        THE COURT:  I can't remember what the --

5        MR. PARK:  That's correct.

6        THE COURT:  -- exactly, but, like, with all --

7   with regard to all three of her jobs, she understood --

8        MR. PARK:  Absolutely.  And, in fact, she's here

9   as well, but, you know, when she was deciding whether or not

10   to actually pursue a public interest law career in the law,

11   she -- this was one of the determining factors in terms of

12   whether or not she might actually qualify.  And when she

13   talked to her counselor, they informed her of the Public

14   Service Loan Forgiveness program and, based upon that

15   information, she dedicated herself to spending years at

16   ProBAR down in South Texas.  And so all of this in terms

17   of -- and this is why we go back to the overall scheme and

18   what was actually implemented.  And I know the Department

19   disputes it, but the entire scheme; the regulations/statute

20   all bear the hallmarks of final agency action with respect

21   to employment eligibility determinations.

22        With respect to deference, Your Honor, the one

23   thing that, I think, the Department can't dispute -- because

24   they haven't disputed it in their briefs -- is there's

25   nothing that shows any sort of reasoned consideration with

1      respect to their decision-making with respect to at the time

2      because that -- whether it's Auer; whether it's Skidmore --

3      and, obviously, they don't even try to invoke Chevron here

4      because that's clearly inapplicable -- there's no basis on

5      which this Court can determine that they have any reasoned

6      basis for them to make the decisions they made at the time,

7      Your Honor.

8                THE COURT:  Okay.  Okay.  Mr. Park, while I have

9      you up there, then, one more -- the last area I wanted to

10     cover is relevant to the preliminary injunction motion.

11               MR. PARK:  Yes, Your Honor.

12               THE COURT:  So you might have seen this question

13     coming, you know?  The standard for irreparable harm is

14     pretty high here; that it must be -- that the harm must be

15     certain and great and of such imminence that there's a clear

16     and present need for equitable relief and the injury must be

17     beyond remediation.  And, typically, when we're talking

18     about money -- which, in part, we're talking about here --

19     that those injuries are absolutely able to be remedied in

20     the ordinary course of a litigation.  So I guess, number

21     one, there's, sort of, that, I just wanted to set out; and

22     then the second point is, you know, the -- obviously, the

23     case was filed quite a while ago; your motion for summary

24     judgment was filed quite a while ago, but here we are with a

25     motion for preliminary injunction filed only recently.  So

1    tell me why the situation facing your clients meets the

2    standard for harm here.

3              MR. PARK:  Sure, Your Honor.

4              And in this instance, I'll have a timeline put up,

5    Your Honor.  And I will, you know, represent to this Court

6    that, you know, when this action was first filed, yes, we

7    actually assessed whether or not, you know, we should file,

8    in conjunction with the complaint, a motion for preliminary

9    injunction, and we decided at that time, given our

10   understanding of how high the standard is, that, you know,

11   as officers of the court, we could not do so.  Understanding

12   quite intimately through practice and being on both sides of

13   those motions and being on numerous sides and having, you

14   know, had judges like yourself question me about that, we

15   decided not to; however, here is the difference.

16             Now, the timeline is, you know -- and Kimi

17   Jackson -- and, as you know -- as the Director of ProBAR

18   down in South Texas, has filed several declarations.  And so

19   let me just analogize this to an unfortunate event, a storm.

20   I mean, there was rumblings and there was an understanding,

21   as she set forth in her sworn declarations, with respect to

22   what she felt would be the impact of these actions on the

23   ProBAR, and the time went on.  And so there was an

24   understanding that there was a loss of positions; there was

25   a vacant position, etcetera; and so that was known.  So at

1   about the time we filed it which was right before January of

2   2017, you know, there was some rumblings and then events

3   overtook them; right?  And so this is akin to seeing -- Kimi

4   Jackson seeing the storm clouds; right?  And understanding

5   the winds are picking up, etcetera.

6          Now, subsequently, if we can go to the next slide,

7   a lot of things happened in terms of, you know, funders and

8   non-profit attorneys expressing their concerns, but what

9   really happened and what really precipitated this were

10  things beyond the control of the Department of Education;

11  beyond the control of anyone here which was with respect to

12  the -- to what happened in the border crisis.  And so I

13  liken this to there's a storm coming; it's -- you can see

14  it, you know; it's not imminent, irreparable; and then, you

15  know, beyond your thoughts, it actually hits directly -- the

16  storm track hits directly on you; right?

17         And so for example -- a concrete example, I was

18  traveling in Asia and I got a call saying, We have a

19  resignation.  On the night that we filed for a preliminary

20  injunction, we had one of our critical employees resign.

21  And so this is not something we're generating for strategic

22  purposes.  This is Kimi Jackson, who -- and, frankly, Your

23  Honor, I thought about whether or not we should bring Kimi

24  Jackson live in person to testify, but according to the

25  local rules, obviously, that's discouraged with respect to

1    live testimony, but I can tell you, Your Honor, that the

2    damage; the harm that, you know -- we have over half of our

3    positions are -- or about half our positions are vacant at

4    ProBAR right now.  There is an ongoing crisis.  Part of

5    their mission is to represent these individuals.  I can tell

6    you because I have a case actually in the border, and so law

7    firms are mobilizing to go down to the border, but there is

8    -- they're being overwhelmed right now, Your Honor.

9            THE COURT:  But the harm has to be clear.  The

10   harm has to be to a plaintiff here.

11           MR. PARK:  That's correct.

12           THE COURT:  Okay.  So it has to be either to a

13   named plaintiff or, I guess, you're arguing to me, by virtue

14   of ProBAR, that the ABA is being harmed.

15           MR. PARK:  Absolutely, Your Honor.

16           THE COURT:  I mean, but -- and that's -- that harm

17   is -- I don't want to minimize this, but that harm is, We

18   haven't been able to fill certain positions.  It really

19   doesn't -- I mean, the fact that there may be a demand for

20   your services in Place A or B or C, I'm not sure that can --

21           MR. PARK:  Well, the harm goes --

22           THE COURT:  I don't know that that goes into the

23   harm calculus for any named plaintiff here.

24           MR. PARK:  The harm goes further than that, Your

25   Honor.  It's -- we haven't been able to fill positions for a

1    while; we have current positions -- current needs are being

2    unmet; and we have credible, you know, sources -- in fact,

3    direct sources -- that -- saying that our funding is in

4    jeopardy which actually jeopardizes the continued viability

5    of our organization going forward and the mission of ProBAR

6    and its ability to serve vulnerable populations in South

7    Texas.  So it's not just the vacancies.  It's the continued

8    -- and it's, sort of, an accretion, you know?  As I said, we

9    did not file a motion for preliminary injunction at the time

10   we filed the complaint in December 2016 because the harms,

11   while on the horizon, had not yet been visited.  The storm

12   has now made landfall, Your Honor.

13            THE COURT:  All right.  Well, I will certainly

14   consider that.  And, as I recall it, you filed that motion

15   -- has the Government -- I don't believe they filed a

16   response --

17            MR. PARK:  They have, Your Honor.  They

18   responded --

19            THE COURT:  Was it yesterday?  Last night?

20            MR. PARK:  They responded several days ago and we

21   filed a reply, Your Honor.

22            THE COURT:  Oh, that's what I was waiting for.

23   When did you file your reply?

24            MR. PARK:  We filed it Monday, Your Honor.

25            THE COURT:  All right.  Okay.  So I'll certainly

```
 1    take all that under advisement.  All right.

 2              MR. PARK:  Thank you, Your Honor.

 3              THE COURT:  Absolutely.

 4              Mr. Patil, can I get you to respond to anything

 5    Mr. Park said and, specifically, on this point of harm

 6    regarding the preliminary injunction.

 7              MR. PATIL:  Sure, Your Honor.

 8              I think what we -- as we argued in our briefs,

 9    decisions in this court and the D.C. Circuit have been clear

10    that delays of -- as short as 44 days or a couple months are

11    enough to rebut the notion that -- or the claim of imminent

12    harm.  And here, that's exactly what we have.  We have a --

13    as Your Honor put it, the real nub of the claimed injury

14    here is inability to recruit or retain attorneys.  That --

15    they have -- plaintiffs -- or excuse me, the ABA has made

16    that argument since the day the case started.  They've

17    claimed that that argument has become more -- or that injury

18    has become more acute with respect to ProBAR in July of 2017

19    in opposing an extension motion; in March of 2018 in their

20    motion for a status conference.  They -- in that motion as

21    well, they cited, you know, changes in regulatory policy.

22    Here, the alleged policy that they say is, kind of, putting

23    them in this bind has been around since -- or allegedly has

24    been putting them in this process, according to their last

25    -- their latest filing, since May 2018, but only in
```

1    September -- only after, you know, the clock hit one year

2    did this motion get filed.  And under the clear precedent of

3    this case, that -- or in this court, that's not imminent.

4          In addition, as we -- also, as we argued, you

5    know, what plaintiffs need here -- what the ABA claims it

6    needs is the ability to tell borrowers -- or excuse me, tell

7    prospective employees and current employees that it

8    qualifies as a public service organization and that they are

9    entitled to loan forgiveness.  They are not going to be able

10   to get that with a preliminary injunction.  That's just

11   simply not what preliminary injunctions do.  And, in fact, I

12   don't think that the ABA would even purport to market itself

13   on the basis of a statement that they are qualifying -- they

14   are a qualified employer if they -- if this Court has not

15   reached a final resolution.

16         THE COURT:  All right.  Okay.  Thank you.

17         Mr. Park, I'll hear, then -- I'm out, then, of

18   questions and topics.  So I'll hear you on anything, if

19   there's something you think we haven't hit, the points that

20   you want to make, and then I'll hear from the Government, as

21   well.

22         MR. PARK:  Your Honor, just one point in terms of

23   the -- I'll refer you to cases briefed in our reply,

24   etcetera, but Esch v. Lyng --

25         THE COURT REPORTER:  I'm sorry.  What was it?

1              MR. PARK:   Esch, E-S-C-H, v. Lyng, L-Y-N-G, 665 F.

2    Supp. 6, the decision of this court from 1987 relating to

3    where -- the PI's declaration of farmers' eligibility for a

4    program, you know?  The court recognized, Would have had an

5    immediate and undeniably valuable effect of allaying the

6    concerns of various creditors who would cease their

7    collection efforts on the strength of such a ruling.  And so

8    to the extent that a PI has been recognized by this court in

9    a prior ruling as having a salutary effect on a particular

10   situation, I think that's the court that -- that's a

11   decision that Your Honor should take account of.

12             You know, I think -- and I thank the Court for the

13   fulsome discussion and for the questions and, obviously, I

14   would offer any additional briefing that the Court might

15   require in this.  I will say, though, the one thing -- I

16   dispensed with my floor opening at -- in the concessions of

17   the shortness of life, but I will say that, you know, Your

18   Honor asked about the real impact in the reliance interests

19   here, and that's, you know -- something that cannot be

20   understated is the fact that these plaintiffs have put their

21   lives on hold.  And in terms of, sort of, you know, the

22   effect -- and I'll, you know -- in terms of wiping off and

23   retroactively -- I mean, it has consequences.  And, for

24   example, you know, the Department seems to suggest that

25   these, quote, unfortunate or regrettable errors are --

1    somehow have not changed the plaintiffs' lives or put them

2    in any different position, and that's just not correct.

3            In fact, I'll give -- one technical example is

4    wiping away the prior payments -- the credits in the bank,

5    you know -- makes the plaintiffs have to pay in absolute

6    dollars more money on the back end because they're enrolled

7    in income-based repayment plans whereby their payments --

8    monthly payments are pegged to a percentage of the

9    discretionary income.  And so by virtue of their experience

10   and attentive hard work, they've actually advanced in

11   positions in earning, you know, higher salaries, you know?

12   Still very low-paying, but nonetheless, higher salaries.  So

13   by wiping away the credits in the bank from the earlier

14   years, they're forcing the plaintiffs to pay more in

15   absolute dollars to qualify for loan forgiveness, you know,

16   let alone, you know, the emotional impact.  And I will say,

17   you know, a part of what I have done as pro bono counsel to

18   these individual plaintiffs and the ABA is, obviously, you

19   know, have an understanding of what, you know, they have

20   incurred.  And in terms of what Jamie Rudert said, the

21   denial from the Department was devastating.  Devastating.

22           And so you know, I know this is -- may be a case

23   of statutory interpretation; regulatory; of the APA,

24   improper procedures, but the impact, not only in

25   financial/legal change of positions but in actual life

1    decisions, is enormous here, and that's what I'll leave the

2    Court with.

3              THE COURT:  Thank you.

4              Mr. Patil?

5              MR. PATIL:  Your Honor, just one very brief point.

6              Mr. Park's citation to this Esch case is not

7    applicable here.  That -- the discussion that he relies on

8    is actually a determination -- assessment of whether or not

9    the plaintiffs were asking for prospective or retrospective

10   relief to determine whether or not the Court of Claims would

11   have exclusive jurisdiction under the Little Tucker Act.

12   It's not a -- relevant to the part of the analysis on

13   irreparable harm.

14             THE COURT:  All right.

15             MR. PATIL:  And nothing further from me.

16             THE COURT:  All right.

17             All right, then.  Well, with that, I will take

18   this under advisement and, frankly, regardless of the issue

19   of the preliminary injunction, one way or the other, my hope

20   is to get a decision on the full motion, you know, as soon

21   as I possibly can.  So again, I apologize -- particularly to

22   the plaintiffs -- for how long this has sat.  And if there's

23   nothing further, the parties are excused.

24             THE DEPUTY CLERK:  All rise.  This Honorable Court

25   is adjourned.

1          (Proceedings concluded at 12:02 p.m.)

2                    * * * * * * * * * * * *

3             **CERTIFICATE OF OFFICIAL COURT REPORTER**

4    I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify that

5    the above and foregoing constitutes a true and accurate

6    transcript of my stenographic notes and is a full, true and

7    complete transcript of the proceedings to the best of my

8    ability, dated this 1st day of October 2018.

9                              /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                              Official Court Reporter
10                             United States Courthouse
                              Room 6722
11                             333 Constitution Avenue, NW
                              Washington, DC 20001

12

13

14

15

16

17

18

19

20

21

22

23

24

25