# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AMERICAN BAR ASSOCIATION *et al.*,

      *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
EDUCATION *et al.*,

      *Defendants*.

Civil Action No. 16-2476 (TJK)

## <u>MEMORANDUM OPINION</u>

In 2007, Congress established the Public Service Loan Forgiveness Program ("PSLF" or "PSLF Program"), which offers federal student loan forgiveness for those who make ten years, or 120 months, of monthly loan payments while employed in public service. At any time, federal student loan borrowers employed in public service may check their ongoing eligibility to participate in the program by submitting an Employment Certification Form (ECF). Upon receipt of that form, the Department of Education (the "Department") determines whether the borrower's loan payments were made while employed at a qualifying "public service organization," such that they count towards the PSLF Program's requirements. This case concerns whether the Department's reversals of certain of those determinations, made before the borrower's completion of all 120 monthly loan payments, were lawful.

Plaintiffs American Bar Association (ABA) and Michelle Quintero-Millan, Geoffrey Burkhart, Kate Voigt, and Jamie Rudert (collectively, the "Individual Plaintiffs") filed this action against the Department and Betsy DeVos, in her official capacity as Secretary of Education (collectively, "Defendants"), challenging the Department's allegedly unlawful reversal of certain determinations under the PSLF Program. They bring five claims against Defendants. Counts I,

II, III, and IV are brought under the Administrative Procedure Act (APA), 5 U.S.C. § 500 *et seq.* In Count I, Plaintiffs allege that the Department changed its interpretation of its regulations in an arbitrary and capricious manner by adopting new standards governing whether non-501(c)(3) not-for-profit organizations, such as the ABA and the Individual Plaintiffs' employers, qualify as "public service organizations" under the PSLF Program. ECF No. 1 ("Compl.") ¶¶ 183–92. In Count II, Plaintiffs allege that the Department failed to follow the APA's notice requirements when it introduced those standards. *Id.* ¶¶ 193–200. In Count III, the ABA and Plaintiffs Burkhart, Rudert, and Voigt allege that the Department's retroactive application of the standards was arbitrary and capricious. *Id.* ¶¶ 201–08. And in Count IV, Plaintiffs allege that the Department's new standards were themselves inconsistent with the PSLF statute and regulation. *Id.* ¶¶ 209–16. In Count V, Plaintiffs allege that the Department's retroactive application of the standards violated the Due Process Clause of the Fifth Amendment. *Id.* ¶¶ 217–20.

Before the Court are the parties' cross-motions for summary judgment. For the reasons explained below, the Court concludes that Defendants acted arbitrarily and capriciously when the Department changed its interpretation of the PSLF regulation in two ways without displaying awareness of its changed position, providing a reasoned explanation for that decision, and taking into account the serious reliance interests affected. Accordingly, summary judgment is appropriate on behalf of Quintero-Millan, Burkhart, and Voigt, on Count I, and the new standards on which the Department relied when it sent denial letters to them must be vacated. As a result, the Court need not reach their additional causes of action.

In contrast, summary judgment is appropriate in favor of Defendants on all causes of action brought by Rudert and the ABA. The record does not support Rudert's assertion that the Department impermissibly changed its interpretation of the PSLF regulation, and then relied on

that interpretation in determining that his employment failed to qualify for the PSLF Program. For this and other reasons explained below, Rudert has failed to demonstrate that the APA was violated in his case. And further, for the reasons explained below, the Department's representations to the ABA concerning whether it qualified as a public service organization for purposes of the PSLF Program were not final agency actions subject to challenge by the ABA through the APA. Finally, both the ABA's and Rudert's claims under the Due Process Clause fail because both lack the protected property interests required to succeed on their claims.

Accordingly, the Court will grant in part and deny in part Plaintiffs' Motion for Summary Judgment, ECF No. 17, and grant in part and deny in part Defendants' Motion for Summary Judgment, ECF No. 22. For the reasons explained below, the Court will also grant Plaintiffs' Supplemental Motions to Allow for Extra-Record Review. ECF Nos. 24, 35.[1]

## I.    Background

### A.    The PSLF Program

#### 1.    The PSLF Statute

In 2007, the College Cost Reduction and Access Act, Pub. L. No. 110-84, 121 Stat. 784, established the PSLF Program, under which the Department is required to forgive eligible loans of borrowers who make monthly loan payments for ten years while employed in public service. Under the statute, the Department must "cancel the balance of interest and principal" of qualifying student loans belonging to an individual who (1) is not in default on the loans, (2)

---

[1] In evaluating these motions, the Court considered all relevant filings including, but not limited to, the following: Compl.; ECF No. 14 ("Ans."); ECF No. 17 at 1–4 ("Mot."); *id.* at 5–99 ("Pls.' MSJ Br."); ECF No. 22 at 1–2 ("Cross-Mot."); *id.* at 3–46 ("Defs.' MSJ Br."); ECF No. 24 ("Pls.' Supp. Br."); ECF No. 25 ("Pls.' Reply"); ECF No. 30 ("Defs.' Opp. to Supp."); ECF No. 31 ("Defs.' Reply"); ECF No. 32 ("Pls.' Supp. Reply"); ECF Nos. 34-1, 34-2 (Joint Appendix, with citations designated as "AR __"); ECF No. 35 ("Pls.' 2d Supp. Br."); ECF No. 36 ("Defs.' Opp. to 2d Supp."); ECF No. 37 ("Pls.' 2d Supp. Reply"); and ECF No. 46 ("Oral Arg. Tr.").

makes 120 monthly payments after October 1, 2007, on the loans, and (3) is "employed in a public service job" at the time each payment is made and at the time of forgiveness. 20 U.S.C. § 1087e(m)(1). For a payment to qualify, the borrower must also be enrolled in an approved repayment plan, such as an "income-based repayment plan" ("IBR plan"), *id.*, which permits a borrower facing financial hardship to make lower monthly payments capped at a percentage of her gross income, 20 U.S.C. § 1098e(a). A "public service job" is defined to cover "a full-time job in . . . government . . . , public education . . . , public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a nonprofit organization) . . . , [and] public service for individuals with disabilities." 20 U.S.C. § 1087e(m)(3)(B).

## 2. The PSLF Regulation

In October 2008, the Department promulgated a regulation setting forth the procedures through which a borrower may apply for loan forgiveness. *See* 34 C.F.R. § 685.219. The regulation defines the statutory term "employed in a public service job," 20 U.S.C. § 1087e(m)(1)(B), to require that an eligible borrower be "hired and paid by a public service organization," 34 C.F.R. § 685.219(b). Thus, a borrower's eligibility for the PSLF Program is not determined by her job responsibilities, but rather by whether her employer qualifies as a "public service organization." *Id.* Under the regulation, "public service organization" includes any government organization, not-for-profit organization classified under Section 501(c)(3) of the Internal Revenue Code, or not-for-profit private organization that is not classified under Section 501(c)(3) so long as it "provides [qualifying] public services" and does not engage in certain disqualifying activities. 34 C.F.R. § 685.219(b). The qualifying "public services" include, among many others, "public interest law services," "public education," and "public service for individuals with disabilities and the elderly." *Id.*

During the negotiated rulemaking process leading to the promulgation of the regulation, the Department agreed to develop a form with "an employer certification section and instructions regarding supporting documentation that the Department [needs] to determine the borrower's eligibility for the forgiveness benefit." Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 73 Fed. Reg. 63,232, 63,241–42 (Oct. 23, 2008); AR 45–46. The Department affirmed that the form would permit a borrower "to collect a certification from his or her employer either annually or at the close of the 120-payment qualifying period." 73 Fed. Reg. at 63,242; AR 46. Based on these commitments undertaken during the negotiated rulemaking, the Department developed a process through which a borrower may certify the eligibility of payments made during a particular period of employment at any time, long before she submits a loan forgiveness application upon completion of all 120 qualifying payments (the "ECF Process"). Oral Arg. Tr. at 25:1–11.

### 3.    The ECF Process

According to the Department, the ECF Process allows borrowers to certify that their "employment and payments qualify for [the PSLF Program]." AR 178. Through the submission of an ECF, borrowers and their employers certify that the borrower was employed full-time for a qualifying public service organization when making monthly loan payments. *See* AR 152–53. In order to receive loan forgiveness under the program, borrowers must submit valid ECFs covering their "full-time public service employment while making the required 120 separate, qualifying monthly payments." AR 154. But, as noted above, borrowers may also submit ECFs before they are eligible to apply for loan forgiveness in order to "receive feedback on the eligibility of [a borrower's] employment and payments," AR 178, and to "verify that [a borrower's] employer qualifies as a public service organization," AR 152. The Department recommends that borrowers submit ECFs either annually or whenever the borrower changes

employers.  AR 154.  A single ECF may cover loan payments made over any length of time, but the Department requires borrowers to submit separate ECFs for each employer.  *See* AR 152–53. The ECF application must be signed by an authorized official from the relevant organization to verify that the borrower was a full-time employee during the relevant time period.  *Id.*

The Department relies on PSLF servicers, primarily "FedLoan Servicing," to process ECFs prior to a borrower submitting a loan forgiveness application at the conclusion of making 120 qualifying monthly payments.  AR 178.  ECFs are processed in several steps.  First, FedLoan Servicing conducts an "initial review" in which it "check[s] that the borrower provided all required information" and followed the form instructions.  AR 143.  Once the check is complete, Fedloan Servicing "determine[s] whether an employer is a qualifying public service organization" by confirming that the organization is listed in one of the Department's "searchable databases, based on the type of public service organization."  *Id.*  If FedLoan Servicing cannot determine whether an employer qualifies as a public service organization—and in all cases where a borrower submits an ECF based on her employment at a private, non-501(c)(3) not-for-profit organization—it is required to escalate the decision to the Department. AR 143, 160–61.

After determining that the borrower's employer is a qualifying public service organization, FedLoan Servicing will "determine whether the borrower has met the full-time requirement . . . while employed [there]."  AR 143.  If FedLoan Servicing confirms that the borrower made loan payments while employed full-time at a qualifying employer, then, after approving the first ECF received by the borrower, it will "request the transfer of all federally-held loans" to FedLoan Servicing from the borrower's original loan servicer.  AR 144.  Once the

transfer is made, FedLoan Servicing will "track the number of PSLF qualifying payments made after the loans [were] transferred from the original servicer." *Id.*

After completing 120 eligible monthly payments, borrowers may apply for loan forgiveness through a separate application. AR 179. If a borrower submitted ECFs covering the entire period during which she made 120 qualifying payments, then she must submit "one additional" ECF to verify that she is employed full-time with a qualifying public service organization at the time she submits the application. *Id.* If a borrower did not submit ECFs prior to completing her loan forgiveness application, or only submitted a portion of them, then she must provide all the remaining ECFs upon her application for loan forgiveness. *Id.*

## B. Plaintiffs

The ABA is an organization for legal professionals that asserts that the Department unlawfully stripped it of its status as a qualifying public service organization for purposes of the PSLF Program. Compl. ¶¶ 21, 208. The Individual Plaintiffs are law school graduates who contend that they made qualifying loan payments under the PSLF Program while employed by public service organizations, including the ABA, over varying periods since 2011—but have since been informed that, to the contrary, because their employers are not public service organizations, their payments do not qualify. *See id.* ¶¶ 107–77.

### 1. ABA

The ABA is a private, not-for-profit 501(c)(6) organization that, among other activities, conducts legal education initiatives, administers the accreditation of law schools and other projects for the legal profession, and provides public interest law services. Pls.' MSJ Br., Ex. A ¶¶ 5–11. The ABA operates several public interest legal divisions, including the South Texas Pro Bono Asylum Representative Project ("ProBAR"), the Commission on Homelessness and Poverty, and the Center on Children and the Law. *Id.*, Ex. A ¶¶ 12, 14, 18. According to

Plaintiffs, ProBAR serves as the nation's "largest provider . . . of legal services and legal-rights education for detained unaccompanied immigrant children." *Id.*, Ex. A ¶ 12.

Following the establishment of the ECF Process in January 2012, the ABA asserts that several of its employees submitted ECFs to the Department and received letters in response confirming that their "employment with the ABA qualified" for participation in the PSLF program. *Id.*, Ex. A ¶ 22. Based on these determinations, the ABA informed several prospective employees that "it was a qualifying employer under the PSLF program." *Id.*, Ex. A ¶ 23. Beginning in 2015, ABA employees began to receive letters from the Department that denied their eligibility for the PSLF Program on the basis that the Department "could find no evidence of [the ABA] being a not-for-profit organization that also provides a qualifying service for the PSLF program." *Id.*, Ex. A ¶ 22; AR 185. Around April 2016, the ABA's then-Executive Director and Chief Operating Officer contacted the Department about the ABA's status. Pls.' MSJ Br., Ex. A ¶ 28. In June 2016, the Department informed the ABA that, even after reviewing the additional information the ABA had submitted, the Department concluded that the ABA did not qualify "as a public service organization for . . . PSLF purposes" because it did not demonstrate "that the primary purpose of the ABA is to provide 'public interest law services' [as] the term is defined in the PSLF regulations." AR 190–91. After an additional exchange of letters and a meeting with Department officials, in December 2016 the Department reaffirmed to the ABA that it was not a qualifying public service organization "for the reasons outlined" in its June 2016 letter. AR 192–93.

### 2. Michelle Quintero-Millan

After graduating from the Sturm College of Law at the University of Denver in 2012, Quintero-Millan joined ProBAR in June 2012 as a Staff Attorney. *See* Pls.' MSJ Br., Ex. E ¶¶ 1, 4. She departed in May 2015 with the title of Supervising Attorney. *Id.*, Ex. E ¶ 7. During

her time at ProBAR, Quintero-Millan provided pro bono legal services to undocumented and unaccompanied immigrant children in southern Texas. *Id.*, Ex. E ¶¶ 4–5. In November 2015, Quintero-Millan submitted her first ECF to FedLoan Servicing. *Id.*, Ex. E ¶ 10; AR 218. In November 2016, FedLoan Servicing informed Quintero-Millan, without explanation, that her employment at ProBAR did not qualify under the PSLF program. Pls.' MSJ Br., Ex. E ¶ 13; AR 237–38. Quintero-Millan asserts that she had accepted the position at ProBAR "with the understanding, based on [her] inquiries during the application process[,] that [her] employment would qualify for PSLF." Pls.' MSJ Br., Ex. E ¶ 9. Since January 2013, Quintero-Millan has been enrolled in an IBR plan, which caps her loan payments as a percentage of her income and, as a result, has caused her monthly payments to be less than the interest on her loans. *Id.*, Ex. E ¶ 16. Accordingly, Quintero-Millan's total federal student debt has increased from approximately $340,000 when she entered repayment to $430,446.48 as of May 2017. *Id.*, Ex. E ¶ 17.

### 3. Geoffrey Burkhart

In June 2014, Burkhart—a 2008 graduate of DePaul University College of Law—joined the ABA as Attorney and Project Director for the Division for Legal Services. Pls.' MSJ Br., Ex. D ¶¶ 1, 4. He remained in the position until December 21, 2016, when he became the Deputy Director of the ABA's Center for Innovation. *Id.*, Ex. D ¶ 4. While employed at the Division for Legal Services, Burkhart worked "to improve civil legal services and criminal justice for poor individuals through technological and process innovations." *Id.* His work included, among other responsibilities, drafting amicus briefs, conducting workload studies of public-defender offices, and launching a news service for public-defense leaders. *Id.*, Ex. D ¶ 5.

Prior to joining the ABA, Burkhart asserts that he received confirmation (though he does not specify how) from both the ABA and FedLoan Servicing that his prospective position there

was eligible for the PSLF Program. *Id.*, Ex. D ¶ 7. Burkhart claims that he accepted the job in reliance on those representations. *Id.* In July 2014, Burkhart submitted an ECF to FedLoan Servicing and, that same month, received a letter confirming the eligibility of his loan payments. AR 208–11. Burkhart continued to submit ECFs in order to track his eligibility and received, as recently as June 28, 2016, verifications that his payments counted toward those necessary for loan forgiveness. Pls.' MSJ Br., Ex. D ¶ 8. On October 12, 2016, Burkhart received a letter from FedLoan Servicing informing him that upon its "further research and after consulting with the Department," it had reversed its previous determinations because the ABA does not "provide a qualifying service." AR 214–15. During his employment with the ABA, Burkhart has been enrolled in an IBR plan, which has caused his monthly payments to be lower than the accruing interest on his student loans. Pls.' MSJ Br., Ex. D ¶ 9. As a result, Burkhart estimates that the total balance of his "federal student loans has grown from $155,899.95 in October 2009 to over $200,000 as of May 17, 2017." *Id.*, Ex. D ¶ 11. Burkhart asserts that the Department's reversal has caused him and his family "great concern" and may force him to seek alternative employment. *Id.*, Ex. D ¶ 12.

### 4. Kate Voigt

Voigt graduated from Boston College Law School in 2011. Pls.' MSJ Br., Ex. C ¶ 1. In December 2011, she accepted a position in the Liaison Department of the American Immigration Lawyers Association ("AILA"), a 501(c)(6) organization that provides a variety of services for immigrants, as well as educational services on the topic of immigration. *Id.*, Ex. C ¶¶ 4–5. Shortly after starting at AILA, Voigt contacted the Department seeking clarification as to whether her position there qualified for the PSLF Program. *Id.*, Ex. C ¶ 6. In June 2012, the Department informed Voigt that her employment at AILA qualified. *Id.* As a result, Voigt claims, she continued to work at AILA. *Id.*, Ex. C ¶ 7.

In June 2014, Voigt contacted the Department about a letter received by her coworker that stated, to the contrary, that employment at AILA did *not* qualify under the PSLF Program. *Id.*, Ex. C ¶ 9. In response, the Department sent Voigt a letter in December 2014 informing her that, although it previously recognized employment with AILA as qualifying for the PSLF Program, it had reversed its position. AR 335. The letter was emailed to her by Ian Foss, a Department employee. AR 334. The Department had done so, the letter explained, because AILA's services did not fit within its definition of "public education services," defined by the Department as "services that provide educational enrichment or support directly to students or their families in a school or a school-like setting." AR 335–36. Voigt followed up to the letter by emailing Foss, expressing her disagreement with the decision. Pls.' MSJ Br., Ex. C ¶ 13. Voigt never received a response to the email. *Id.*

In November 2016, almost two years later, Voigt received a letter from FedLoan Servicing confirming that the Department had reversed its position as to whether employment at AILA qualified for the PSLF Program. *Id.*, Ex. C ¶ 17. Voigt asserts that, based on the Department's original confirmation, she chose to remain enrolled in an IBR plan that capped her monthly loan payments at an amount lower than the monthly interest charges of her student debt. *Id.*, Ex. C ¶ 8. Accordingly, Voigt estimates that, from October 2011 to May 2017, her federal student loan balance grew from $205,546 to $247,638.55. *Id.*, Ex. C ¶ 18. She asserts that the Department's decision to rescind her employment's eligibility has caused her great concern and has affected her ability to plan her finances. *Id.*, Ex. C ¶ 19.

### 5. Jamie Rudert

In April 2012, Rudert began working at Vietnam Veterans of America ("VVA"), a 501(c)(19) organization that provides advocacy and support services to Vietnam veterans, including representing veterans seeking government benefits and services. *Id.*, Ex. B ¶ 4; AR

315.  Rudert, a 2010 graduate of the American University Washington College of Law, asserts that he first learned of the PSLF Program while in law school.  Pls.' MSJ Br., Ex. B ¶¶ 1–2.  Upon joining VVA, Rudert worked as an Appellate Attorney from April 2012 to May 2013, where he represented veterans with service-connected disability claims before the Board of Veterans' Appeals.  *Id.*, Ex. B ¶ 6.  In May 2013, he was promoted to Deputy Director.  *Id.*, Ex. B ¶ 7.  As Deputy Director, he continued to represent veterans in their appeals while also supervising other attorneys.  *Id.*  He remained in this position until September 2015, when he left VVA for Paralyzed Veterans of America ("PVA"), a 501(c)(3) organization, where he continued to represent veterans in disability-benefit appeals.  *Id.*, Ex. B ¶ 11.

In July 2012, Rudert submitted an ECF and received a letter from FedLoan Servicing (which was not his loan servicer at the time but receives all ECF applications regardless of whether it is a borrower's servicer) indicating that his work at VVA from April 1, 2012, to June 18, 2012, qualified for the PSLF Program.  *Id.*, Ex. B ¶ 8.  On August 1, 2012, he received another letter from FedLoan Servicing, this one informing him that his loans were being transferred to FedLoan Servicing from his original loan servicer due to his qualifying payments.  *Id.*, Ex. B ¶ 9.  On October 30, 2014, he received a letter, in response to a second ECF submission, confirming that his employment at VVA qualified for the PSLF Program.  *Id.*, Ex. B ¶ 10.  FedLoan Servicing later informed Rudert that, as of January 2015, he had made 30 qualifying payments.  *Id.*

In early 2016, after his departure from VVA, Rudert submitted another ECF, while employed at PVA, which covered loan payments during his final year at VVA.  *Id.*, Ex. B ¶ 12.  In April 2016, he received a letter from FedLoan Servicing informing him that, based on its "further research and after consulting with the Department," it "reversed [his] previously

approved employment period" because VVA "does not provide a qualifying service." AR 282–83. Rudert asserts that, if he had known that his employment at VVA did not qualify for the PSLF Program, he would have departed earlier for another employer. Pls.' MSJ Br., Ex. B ¶ 14. During his participation in the PSLF Program, Rudert has been enrolled in an IBR plan, which has decreased his required monthly loan payments to an amount lower than the monthly interest charges on his total student debt. *Id.*, Ex. B ¶ 3. Consequently, Rudert estimates that his federal student loan balance has grown from $134,8087.16 in August 2012 to $161,985.02 in May 2017. *Id.*, Ex. B ¶¶ 9, 18.

## II. The Parties' Motions for Summary Judgment

### A. Legal Standard

Under Federal Rule of Civil Procedure 56(c), this Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Summary judgment is appropriately granted when, viewing the evidence in the light most favorable to the non-movants and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in their favor." *Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016). However, in a case involving review of an agency action under the APA, "the district judge sits as an appellate tribunal" and "[t]he 'entire case' on review is a question of law." *Am. Biosci. Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). In such circumstances, the district court "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)). Accordingly, the Court's review "is normally confined to the administrative record," *Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 143 F. Supp. 2d 7, 10 (D.D.C. 2001), except within a "narrow set of

exceptions," where a court may consult extra-record evidence due to "gross procedural deficiencies—such as where the administrative record itself is so deficient as to preclude effective review," *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013).

### B. Analysis

Defendants assert two threshold challenges to Plaintiffs' APA claims. First, they assert that the ABA does not have a cause of action because its interests do not fall within the "zone of interests" protected by the PSLF statute. The Court concludes that the zone-of-interests test does not bar the ABA's claims. Second, Defendants assert that Plaintiffs do not have a cause of action because the Department's actions at issue are not final agency actions subject to judicial review. The Court concludes that the letters sent to the Individual Plaintiffs determining that their employment did not qualify for the PSLF Program—and thus that their loan payments made while working for those employers did not count toward the total needed for loan forgiveness— are final agency actions. Therefore, the Individual Plaintiffs may assert causes of action challenging them under the APA. On the other hand, the Department's letters to the ABA concerning its status as a qualifying "public service organization" under the PSLF regulation are not final agency actions. Therefore, the ABA may not assert APA claims directed at those letters.

Turning to the merits of the Individual Plaintiffs' APA claims, the Court concludes that the Department changed the standards by which it assessed whether non-501(c)(3) not-for-profit organizations qualified as public service organizations under the PSLF Program. Moreover, these changes were arbitrary and capricious because, in adopting the new standards, the Department failed to display awareness of its changed position, provide a reasoned analysis for that decision, and take into account the serious reliance interests affected. Because summary judgment is appropriate in favor of Quintero-Millan, Burkhart, and Voigt on Count I on that

basis, the Court need not reach their other challenges under the APA, or their argument that the Department violated their due process rights under the Fifth Amendment.

On the other hand, the Court concludes that summary judgment is appropriate in Defendants' favor on Rudert's APA claims. It does so because it cannot conclude that the Department based its determination that his employment failed to qualify for the PSLF Program on a new interpretation of the PSLF regulation, and for other reasons explained below. Finally, the Court concludes that the ABA and Rudert's due process claims under the Fifth Amendment fail, as well. As a result, summary judgment is appropriate in Defendants' favor as to all causes of action brought by the ABA and Rudert.

### 1. Whether the ABA's Injuries Fall Within the Zone of Interests of the PSLF Statute

Defendants assert that the ABA's alleged injuries do not fall within the zone of interests of the PSLF statute and regulation,[2] which are "intended to provide student debt relief to borrowers," not public service organizations. Dfs.' Opp. at 21. The Court disagrees, especially given how this test is typically applied in the APA context.

The "zone-of-interests limitation" is a "requirement of general application" for "all statutorily created causes of action." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 163 (1997)). The test, which "is not meant to be especially demanding," "denies a right of review if the plaintiff's interests are so

---

[2] Although Defendants allege that the ABA's claims fall outside the zone of interests of *both* the PSLF statute and regulation, Defendants cite to no authority indicating that the zone-of-interests doctrine applies to agency regulations. The Supreme Court instructs that the doctrine applies to "all *statutorily* created causes of action" based on the presumption that *Congress* "'legislat[es] against the background of' the zone-of-interests limitation . . . ." *Lexmark Int'l, Inc.*, 572 U.S. at 129 (quoting *Bennett*, 520 U.S. at 163) (emphasis added). But Defendants can point to no similar instruction that the zone-of-interests doctrine applies equally to a *regulation* promulgated by an agency. Accordingly, the Court concludes that it need only assess whether the ABA's alleged injuries fall within the zone of interests of the PSLF statute.

marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). "[T]here need be no indication of congressional purpose to benefit the would-be plaintiff" for a court to conclude that the plaintiff falls within a statute's zone of interests. *Clarke*, 479 U.S. at 400.

The zone-of-interests standard "is particularly generous as applied to plaintiffs who bring suit under the APA, in light of the need to 'preserv[e] the flexibility of the APA's omnibus judicial-review provision, which permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review.'" *Otay Mesa Prop., L.P. v. U.S. Dep't of the Interior*, 144 F. Supp. 3d 35, 58 (D.D.C. 2015) (quoting *Lexmark Int'l*, 572 U.S. at 130); *see also Mendoza v. Perez*, 754 F.3d 1002, 1016 (D.C. Cir. 2014) ("[W]e apply the zone-of-interests test in a manner consistent with 'Congress's evident intent when enacting the APA to make agency action presumptively reviewable.'" (quoting *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012))).  In cases where the plaintiff asserts a cause of action under the APA, the "relevant zone of interest" is "defined by a substantive statute, not by the APA." *Am. Inst. of Certified Pub. Accountants v. IRS*, Civ. No. 15-5256, 2018 WL 3893768, at *4 (D.C. Cir. Aug. 14, 2018) (collecting cases).

The Court concludes that the ABA's asserted interests in this action are not "so marginally related to or inconsistent with the purposes implicit in the [PSLF] statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke*, 479 U.S. at 399.  Although the statute provides a direct benefit in the form of loan forgiveness to individual "borrower[s]," *see* 20 U.S.C. § 1087e(m)(1), it also promotes the interests of public service employers by providing significant financial subsidies to the borrowers they hire on the

condition they remain employed in public service. By design, then, the PSLF statute facilitates a public service organization's recruitment of employees by decreasing their employees' long-term debt burden. This debt relief reduces pressure on public service organizations to raise salaries. *See* Pls.' MSJ Br., Ex. D ¶ 6. Thus, the PSLF statute allows public service organizations to attract and retain desirable employees and, as a result, such organizations have a significant interest in their employees' eligibility under the PSLF Program. *See id.*, Ex. A ¶¶ 25, 26. Consequently, the harms asserted by the ABA—including the negative impact on its ability to retain skilled employees and provide high-quality legal services, *id.*—"arguably fall[] within the zone of interests protected . . . by the [PSLF statute]," *Mendoza*, 754 F.3d at 1016 (quoting *Bennett*, 520 U.S. at 162).

Defendants argue that the ABA falls outside of the zone of interests of the PSLF statute because its purpose is "to encourage *individuals* to enter and continue in full-time public service employment." Dfs.' MSJ Br. at 21 (emphasis added) (quoting 34 C.F.R. § 685.219(a)). The PSLF statute, Defendants argue, "does not mention public service organizations" and so "[a]ny benefit or harm" incurred by the ABA is only "incidental to the benefit incurred by the individual borrowers that the ABA employs." *Id.* at 21–22.

Defendants construe the PSLF statute too narrowly, at least for the purpose of applying the zone-of-interests test. To satisfy the test, a plaintiff need only show that its interests in the agency action "in practice can be expected to police the interests that the statute protects." *Amgen, Inc. v. Smith*, 357 F.3d 103, 109 (D.C. Cir. 2004) (quoting *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1075 (D.C. Cir. 1998)). Here, the ABA's interests in its own status as a qualifying public service organization under the PSLF Program fall squarely in line with the interests of the Individual Plaintiffs, whom Defendants concede may bring suit. Dfs.' MSJ Br. at

21–22. The ABA is motivated by its interests in increasing recruitment and lowering labor costs, which are entirely consistent with those interests more directly advanced by the PSLF statute. *See Amgen*, 357 F.3d at 109 ("Parties motivated by purely commercial interests routinely satisfy the zone of interests test under this court's precedents.").  For these reasons, the Court holds that the ABA's alleged injuries fall within PSLF statute's zone of interests.

### 2. Whether Plaintiffs' APA Claims Challenge Final Agency Action

Next, the Court must determine whether Plaintiffs' APA claims challenge final agency action, such that they are cognizable under that statute.  5 U.S.C. § 704.  The Individual Plaintiffs assert that the Department's letters informing them that their employment, and therefore their loan payments, did not qualify for the PSLF Program were final agency actions.[3]  The ABA argues that the letters sent to it concerning its status as a "public service organization" were final agency actions as well.  *See* AR 190–93.  The parties dedicated a substantial portion of their briefing and argument to this issue, underscoring its centrality to their dispute.  *See* Dfs.' MSJ Br. at 13–20; Pls.' MSJ Br. at 14–20; Oral Arg. Tr. at 4:12–33:12.

"Where there is no final agency action, a plaintiff has no cause of action under the APA." *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138 (D.D.C. 2018).  "Thus, although the absence of final agency action would not cost [the Court its] jurisdiction," it would cost Plaintiffs their "APA cause[s] of action."  *Trudeau v. FTC*, 456 F.3d 178, 188–89 (D.C. Cir. 2006); *see also Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F. 3d 726, 731 (D.C. Cir. 2003).  The finality inquiry is governed by the two-prong test set forth in *Bennett v. Spear*, which states that to be final, agency action must (1) "mark the consummation of the

---

[3] The "denial letters" received by the Individual Plaintiffs are: (1) the October 12, 2016 letter to Burkhart, AR 214–15; (2) the November 19, 2016 letter to Quintero-Millan, AR 237–39; (3) the April 19, 2016 and April 21, 2016 letters to Rudert, AR 277–79, 282–83; and (4) the December 10, 2014 letter to Voigt, AR 335–36.

agency's decisionmaking process" and (2) be an action "by which rights or obligations have

determined, or from which legal consequences will flow." 520 U.S. at 177–78 (internal citations

and quotation marks omitted). The Supreme Court has instructed lower courts to "apply the

finality requirement in a 'flexible' and 'pragmatic' way." *Ciba-Geigy Corp. v. EPA*, 801 F.2d

430, 435 (D.C. Cir. 1986) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149–50 (1967)).

### a.    Consummation of the Department's Decisionmaking Process

<u>The Individual Plaintiffs</u>

Under the first prong of the *Bennett* test, a final agency action "must mark the

consummation of the agency's decisionmaking process" and "must not be of a merely tentative

or interlocutory nature." *Bennett*, 520 U.S. at 177–78 (internal citations and quotation marks

omitted).

When considering the first *Bennett* prong, the D.C. Circuit has looked to the relevant

language of the challenged agency decision. *See Holistic Candlers & Consumers Ass'n v. FDA*,

664 F.3d 940, 944 (D.C. Cir. 2012). The language of the denial letters demonstrates that they

marked the Department's final determination that the Individual Plaintiffs' respective

employment, and their payments made during that employment, did not qualify for the PSLF

Program.[4] The letters sent to Burkhart and Rudert unambiguously stated that the Department

"reversed [their] previously approved employment period[s] under the PSLF program because

[their employers] do[] not provide a qualifying service." AR 214, 282. Likewise, the

Department's letter to Voigt flatly asserted that it had "determined that AILA is not a qualifying

employer for PSLF purposes." AR 336. In the letter to Quintero-Millan, the Department stated

that, based on its review of her ECFs, her employment "[d]oes [n]ot [q]ualify" and that she "may

---

[4] Because the Department's letters to the ABA fail to satisfy the second prong of the *Bennett* test, as discussed below, the Court need not address them here.

not participate in employment and payment tracking for PSLF." AR 237–38. This definitive language supports the conclusion that, upon sending the denial letters to the Individual Plaintiffs, the Department had completed its determination that their employment and the loan payments at issue did not qualify.

In arguing that the denial letters were not final, Defendants point to the allegedly less-than-definitive language in Quintero-Millan's letter, which stated that her "employer does not appear to qualify for PSLF" and invited her to "reapply if [she could] provide additional information to show that [her] employment qualifies." AR 237. But this language does not undermine the conclusion that her denial letter was a final agency action. First, other language in the letter was far more categorical about the Department's determination. The Department identified her "eligibility status" to be, simply, "Organization Does Not Qualify." *Id.* The letter suggested other possible eligibility statuses—for example, "Under Review" or "Missing Information"—each of which would have suggested a lack of finality. AR 237–38 (edits to capitalization). But according to Quintero-Millan's letter, neither of those applied to her. Second, even to the extent that the language cited by Defendants suggested that the Department might reconsider its decision, "[t]he mere possibility that an agency might reconsider in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012).

As part of the first *Bennett* prong, courts also look to "the way in which the agency subsequently treats the challenged action." *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016) (collecting cases). The record on this point is particularly clear that the denial letters reflect final agency action. After the Department issued the denial letters, the Individual Plaintiffs did not receive any additional communication from the Department

suggesting that the letters were tentative or interlocutory. Moreover, the ABA challenged the Department's basis for the denial letters issued to Quintero-Millan and Burkhart, but the Department reaffirmed its conclusion. AR 192–93. And when Rudert followed up with FedLoan Servicing after receiving his letter, a representative there simply informed him that "the Department of Education made the determination" and that "there was no appeal process put in place." AR 285. To date, and even after the filing of this lawsuit, the ineligibility determinations reflected in the Individual Plaintiffs' denial letters have apparently remained unchanged for periods ranging from 27 to 50 months. Pls.' MSJ Br., Ex. B ¶ 12; *id.*, Ex. C ¶ 18; *id.*, Ex. D ¶ 10; *id.*, Ex. E ¶ 13. Simply put, there is no indication in the record that these letters do not "represent[] the culmination of [the Department's] consideration of an issue." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018).

Defendants contend that the Individual Plaintiffs' denial letters are "interlocutory and subject to change" because "the Department does not make a final determination on eligibility for PSLF until the borrower files her application . . . after making 120 qualifying payments." Dfs.' MSJ Br. at 15–16. But this argument conflates separate determinations that the Department undertakes in connection with the PSLF Program. Certainly, the Department considers an application to determine a borrower's ultimate eligibility for debt relief only after she has submitted 120 qualifying loan payments. AR 153. But along the way, according to the Department, upon receiving an ECF it "verif[ies] that [the borrower's] employer qualifies as a public service organization" and "notif[ies] [the borrower] in writing of the number of qualifying payments . . . made while employed in qualifying public service." AR 155. Through this process, the Department "determine[s]" the eligibility of loan payments made during a borrower's employment with a particular organization. *See* AR 143–44. And, if the loan

payments are approved as eligible, the Department will "request the transfer of all federally-held loans" to FedLoan Servicing from the borrower's original loan servicer and "track the number of PSLF qualifying payments" going forward.  AR 144.  That the Individual Plaintiffs have not submitted applications for loan forgiveness does not undercut the conclusion that, at the very least, the denial letters reflect the end of the Department's decisionmaking process concerning whether a borrower's employer qualifies as a public service organization, and whether the loan payments at issue count toward the 120 monthly payments required.

Courts have also looked to other agency materials to evaluate whether an action marked the consummation of an agency's decisionmaking.  *See Holistic Candlers*, 664 F.3d at 944 (consulting an FDA manual).  In this case, language describing the ECF Process in the Department's guidance documents further underscores, in important ways, the conclusion that the denial letters marked the end of an agency process for the Individual Plaintiffs.  For example, the Department's "Dear Borrower" letter—which was sent to all borrowers interested in the PSLF Program, such as the Individual Plaintiffs, *see* AR 142—instructed borrowers that, when submitting their final application for loan forgiveness, they "do not have to re-submit [ECFs]" that have "already been validated by the Department," AR 153.  In the same letter, the Department informed them that it "will review" an application for loan forgiveness along with any ECFs "*not previously validated* by the Department" in order to "determine if [a borrower] fulfilled all of the requirements to be eligible for PSLF."  *Id.* (emphasis added).  Therefore, the Department's own language confirms that when it "validates" a borrower's employment and loan payments made during her time there, its determination marks the consummation of a process that is not revisited.  At that point, "for all practical purposes [the Department] 'has ruled definitively'" on whether the payments count toward the 120 required by the PSLF statute.  *U.S.*

*Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1814 (2016) (quoting *Sackett*, 566 U.S. at 131 (Ginsburg, J., concurring)).

In considering whether an agency action marks the consummation of a decisionmaking process, the D.C. Circuit has also instructed courts to look to "whether the *impact* of the [agency action] is sufficiently 'final' to warrant review in the context of the particular case." *Citizens Ass'n of Georgetown v. FAA*, 896 F.3d 425, 431 (D.C. Cir. 2018) (emphasis added) (quoting *Friedman v. FAA*, 841 F.3d 537, 542 (D.C. Cir. 2016)). Here, the denial letters have impacted the Individual Plaintiffs' careers and finances in a significant way that underscores their finality, and warrants review at this time.[5] After receiving the denial letter, Quintero-Millan interviewed for a director position at ProBAR, but then declined to pursue the position because she "could not work at ProBAR if [her] employment would not qualify for loan forgiveness." Pls.' MSJ Br., Ex. E ¶ 19. Burkhart submits that, with the demands of a family and his "growing educational debt," the Department's decision caused him "great concern about [his] ability to meet [his] student loan obligations, and to doubt [his] decision to devote [his] career to public service." *Id.*, Ex. D ¶ 12. If he had received the denial letter earlier, he affirms that he "would not have accepted the position at the ABA." *Id.*, Ex. D ¶ 6. Voigt asserts that the Department's decision made it "exceedingly difficult to plan [her] finances responsibly," which led her to delay

---

[5] In addressing whether the denial letters had "an immediate or significant practical effect" on the Individual Plaintiffs, the Court may consider factual assertions in declarations attached to their motion papers. *See Pharm. Research & Manufacturers of Am. v. U.S. Dep't of Health & Human Servs.*, 138 F. Supp. 3d 31, 45–46 (D.D.C. 2015) (looking to "sworn declarations" of regulated entities to assess whether an agency action had "an immediate and significant burden" for purposes of determining finality); *Nat'l Min. Ass'n v. Jackson*, 880 F. Supp. 2d 119, 130–31 (D.D.C. 2012) (reviewing declarations to assess "the practical effect of [the] ostensibly non-binding [regulation]" (quoting *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005))), *rev'd on other grounds sub nom. Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014).

purchasing a home and refinancing her loans. *Id.*, Ex. C ¶ 19. And Rudert contends that the denial letter impacted his "decisions in employment, housing, marriage, and financial planning." *Id.*, Ex. B ¶ 16. Had he received his denial letter while employed at VVA, he submits that he "would have left and found a job that did qualify." *Id.*, Ex. B ¶ 14.

Defendants argue that the denial letters did not have "an immediate or significant practical effect" on the Individual Plaintiffs because their "eligibility for PSLF had not yet been finally determined." Dfs.' MSJ Br. at 17 n.6. This is nonsense. In the face of growing debt burdens, the Individual Plaintiffs structured their careers and long-term financial plans around their eligibility for the PSLF Program. The Department's determinations quite obviously had an "immediate" and "significant" impact on their ability to plan their careers and finances, despite the fact that they have not had (and may never have) the opportunity to submit an application for loan forgiveness. To hold otherwise would be incompatible with the Court's obligation to apply the finality requirement in a "flexible" and "pragmatic" manner. *Ciba-Geigy,* 801 F.2d at 435 (quoting *Abbott Labs.*, 387 U.S. at 149–50).

Finally, Defendants contend that the Department's statements in the Federal Register during the PSLF negotiated rulemaking process demonstrate that the denial letters "fall well short of being the 'consummation' of the agency's decision-making process." Dfs.' MSJ Br. at 14. Of course, these statements are of quite limited value to the Court, insofar as they are not the "governing statutes and regulations [that] structure [an agency's] decisionmaking processes." *Soundboard*, 888 F.3d at 1267; *see also Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 539 (D.C. Cir. 1986) ("*Publication* in the Federal Register does *not* suggest that the matter published *was* meant to be a regulation."). Nonetheless, even on their own terms, they demonstrate nothing of the sort urged by Defendants.

Defendants largely rest their argument on part of the *proposed* rulemaking record. 73 Fed. Reg. at 37,705; AR 14. And admittedly, at that time the Department "considered . . . but decided not to adopt" the recommendation that it "provid[e] for annual borrower submission and Departmental review and retention of the form . . . that would be certified by the borrower's employer." 73 Fed. Reg. at 37,705; AR 14; *see also* Dfs.' MSJ Br. at 15; Oral Arg. Tr. at 20:4–21:17. But the problem for Defendants is that during the *final* rulemaking process, the Department largely reversed course. At that point, it decided to establish an annual employment-certification form, which led it to develop the ECF Process. 73 Fed. Reg. at 63,241–42; AR 45–46. More specifically, the Department stated that it would develop a form for borrowers that would "include an employer certification section and instructions regarding supporting documentation that the Department will need to determine the borrower's eligibility for the forgiveness benefit." 73 Fed. Reg. at 63,241–42; AR 45–46. Significantly, the Department represented that borrowers would be able to use the form to collect employment certifications at the close of the 120-month qualifying period, but also at *other intermittent times as well*. 73 Fed. Reg. at 63,242; AR 46. The Department did note that it "expect[ed] the borrower to collect and retain the necessary records that support the borrower's eligibility for this benefit." 73 Fed. Reg. at 63,242; AR 46. But in the end, the Department's statements in the Federal Register do not undermine the conclusion that the denial letters represented the consummation of the Department's process in determining whether the Individual Plaintiffs' employment—and loan payments made during that employment—qualified under the PSLF Program.

For the reasons described above, the Court concludes that the denial letters sent to the Individual Plaintiffs satisfy the first prong of the *Bennett* test.

### b.   Determination of Plaintiffs' Rights and Obligations

#### The Individual Plaintiffs

The second prong of the *Bennett* inquiry is satisfied if the agency action is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 177 (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).  In other words, the second prong focuses on "whether the result of that process is one that will directly affect the parties."  *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).

When the "definitiveness" of an agency decision satisfies the first *Bennett* prong, the D.C. Circuit has recognized that the same evidence may "also lead[] inexorably to the conclusion that [a plaintiff's] 'rights . . . have been determined.'"  *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016) (omission in original) (quoting *Bennett*, 520 U.S. at 178); *see also U.S. Army Corps of Eng'rs*, 136 S. Ct. at 1814 ("The definitive nature of [the agency action] also gives rise to direct and appreciable legal consequences, thereby satisfying the second prong of *Bennett*." (internal quotation marks omitted)).  And for reasons already explained, such is the case here for the Individual Plaintiffs, whose rights under the PSLF statute to have their loan payments count toward loan forgiveness were determined in the denial letters.  *See* 20 U.S.C. § 1087e(m).

Defendants contend that the denial letters "fall well short of determining rights or obligations" because the letters only provide "provisional guidance" to the Individual Plaintiffs. Dfs.' MSJ Br. at 17.  In support of their position, Defendants cite to the language contained in the denial letter to Quintero-Millan, addressed in the Court's analysis of *Bennett*'s first prong, stating that the Department will "only determine" whether the borrowers have "fulfilled all of the requirements to be eligible for PSLF" after submitting a final loan forgiveness application.  *Id.* at

17–18 (citing AR 195). And again, Defendants note that the letters state that the borrower's "employer does not appear to qualify for PSLF." *Id.* at 18. But for all the reasons already explained, the denial letters were not provisional. At a minimum, the letters determined the rights of the Individual Plaintiffs to have the payments at issue count toward the 120 such payments needed. Additionally, in the cases of Burkhart and Voigt, who as of May 2017 continued to work for employers that the Department concluded did not qualify as "public service organizations," the letters effectively determined their eligibility to participate in the PSLF Program unless they changed jobs.

### The ABA

Unlike the Individual Plaintiffs' denial letters, however, the Department's letters to the ABA are not actions by which a party's "rights or obligations have been determined" or from which "legal consequences will flow." *Bennett*, 520 U.S. at 178.

In its June 2016 letter, the Department informed the ABA that it had "determined that the ABA does not qualify as a public service organization for [. . .] PSLF purposes" because it failed to demonstrate that its "primary purpose" was to provide "public interest law services." AR 190–91. In December 2016, the Department confirmed that determination. AR 192–93. Though these letters appear similar to those sent to the Individual Plaintiffs, they cannot satisfy the second prong of the *Bennett* test.

Under the PSLF statute, the Department has an obligation to provide loan forgiveness only to eligible *borrowers*. *See* 20 U.S.C. 1087e(m). The system by which it does so requires that borrowers collect and submit ECFs covering 120 valid loan payments, which the Department approves or denies as they are received. Accordingly, the Department's letters to the ABA—which do not constitute a determination on the eligibility of payments made by a

particular *borrower*—cannot be said to determine rights or obligations under the statute. As an employer, the ABA has no such rights or obligations, since it has no possible claim to loan forgiveness. And indeed, there is no procedure set out in 34 C.F.R. § 685.219 or the Department's guidance by which an *employer* can seek to validate whether it meets the definition of a "public service organization" in a manner similar to the process available for borrowers to track the number of eligible payments they have completed. *See* 34 C.F.R. § 685.219; AR 168–80.

For the same reasons, legal consequences do not flow from the Department's letters to the ABA. When considering the issue of legal consequences, the D.C. Circuit has looked to "the actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Nat'l Min. Ass'n*, 758 F.3d at 252. "[I]f the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purpose of judicial review." *Nat'l Ass'n of Home Builders*, 415 F.3d at 15. Although the letters to the ABA describe separate eligibility determinations rendered by the Department, as well as the basis for those decisions, the letters themselves do not carry the same legal consequences for any particular borrower, like the letters sent to the Individual Plaintiffs. Nor do the letters carry legal consequences for the ABA. Because the ABA has no legal obligations or rights under the PSLF statute, the Department's letters cannot have changed them. And the ABA's extensive account of "serious recruiting and retention problems due to the revocation of its status as a PSLF-eligible employer" does not alter this conclusion. Pls.' Reply at 9. Practical effects alone, significant as they may be, do not meet the ABA's burden under *Bennett*'s second prong. *See Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 811 (D.C. Cir. 2006) ("The flaw in appellants' [finality] argument is that the 'consequences' to which they allude are practical, not

legal."). Therefore, these letters are not final agency actions and are unreviewable under the APA. For this reason, the Court will enter judgment for Defendants on Counts I, II, III, and IV of the ABA's claims.

* * *

For the foregoing reasons, the Court concludes that the Department's denial letters sent to the Individual Plaintiffs were final agency actions, and the letters it sent to the ABA were not. Consequently, the Court will proceed to consider the Individual Plaintiffs' claims that the Department's determinations reflected in those letters violated the APA.

### 3. The Individual Plaintiffs' APA Claims

#### a. Whether the Department Changed its Practices

The Individual Plaintiffs allege, in Count I, that Defendants violated the APA when the Department changed its practices "without notice or explanation," Pls.' MSJ Br. at 29, by adopting a set of new "interpretations of statutory and regulatory terms defining the types of employment that qualify for the PSLF program." Pls.' Reply at 8; *see also id.* at 30–31. The Department relied upon these new interpretations, the Individual Plaintiffs argue, when it issued the denial letters to them and reversed its earlier determinations that their employment with the ABA, AILA, and VVA qualified. Pls.' MSJ Br. at 29–33. In fact, the various APA claims they bring are *all* predicated on their contention that the Department changed its interpretation of the PSLF regulation in certain ways, thereby rendering their employment and related payments ineligible under the PSLF Program. For their part, Defendants deny that any change took place, maintaining that the Department's denial letters were only "individualized, non-final determinations" that should not be read as "the agency's generally applicable policy in administering the PSLF." Dfs.' MSJ Br. at 28–29. Therefore, the first step in evaluating the

Individual Plaintiffs' APA claims is determining whether the Department did in fact change its

practices by applying a new interpretation of the PSLF regulation to the Individual Plaintiffs.[6]

To determine whether an agency has changed its practices in the face of its insistence

"that nothing [has] changed," courts independently review the administrative record.  *Am. Wild*

*Horse Preservation Campaign v. Perdue*, 873 F.3d 914, 924–25 (D.C. Cir. 2017).  But the record

need not necessarily reflect formal documentation of a change for the Court to conclude that one

has occurred.  *Aracely*, 319 F. Supp. 3d at 141 (concluding upon review of the record that

"Plaintiffs' evidence of an unwritten . . . policy . . . outweigh[ed] Defendants' self-serving

declaration to the contrary.").  Indeed, another court in this district determined, over an agency's

objections, that an agency changed its practices even where the plaintiffs "failed to cite any

statute, regulation, policy memoranda, or any other document memorializing the [change] they

challenge."  *R.I.L—R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015).  Therefore, the Court

---

[6] Throughout the briefing, the parties reference two distinct sets of agency actions: (1) the issuance of the denial letters and (2) the alleged adoption of new standards by which the Department determined whether non-501(c)(3) not-for-profit organizations qualified as public service organizations under the PSLF Program.  *Compare* Pls.' MSJ Br. at 15-16 (arguing that the Department's "eligibility denials" are final agency actions) *with id.* at 25-26 (arguing that the standards reflect the Department's "changed interpretations" of the PSLF regulation).  However, the parties only address the finality of the denial letters, and not the finality of the Department's decision to adopt the purportedly-new standards on which the letters were based.  While Defendants argue that the denial letters, and other letters in response to ECF submissions, should not be considered final, they contend that the three contested standards reflect the Department's "consistent and unchanged" interpretation of the PSLF regulation.  Dfs.' MSJ Br. at 30.  And although Defendants suggested at oral argument, for the first time, that these standards may not reflect final agency action, that suggestion was made only in furtherance of their argument that the denial letters were not final.  *See* Oral Arg. Tr. at 27:15–28:16.  Therefore, for the same reasons that the denial letters are final—and in light of Defendants' position that the Department applied the standards at issue to determine that the Individual Plaintiffs' employment did not qualify under the PSLF Program, Dfs.' MSJ Br. at 27—the Court concludes that it may review the Department's adoption of the standards as final agency action, as well, *see Aracely*, 319 F. Supp. 3d at 139 (reviewing cases in which an unwritten agency policy, applied through individual determinations, is determined "to be judicially reviewable as a final action").

will independently review the evidence in the record to determine whether the Department in fact changed its practices by applying a new interpretation of the PSLF regulation. In doing so, the Court will also consider—for reasons explained in Section III—extra-record evidence submitted by Plaintiffs.

The Individual Plaintiffs allege that the Department changed its interpretation of the PSLF regulation by adopting new, heightened standards governing whether non-501(c)(3) not-for-profit organizations qualify as public service organizations for purposes of the PSLF Program.[7] They identify three newly-adopted standards the Court will refer to as the "Primary Purpose" standard, the "School-like Setting" standard, and the "Outright Provision of Services" standard. *See* Pls.' MSJ Br. at 31–33. The Court considers whether the evidence supports their claim that each reflects a change to how the Department interpreted and applied the PSLF regulation below.

The "Primary Purpose" Standard

The Individual Plaintiffs allege that, sometime between 2015 and 2016, the Department adopted the Primary Purpose standard as part of its determination as to whether non-501(c)(3) not-for-profit organizations that provide "public interest law services" qualify as "public service organizations" under the PSLF regulation. *Id.* at 31–32; *id.*, Ex. A ¶¶ 24, 31–36. Under this standard, for her loan payments to qualify, a borrower must demonstrate that the "primary purpose" of her non-501(c)(3) not-for-profit employer is to provide qualifying public services. *See id.*, Ex. A ¶ 31; AR 190–91. As Defendants' concede, the Department relied on this

---

[7] The Court notes that these standards appear to have no bearing on the eligibility of borrowers who are not employed at non-501(c)(3) not-for-profit organizations, such as Federal, State and local government employees, uniformed members of the U.S. Armed Forces or the National Guard, employees of 501(c)(3) not-for-profits, or those who are otherwise eligible for the PSLF Program. *See* 34 C.F.R. § 685.219(b); Oral Arg. Tr. at 24:2–10.

reasoning when it sent denial letters to ABA employees in 2016, Dfs.' MSJ Br. at 27, which includes the denial letters challenged by Quintero-Millan and Burkhart, *see* AR 214–15, 237–39. The Individual Plaintiffs contend that, by adopting the standard, the Department "reversed [its] past practice without notice or explanation." Pls.' MSJ Br. at 29. Defendants, by contrast, contend that the Department had *always* applied this reasoning in evaluating whether employment at particular organizations qualified for the PSLF Program, and that the letters approving ECFs submitted by Burkhart prior to his 2016 denial letter resulted from a "mistake" or "contractor's error." Dfs.' MSJ Br. at 9; Dfs.' Reply at 17–18.

The evidence supports the Individual Plaintiffs' claim that the Department changed how it interpreted and applied the PSLF regulation by adopting the Primary Purpose standard at some point before it began issuing denial letters to ABA employees like Quintero-Millan and Burkhart. The Department's handling of Burkhart's case is, at a minimum, consistent with such a change. As discussed above, despite the ABA's apparent failure to meet this standard, the Department approved his employment there on at least four occasions before reversing course. Pls.' MSJ Br., Ex. D ¶¶ 7–8. In addition, according to the ABA, several of its other employees received letters confirming that their employment there had qualified as well. *Id.*, Ex. A ¶ 22. But the record is also notable for what it lacks: any evidence as to whether the Department applied the Primary Purpose standard—or even sought information about any employer's primary purpose— prior to sending letters to the ABA's employees denying their eligibility in 2015.[8] *Id.*, Ex. A ¶ 24. The earliest specific reference to the Primary Purpose standard in the record appears to be

---

[8] At oral argument, the Court invited Defendants to point to any evidence in the record, or to submit additional evidence, showing that it had applied the Primary Purpose and School-like Setting standards prior to 2015 or 2014, respectively. Oral Arg. Tr. 49:25–51:17. Defendants did not do so.

in the Department's June 2016 letter to the ABA.  *See* AR 190–91 (describing how the Department had not received documentation demonstrating "that the primary purpose of the ABA is to provide 'public interest law services'").

The extra-record evidence—which consists of internal Department and FedLoan Servicing email traffic—addresses this point directly.  And it demonstrates that the Department changed how it interpreted the PSLF regulation by adopting the Primary Purpose standard and applying it to borrowers generally.  In February 2017, a FedLoan Servicing employee emailed Foss to express "concern[]" as to whether his recent instruction that an "organization's 'primary purpose' [had] to be to provide one of the qualifying services" was "directly conflicting with how we have been evaluating certain [public health] organizations" based on guidance Foss had offered several years earlier.[9]  Pls.' Supp. Br., Ex. B.  The employee referenced a prior case in which FedLoan Servicing and the Department, in applying that guidance, had jointly agreed to approve an employer even though its primary purpose did *not* involve a qualifying service.  *Id.* In response, Foss instructed the employee to "do a retraction" of the employer's eligibility status. *Id.* Foss then requested that the employee "comb through those organizations that [they had] approved" and "provide [the Department] a list, like [the employee had] done for public education and *public interest legal services*." *Id.* (emphasis added).

Not long afterward, in June 2017, that same FedLoan Servicing employee described to a co-worker how, a "few months ago," the Department "introduced a new concept in the review, 'primary purpose.'"  Pls.' 2d Supp. Br., Ex. E.  As a result, the Department was reevaluating ECFs that FedLoan Servicing had previously approved based on earlier Department guidance.

---

[9] In 2014, Foss had sent Voigt the Department's explanation as to why it changed its position on whether her employment at AILA qualified for the PSLF Program.  *See* AR 334.

*Id.* In fact, the employee recounted, FedLoan Servicing had provided the Department a spreadsheet of organizations that it had approved pursuant to the prior guidance, but the Department "still ha[d] not provided follow-up" on it. *Id.* The next month, FedLoan Servicing updated its "Employment Certification Form Manual" to reflect that "[a]s of February 23, 2017, [the Department] advised [that] a private not-for-profit (non-501(c)(3)) organization should be evaluated based on [its] 'primary purpose.'" *Id.*, Ex. C.

This extra-record evidence shows that the Department's adoption of the Primary Purpose standard represented a change to how it interpreted and applied the PSLF regulation. To be sure, this evidence postdates the denial letters sent to Quintero-Millan and Burkhart, and some of it appears to concern the standard's application to public health organizations specifically. Nonetheless, it shows a Department employee referencing an *earlier* implementation of the Primary Purpose standard with regard to "public interest legal services" employers. Pls.' Supp. Br., Ex. B. That implementation apparently required the Department to request a list of such employers that had been approved beforehand so that they could be reconsidered. *Id.* And it does not appear that the manual used by FedLoan Servicing to apply the PSLF regulation included the Primary Purpose standard until as late as 2017. Pls.' 2d Supp. Br., Ex. E. Indeed, following the commencement of this action, the Department added the Primary Purpose standard to its on-line description of the PSLF Program's qualifications. *See* Pls.' Reply at 18 n.6; *Federal Student Aid: Public Service Loan Forgiveness*, https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service#qualify (last visited Feb. 21, 2019). This evidence simply does not comport with Defendants' contention that the prior letters sent to Burkhart and other ABA employees confirming that their employment qualified for the PSLF Program were

the result of individualized mistakes or errors in applying a standard that had always been in place.

In total, this evidence makes abundantly clear that, at some point before sending the denial letters to Quintero-Millan and Burkhart in 2016, the Department changed its practices by adopting the Primary Purpose standard. Through this change, the Department modified the requirements by which a non-501(c)(3) not-for-profit organization may qualify as a public service organization by adding the condition that organizations that serve multiple purposes must show that their *primary* one is to provide a qualifying public service. Regardless of whether adding such a requirement was "a reasonable decision" and "consistent with the intent of the statute," as Defendants contend, Dfs.' MSJ Br. at 27, the Department's adoption of the Primary Purpose standard constituted a change to how it interpreted and applied the PSLF regulation. And as explained in more detail below, that change, at the least, required it to meet the minimum requirements for reasoned decisionmaking under the APA. *See Ark Initiative v. Tidwell*, 816 F.3d 119, 128 (D.C. Cir. 2016) ("Where an agency changes a policy or practice, it 'is obligated to supply a reasoned analysis for the change.'" (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

### The "School-Like Setting" Standard

According to the Individual Plaintiffs, the Department also changed its practices by adopting the School-like Setting standard, and then relied upon that standard in sending Voigt her denial letter in December 2014. Pls.' MSJ Br. at 32; AR 335–36. Under the School-like Setting standard, a public education organization under consideration for PSLF eligibility is required to demonstrate that it provides qualifying services "in a school or a school-like setting." AR 336. Over two years beforehand, when the Department determined that Voigt's employer,

AILA, qualified as "an eligible public service organization" under 34 C.F.R. § 685.219(b), AR 337, the Individual Plaintiffs contend this standard "did not exist,"[10] Pls.' MSJ Br. at 32. As with the Primary Purpose standard, the Department does not contest that the School-like Setting standard provided the underlying rationale for its ultimate determination that Voigt's employment at AILA did not qualify as an organization that provides public education services. Dfs.' MSJ Br. at 27. But the Department submits that it has "consistently applied" its interpretation of "public education" services since the initial promulgation of the PSLF regulation. Dfs.' Reply at 15–16.

The evidence, however, shows that the Department changed how it interpreted and applied the PSLF regulation by adopting this new standard. Once again, there is evidence in the record consistent with such a change—for example, at first, the Department told Voigt that her employment at AILA "[met] the definition of public service organization" under the regulation, only to then reverse course, AR 337—but it does not directly address the point. And, as it did with the Primary Purpose standard, the Department added the School-like Setting standard to an updated version of its ECF instruction sheet following the commencement of this suit. Pls.' MSJ Br. at 10–11 n.4; *see* Public Service Loan Forgiveness (PSLF): Employment Certification Form at 3, https://studentaid.ed.gov/sa/sites/default/files/public-service-employment-certification-form.pdf (last visited Feb. 21, 2019). However, the record does not contain any evidence, one way or the other, as to whether the Department applied the School-like Setting standard to any

---

[10] In its June 2012 confirmation that Voigt's employment was eligible, the Department did not specify whether AILA qualified as an organization that provided "public interest law services" or "public education services." *See* AR 337. Defendants contend that, at that time, the Department had mistakenly determined that AILA qualified as "a not-for-profit organization that provided public interest law services." Dfs.' MSJ Br. at 10. Plaintiffs do not challenge the Department's determination that AILA was not a qualifying public service organization on that basis. *See* Pls.' Reply at 30.

particular borrower's employment, or even inquired into the setting in which an organization provided education services, before its December 2014 denial letter to Voigt. *See supra* note 8.

The extra-record evidence, however, decimates Defendants' position in Voigt's case. In August 2014, Foss emailed a FedLoan Servicing employee, excitedly announcing that Department had finally "settled . . . on a definition of public education!" Pls.' Supp. Br., Ex. C. Foss then went on to describe how the new definition would require a qualifying organization to "provide educational enrichment or support directly to students or their families in a school or a school-like setting." *Id.* This email, unrebutted by the Department, is all-but-conclusive evidence that it introduced the School-like Setting standard over two years *after* it informed Voigt in June 2012 that her employment at AILA qualified, and a few months *before* it reversed itself in her case. And even accepting Defendants' contention—for which there is no contemporaneous evidence—that the Department did not assess Voigt's employment as potentially providing public education services (as opposed to public interest law services) prior to issuing its June 2012 letter, the extra-record evidence shows that the Department adopted this new standard years after its promulgation of the PSLF regulation. *See id.* Moreover, as noted above, the extra-record evidence indicates that, after it adopted this new standard, the Department was forced to retract letters that had previously confirmed borrowers' eligibility based on their employment with organizations that provided "*public education* and public interest legal services." *Id.*, Ex. B (emphasis added).

Based on this evidence, the Court concludes that the Department changed how it interpreted and applied the PSLF regulation by adopting the School-like Setting standard, and then applied that new standard to Voigt's case. Through this change, the Department added the condition that qualifying organizations must provide public education services directly to

students or their families in a school or a school-like setting.[11]  That requirement appears

nowhere in the text of the regulation itself, which does not define the term "public education."

*See* 34 C.F.R. § 685.219(b).  And while such a reading of the regulation may be reasonable, as

explained in more detail below, the Department was obligated, at a minimum, to meet the APA's

requirements for reasoned decisionmaking when it changed its practices to adopt the standard.

<u>The "Outright Provision of Services" Standard</u>

Finally, the Individual Plaintiffs argue that the Department changed its practices by

adopting the Outright Provision of Services standard when considering whether an organization

provides a "public service for individuals with disabilities and the elderly" under 34 C.F.R. §

685.219(b).  Pls.' MSJ Br. at 32–33.  Under this purported standard, an organization that

"[p]rovides . . . public services," 34 C.F.R. § 685.219(b), must "provide the services *outright*,"

Pls.' MSJ Br. at 33 (emphasis added) (quoting AR 331).  The Department relied on this new

rationale, according to the Individual Plaintiffs, when it issued the April 2016 denial letter to

Rudert on the basis that VVA only "facilitate[d] the provision of disability-related services" and

did not "provide the services outright."[12]  *Id.* at 32–33 (quoting AR 331).

Unlike the Individual Plaintiffs' claims about the Primary Purpose and School-like

Setting standards, however, their claim that the Outright Provision of Services standard

---

[11] The Court notes that the extra-record evidence, by reflecting the adoption and application of both the Primary Purpose standard and the School-like Setting standard to borrowers in an across-the-board fashion, further underscores the finality of the denial letters sent to Quintero-Millan, Burkhart, and Voigt.  *See supra* Section II(B)(2).

[12] The Department appears to have also determined that VVA did not meet the regulatory requirements to provide "public interest law services" because it was not "funded in whole or in part by a local, State, Federal, or Tribal government" as set out in 34 C.F.R. § 685.219(b).  *See* AR 330–31.  Rudert does not challenge the Department's determination as to this alternative basis for eligibility.

represented a change to the Department's interpretation of the PSLF regulation is unsupported by the evidence. The only reference to this alleged standard in the record is in an August 2016 letter from the Department to a congresswoman who had inquired about Rudert's denial. AR 330–31. And unlike with the other standards, there is no extra-record evidence that shows a discrete shift how the Department's interpreted and applied the PSLF regulation. Indeed, the purported Outright Provision of Services standard appears only to reflect a straightforward application of the regulation to Rudert's case, rather than a new interpretation, given that its plain language mandates that a qualifying organization "[p]rovide[]" particular public services. 34 C.F.R. § 685.219(b). Without additional supporting evidence, the Individual Plaintiffs' argument that Rudert's denial represents a change in the Department's practices following the promulgation of the PSLF regulation is unpersuasive. At bottom, the Court cannot conclude, "as a factual matter," that the Department "changed its past position . . . ." *United Student Aid Funds, Inc. v. King*, 200 F. Supp. 3d 163, 170 (D.D.C. 2016).

### b.    The Individual Plaintiffs' Procedural APA Claim (Count I)

In Count I, the Individual Plaintiffs assert, among other things, that because the Department changed its interpretations of the PSLF regulation by adopting the Primary Purpose and School-like Setting standards, it must—but did not—adhere to certain minimal procedural requirements under the APA. The Court agrees. The Department argues, for various reasons, that the Primary Purpose and School-like Setting standards are "reasonable" and "consistent with the intent of the statute." Dfs.' MSJ Br. at 25–28. Maybe so. But its refusal to concede that it

changed its practices when it adopted the standards effectively precluded it from satisfying the APA's basic procedural requirements when it did so.[13]

The APA requires that a court "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Under this standard, courts do not "substitute [their] judgment for that of the agency," but review the action to determine whether the agency "examine[d] the relevant data and articulat[d] a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 719 (D.C. Cir. 2016) (quoting *State Farm Mut. Auto. Ins.*, 463 U.S. at 43). "One of the core tenets of reasoned decisionmaking . . . is that 'an agency changing its course . . . is obligated to supply a reasoned analysis for the change." *Jicarilla Apache Nation v. U.S. Dep't. of the Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010) (second omission in original) (quoting *State Farm Mut. Auto Ins.*, 463 U.S. at 42); *see Judulang v. Holder*, 565 U.S. 42, 45 (2011) ("When an administrative agency sets policy, it must provide a reasoned explanation for its action."). And although "an agency 'is free to alter its past rulings and practices even in an adjudicatory setting,'" *Dilmon v.*

---

[13] Although the parties agree that the Primary Purpose and School-like Setting standards represent the Department's interpretation of its own regulations, they do not squarely address in their briefing the type of agency action by which the Department adopted the standards. *See Nat'l Min. Ass'n*, 758 F.3d at 251 ("The APA divides agency action . . . into three boxes: legislative rules, interpretive rules, and general statements of policy."). At times, Plaintiffs suggest that the Department's adoption of the standards constituted a legislative rulemaking, which would require the Department to undergo formal notice-and-comment procedures. Pls.' MSJ Br. at 11, 30 n.15; *see* 5 U.S.C. § 553. Defendants, by contrast, skirt the issue by taking the position that the Department applied the standards consistently since the promulgation of the PSLF regulation and therefore did not engage in any agency action subject to the APA. Dfs.' MSJ Br. at 30. Given the Court's conclusion that the Department engaged in arbitrary and capricious action by departing from its past practices without meeting the basic procedural requirements of the APA—and ruling in favor of Quintero-Millan, Burkhart, and Voigt on that basis—it need not determine the specific type of agency action the Department undertook in adopting the Primary Purpose and School-like Setting standards.

*Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1090 (D.C. Cir. 2009) (quoting *Airmark Corp. v. FAA*, 758 F.2d 685, 691–92 (D.C. Cir. 1985), it is required "to 'display awareness that it *is* changing position' and [may not] 'depart from a prior policy *sub silentio* or simply disregard rules that are still on the books,'" *id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)); *see also Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970))). Further, when an agency changes a policy, "serious reliance interests must be taken into account." *Mingo Logan Coal*, 829 F.3d at 719 (quoting *Fox Television Stations*, 556 U.S. at 515). Consequently, "where the agency has failed to provide even [a] minimal level of analysis, its action is arbitrary and capricious and . . . cannot carry the force of law." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016)

Therefore, by adopting new standards that modified the criteria by which borrowers' employment qualified for the PSLF Program, the Department was required to "display awareness" of its changing position, provide reasoned analysis for that decision, and take into account any serious reliance interests affected. *Id.* As explained in more detail below, the Department failed to satisfy these requirements as to Quintero-Millan, Burkhart, and Voigt.

There is no indication in the record that, prior to issuing the denial letters to Quintero-Millan and Burkhart, the Department acknowledged that it changed its practices by adopting the Primary Purpose standard, provided a reasoned analysis for such a change, or demonstrated that it had considered the substantial reliance interests at stake. Nor did the Department meet these minimum requirements in the denial letters themselves. Indeed, the Department did not even

reference the Primary Purpose standard as the basis for its decision in the denial letters issued to Quintero-Millan and Burkhart, although it now asserts that it relied on it when evaluating the eligibility of ABA employees at that time. *See* Dfs.' MSJ Br. at 27. And to this day, the Department has not acknowledged that it changed its practices in this regard. Therefore, Quintero-Millan and Burkhart were provided none of the process required by the APA, and the Department concedes as much. *See id.* at 30 (arguing that no process was required because the Department's interpretation of the PSLF regulation remained unchanged). Accordingly, the Department acted arbitrarily and capriciously when it adopted the Primary Purpose standard without the minimum requirements of reasoned decisionmaking and determined that Quintero-Millan and Burkhart's employment did not qualify on that basis. Summary judgment is thus warranted in their favor, and against Defendants, on Count I.

Likewise, the Department failed to provide Voigt with the required minimum process under the APA when it denied that her employment qualified for the PSLF program by applying the School-like Setting standard. In her December 2014 denial letter, the Department mentioned the relevant standard by informing her that it "considers 'public education services' to be services that provide educational enrichment or support directly to students or their families in a school or school-like setting." AR 336. But the Department failed to acknowledge that it had adopted this standard just a few months beforehand, failed to explain its reasoning for the change to its practices, and failed to show that it had considered the relevant reliance interests.[14] And

---

[14] Even if the Department had not yet settled on an interpretation of the term "public education services" before it adopted the School-like Setting standard in 2014, its application of that standard from that point forward would still be arbitrary and capricious for lack of any reasoned explanation. *See Kirwa v. U.S. Dep't of Defense*, 285 F. Supp. 3d 21, 39 (D.D.C. 2017) ("Whether [an agency] is taking an initial agency action or changing a longstanding policy, or practice, it must still provide a reasoned explanation for its action.").

there is no indication in the record that it met these minimum procedural requirements through any other means, such as a public notice to borrowers, prior to issuing the denial letter to Voigt. Therefore, the Department acted arbitrarily and capriciously when it adopted the School-like Setting standard without meeting the requirements of reasoned decisionmaking and, on that basis, determined that Voigt's employment did not qualify. For this reason, summary judgment is warranted in Voigt's favor, and against Defendants, on Count I as well.

In contrast, because the record does not support the conclusion that the Department changed its interpretation of the PSLF regulation by adopting the purported Outright Provision of Services standard, the Court cannot conclude that it violated the APA's procedural requirements when it determined that Rudert's employment at the VVA did not qualify. *See Select Specialty Hosp.-Bloomington, Inc. v. Sebelius*, 774 F. Supp. 2d 332, 344–45 (D.D.C. 2011) (denying similar APA procedural claims because the plaintiffs "d[id] not show that the [agency] actually changed [its] interpretation of the regulation"). Although the Individual Plaintiffs contend that the Department "articulate[d] a new standard" when it issued its denial letter to Rudert, Pls.' MSJ Br. at 33, they fail to provide clear evidence that any such change occurred. Accordingly, Rudert has not carried his burden of persuading the Court that the Department's application of the Outright Provision of Services standard required it to satisfy any procedural requirements at all. Therefore, summary judgment must be granted for Defendants, and against Rudert, on Count I.

Quintero-Millan, Burkhart, and Voigt also allege that the Department's new standards violated the APA because the Department failed to satisfy the APA's notice requirements, "failed to comport with the PSLF program's authorizing statute . . . [and] applied regulatory changes in an impermissibly retroactive manner." Pls.' MSJ Br. at 1. Additionally, they allege

that the Department's reliance on those standards violated "due process under the Fifth Amendment." *Id.* However, because the Court's conclusion that the Department violated the APA's most basic procedural requirements disposes of their motions for summary judgment, the Court need not reach these additional claims. *See Spirit of the Sage Council v. Norton*, 294 F. Supp. 2d 67, 90 (D.D.C. 2003) ("Given that it appears clear that the [agency rule] was adopted 'without observance of the procedure required by law,' 5 U.S.C. § 706(2)(D), the Court need not reach the question of whether the [rule] is, as a substantive matter, 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"), *vacated in part*, 411 F.3d 225 (D.C. Cir. 2005).

### c.  Rudert's Remaining APA Claims (Counts II–IV)

Having determined that Defendants are entitled to summary judgment on Rudert's procedural APA claim, the Court turns to his remaining APA claims—namely, that the Department failed to follow APA notice requirements when it adopted the purported Outright Provision of Services standard, that it unlawfully imposed retroactive consequences in applying the standard to Rudert, and that the standard is contrary to the PSLF statute and regulation. The Court concludes that Defendants are entitled to summary judgment on each of these claims.[15]

First, Defendants are entitled to summary judgment on Rudert's claim in Count II that the Department failed to follow APA notice requirements. The statute requires that agencies publish in the federal register all "substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency." 5 U.S.C. § 552(a)(1)(D). The requirement to publish in advance

---

[15] In Plaintiffs' reply brief, Rudert also argues—for the first time—that the Department erred when it concluded, as a factual matter, that VVA did not *directly* provide a "public service for individuals with disabilities." Pls.' Reply at 28–29. The Court considers this argument forfeited. *See Abdullah v. Obama*, 753 F.3d 193, 199 (D.C. Cir. 2014).

applies only to "substantive rules" and not to "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." *Stuart-James Co. v. SEC*, 857 F.2d 796, 800 (D.C. Cir. 1988). Because the Court cannot conclude on this record that Rudert's denial letter was based on any sort of newly-adopted rule or policy change—much less a new substantive rule—Defendants are entitled to summary judgment.

Second, Defendants are also entitled to summary judgment on Rudert's claim in Count III that the Department imposed retroactive consequences on him by relying on a new standard to revoke the eligibility status of his employment and past loan payments. "[A] retroactive rule forbidden by the APA is one which 'alter[s] the *past* legal consequences of past actions.'" *Celtronix Telemetry, Inc. v. FCC*, 272 F.3d 585, 588 (D.C. Cir. 2001) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 219 (1988) (Scalia, J. concurring)) (alterations in original). "To determine whether a rule is impermissibly retroactive, [the Court must] first look to see whether it affects a substantive change from the agency's prior regulation or practice." *Ne. Hosp Corp. v. Sebelius*, 657 F.3d 1, 14 (D.C. Cir. 2011) (quoting *Nat'l Min. Ass'n v. Dep't of Labor*, 292 F.3d 849, 860 (D.C. Cir. 2002)). And again, as set forth in Section II(B)(3)(a), the record does not support Rudert's claim that the Department applied or relied upon a new rule or interpretation when it determined that his employment at VVA did not qualify under the PSLF Program. Moreover, although the Department previously confirmed to Rudert that his employment was eligible, an agency's attempt to correct a "mistake in interpreting and applying its own recently promulgated regulations" does not necessarily trigger the APA's prohibition on retroactive rules. *Alvarado Parkway Inst., Inc. v. Mendez*, 789 F. Supp. 1190, 1201 (D.D.C. 1992). Therefore, the Court cannot conclude that the Department took impermissible retroactive action.

Third, Defendants are entitled to summary judgment on Rudert's claim in Count IV that the purported Outright Provision of Services standard is substantively inconsistent with the plain language of the statute and the PSLF regulation. Even assuming for the sake of argument that this standard reflected an interpretation of the regulation, it is not plainly inconsistent with it. Indeed, "as a general rule, [the Court] defers to the [an agency's interpretation] 'unless [its] interpretation is plainly erroneous or inconsistent with the regulation.'" *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 613 (2013) (citations omitted) (quoting *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 208 (2011)). Here, the PSLF regulation requires that a qualifying organization "provide[] . . . public services." 34 C.F.R. § 685.219(b). Although, as Rudert points out, the regulation does not contain the term "outright," Pls.' MSJ Br. at 33, the inclusion of that qualifier does not suggest that the Department's purported interpretation is "plainly erroneous" or that the Department acted outside the scope of the regulation. And even without applying a deferential standard, such an interpretation would be reasonable on its face. Further, Plaintiffs concede that they do not challenge the regulation as inconsistent with the statute, *see* Pls.' Reply at 18 n.5, and so the alleged interpretation would be consistent with the statute for the same reasons. And in any event, to repeat, Rudert has not demonstrated that the Department's determination of his employment eligibility reflected a new interpretation of the PSLF regulation at all, rather than simply an application of the regulation to his individual case. Therefore, the Court must enter summary judgment for Defendants on Rudert's substantive APA claim.

### 4. The ABA's and Rudert's Fifth Amendment Due Process Claims (Count V)

In Count V, the ABA and Rudert assert that the Department violated their due process rights under the Fifth Amendment when it "retroactively revoked [the ABA's] status as a PSLF-eligible employer, thus compromising its ability to attract and retain employees" and "purged

[Rudert's] prior years of certified PSLF-work and loan payments without notice." Compl. ¶¶ 219–20. To bring a claim under the Due Process Clause, a plaintiff must show (1) "deprivation of a protected liberty or property interest," (2) "by the government," (3) "without the process that is 'due' under the Fifth Amendment." *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015).

Therefore, the Court first determines if either the ABA or Rudert has a property interest "that triggers Fifth Amendment due process protection." *C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 200 (D.C. Cir. 2002) (quoting *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 598 (D.C. Cir. 1993)). "[T]he existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (quoting *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998)). To demonstrate a protected property interest in a benefit, a plaintiff "clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

The Court agrees with Defendants that the ABA has no protected property interest in its status as a qualifying organization that provides public interest law services. The ABA's qualification under the PSLF regulation is understandably important to the ABA because of the second-order effects of that determination on its employees and recruitment. But as explained in Section II(B)(2)(b), the PSLF statute does not create any property rights *for the ABA*. The PSLF statute grants an entitlement to debt relief for borrowers determined to be eligible, but it creates no legitimate claim of entitlement to a property interest protected by the Fifth Amendment on the

ABA's part.  *See* 20 U.S.C. § 1087e(m).  Accordingly, Defendants are entitled to summary judgment on the ABA's claim under the Fifth Amendment's Due Process Clause.

In addition, the statute only creates rights for those borrowers who are entitled to benefits under the PSLF Program.  As discussed above, the Department determined that Rudert's employment with VVA did not qualify because VVA does not provide public services for individuals with disabilities outright, in light of the PSLF regulation's requirement that the organization "provide[] . . . public services."  34 C.F.R. § 685.219(b).  Therefore, Rudert has not demonstrated that he is entitled to a property interest protected by the Fifth Amendment.  For this reason, Defendants are entitled to summary judgment on this claim as well.

### III.   Plaintiffs' Motions for Extra-Record Review

Plaintiffs have also filed two motions for extra-record review.  Pls.' Supp. Br.; Pls.' 2d Supp. Br.  For the reasons explained below, and as reflected in the analysis in Section II(B)(3)(a), the Court will grant both motions.

#### A.   Legal Standard

It is "black-letter administrative law that in an APA case, a reviewing court 'should have before it neither more nor less information than did the agency when it made its decision.'"  *Hill Dermaceuticals*, 709 F.3d at 47 (quoting *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984)).  And the agency enjoys a "presumption" that it has properly compiled the entire record of materials that it considered, either directly or indirectly, in making its decision.  *See, e.g.*, *Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188, 196 (D.D.C. 2006).  The D.C. Circuit has observed that this rule against extra-record evidence "exerts its maximum force when the substantive soundness of the agency's decision is under scrutiny."  *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989).  On the other hand, when "the procedural validity of the

[agency's] action also remains in serious question[,] . . . it may sometimes be appropriate to resort to extra-record information to enable judicial review to become effective." *Id.*

Although the exceptions to this rule "are quite narrow and rarely invoked," *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014), in *Esch* the D.C. Circuit set forth eight circumstances in which a court might consider extra-record evidence. Since then, it has appeared to substantially narrow the circumstances under which extra record review is appropriate, as Judge Mehta explained in detail in *United Student Aid Funds v. DeVos*, 237 F. Supp. 3d 1, 4 (D.D.C. 2017) (collecting cases). The Court need not review all those cases here. It suffices to say that "although the number of situations in which extra-record evidence may be considered has dwindled over time, the D.C. Circuit has consistently stated that where the district court cannot determine from the administrative record whether the agency complied with its procedural obligations, the district court may consider extra-record evidence." *Id.*

**B. Analysis**

During and after briefing on the parties' motions for summary judgment, Plaintiffs twice moved the Court to allow for extra-record review of documents that they allege "provide irrefutable evidence of the Department's changed interpretations of the relevant statutory and regulatory terms at issue in this case."[16] Pls.' 2d Supp. Br., Mot. Plaintiffs urge the Court to make an exception to the "default rule" in APA cases here, because they "challenge gross procedural deficiencies" in that the current record precludes judicial review as to whether the

---

[16] Plaintiffs assert that they obtained the documents submitted as extra-record evidence through two public records requests made pursuant to the Pennsylvania Right-to-Know Act, 65 P.S. § 67.101, *et seq.*, and directed to the Pennsylvania Higher Education Assistance Agency, which does business as FedLoan Servicing, as well as through a FOIA request by Voigt litigated in *Voigt v. U.S. Dep't of Educ.*, No. 17-790 (D.D.C.) (Complaint filed Apr. 28, 2017). Pls.' Supp. Br., Ex. A ¶¶ 3–5; Pls.' 2d Supp. Br., Ex. A ¶¶ 6–9. Defendants do not contest the authenticity of these documents.

Department adopted the Primary Purpose and School-like Setting standards as new interpretations of the PSLF regulation following its promulgation.  Pls.' Supp. Br. at 3–4.

The Court agrees that this is the rare APA case in which consideration of Plaintiffs' proffered extra-record evidence is permissible.  First, it is the procedural—as opposed to substantive—validity of the Department's actions that are primarily at issue, so the usual rule prohibiting extra-record evidence applies with less potency.  As the D.C. Circuit recently reaffirmed, "district courts may consult extra-record evidence when 'the procedural validity of the [agency's] action . . . remains in serious question.'"  *Hill Dermaceuticals*, 709 F.3d at 47 (alterations in original) (quoting *Esch*, 876 F.2d at 991).

Second, the "administrative record itself is so deficient as to preclude effective review" as to whether the Department changed its interpretation of the PSLF regulation when it adopted the Primary Purpose and School-like Setting standards.  *Id.*  Defendants argue that this lack of evidence in the record supports their contention that no such change occurred.  *See, e.g.*, Dfs.' MSJ Br. at 24.  But there is also no evidence supporting their own assertion that the Department's practices have "been consistent and unchanged" all along, *id.* at 30, even after the Court requested Defendants to direct it to any such evidence.  *See supra* note 8.  Certainly, the Department's reversals of its decisions relating to the Individual Plaintiffs and the ABA's other employees are consistent with such a change.  But these handful of individual cases hardly provide an adequate record for the Court to evaluate Plaintiffs' claims.  The extra-record evidence offered by Plaintiffs is the only direct evidence relevant to the question of whether the Department changed its interpretations of the PSLF regulation in the ways claimed by Plaintiffs.  For all the reasons explained in Section II(B)(3)(a), the extra-record evidence at issue here

"shed[s] light on an issue not addressed by the administrative record itself," and may therefore be considered. *Nat'l Min. Ass'n v. Jackson*, 856 F. Supp. 2d 150, 158 (D.D.C. 2012).

In *United Student Aid Funds,* Judge Mehta recently reached the same conclusion in a highly similar circumstance. In that case, the administrative record was "silent" on "two factual issues central to resolving whether [a] Dear Colleague Letter announced a 'new rule' in a manner that satisfie[d] the APA." 237 F. Supp. 3d 1, 5 (D.D.C. 2017). Like here, the question in that case was whether an agency action "constituted [a] type of change in position" that triggered procedural obligations under the APA. *Id.* In that case, the court held that the relevant lack of evidence in the record on the agency's alleged change was a "'gross procedural deficiency' that preclude[d] effective review of [the plaintiff's] APA claims and thus warrant[ed] admission of extra-record evidence." *Id.* at 6 (quoting *Hill Dermaceuticals*, 709 F.3d at 47). Such is the case here.

Defendants advance several arguments urging the Court not to consider the extra-record evidence, but none of them are persuasive.

First, Defendants argue that the extra-record evidence should not be considered because the documents at issue were not "before the agency" at the time of the decisions at issue. Defs.' Opp. to Supp. at 4. But extra-record review of documents not before the agency is precisely what the exceptions to the general rule in APA cases permit. *See, e.g.*, *Univ. of Colo. Health at Mem'l Hosp. v. Burwell*, 151 F. Supp. 3d 1, 13 (D.D.C. 2015) ("[A] party may seek to supplement the record with 'extra-judicial evidence that was not initially before the agency' but [which] the party 'believes should nonetheless be included in the administrative record.'" (alteration in original) (quoting *WildEarth Guardians v. Salazar*, 670 F. Supp. 2d 1, 5 n.4 (D.D.C. 2009))).

Second, Defendants assert that the extra-record evidence is irrelevant, for a variety of reasons—either because it postdates the agency actions at issue, or it relates to FedLoan Servicing (as opposed to Department) employees, or it concerns individual borrowers or employers not at issue in this case. Defs.' Opp. to 2d Supp. at 4. None of these arguments withstand scrutiny. The extra-record evidence is highly probative as to whether the Department changed its interpretation of the PSLF regulation by introducing the Primary Purpose and School-like Setting standards. The evidence concerning Voigt's claim makes the point the most clearly. As described in Section II(B)(3)(a), one email depicts a Department employee announcing in August 2014 that the Department had "settled" on a "definition of public education" that required such services to be provided "in a school or school-like setting." *See* Pls.' Supp. Br., Ex. C. He did so only after the Department told Voigt in June 2012 that her employment at AILA qualified, but well before the Department sent her a denial letter in December 2014. And although the email does not concern Voigt's case specifically, that is part of the point—it demonstrates that the Department adopted a new standard for "public education services" and then applied that standard across the board, to the borrower reflected in the email as well as others, like Voigt.

As for Quintero-Millan and Burkhart, the extra-record evidence does indeed postdate their denial letters. And to be sure, in some cases the evidence reflects communications from FedLoan Servicing employees, as opposed to the Department's—a distinction that in this context hardly makes a difference given the integrated way in which ECFs are processed. *See* AR 143, 160–61 (guidance instructing that all ECF submissions for non-501(c)(3) not-for-profit organizations be escalated to the Department). But in any event, the most important of these emails reflects a *Department employee* discussing an *earlier* effort to implement the Primary

Purpose standard to "public interest legal services" organizations. Pls.' Supp. Br., Ex. B. And at that time, the Department apparently tasked FedLoan Servicing employees with compiling a list of ECFs that had to be reevaluated based on its introduction of this new standard. *Id.* This is highly relevant evidence—notwithstanding the date of the communication itself, and that it concerned processing of another borrower's ECF—that the Department had previously introduced the Primary Purpose standard as a general, broadly-applicable interpretation of the PSLF regulation that required a reevaluation of prior determinations, contrary to its position here.

Accordingly, the Court will grant Plaintiffs' Motion to Allow for Extra-Record Review and Supplemental Motion to Allow for Extra-Record Review, and, as reflected above, has considered the extra-record evidence submitted by Plaintiffs in its evaluation of their claims.

## IV.    Remedy

Under 5 U.S.C. § 706(2), courts must "hold unlawful and set aside agency action" that it determines to be arbitrary and capricious. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that rules are vacated—not that their application to individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1313 (D.C. Cir. 1991).

Although the Court has wide discretion to apply an appropriate remedy in APA cases, it sees no reason not to apply this usual remedy to the Primary Purpose and School-like Setting standards. For their part, Defendants do not provide any particular reason why the Court should not vacate these standards until the procedural deficiencies identified above are corrected. Therefore, the Court will vacate the Primary Purpose and School-like Setting standards, as well as remand the denial letters sent to Quintero-Millan, AR 237–39, Burkhart, AR 214–15, and Voigt, AR 335–36, to the Department for further consideration consistent with this Opinion.

## V.    Conclusion

For all of the above reasons, the Court will, in a separate Order, grant in part and deny in part Plaintiffs' Motion for Summary Judgment, ECF No. 17; grant in part and deny in part Defendants' Cross-Motion for Summary Judgment, ECF No. 22; and grant Plaintiffs' Motion to Allow for Extra-Record Review, ECF No. 24, and Supplemental Motion to Allow for Extra-Record Review, ECF No. 35.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: February 22, 2019